**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROSS WEINTRAUB  Derivatively on Behalf of CHARLES RIVER LABORATORIES INTERNATIONAL, INC., <br><br> Plaintiff, <br> v. <br><br> JAMES C. FOSTER, DAVID R. SMITH, FLAVIA PEASE, NANCY C. ANDREWS, ROBERT J. BERTOLINI, DEBORAH T. KOCHEVAR, GEORGE LLADO, SR., MARTIN W. MACKAY, GEORGE E. MASSARO, CRAIG B. THOMPSON, RICHARD F. WALLMAN, VIRGINIA M. WILSON, STEPHEN D. CHUBB, GEORGE M. MILNE, JR. and C. RICHARD REESE, <br><br> Individual Defendants, <br> -and- <br><br> CHARLES RIVER LABORATORIES INTERNATIONAL, INC., a Delaware corporation, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No.  24-cv-909-GBW <br><br> JURY TRIAL DEMANDED <br><br> **FILED UNDER SEAL** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Ross Weintraub ("**Plaintiff**"), by his attorneys, derivatively and on behalf of Nominal Defendant Charles River Laboratories International, Inc. ("**Charles River**" or the "**Company**") submits this Verified Stockholder Derivative Complaint against individual defendants James C. Foster ("Foster"), David R. Smith, Flavia Pease, Nancy C. Andrews, Robert J. Bertolini, Deborah T. Kochevar, George Llado, Sr., Martin W. Mackay, George E. Massaro, Craig B. Thompson, Richard F. Wallman, Virginia M. Wilson, Stephen D. Chubb, George M. Milne, Jr., and C. Richard Reese for breaches of their fiduciary duties as directors and/or officers

1

of Charles River, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Securities

Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff alleges the following upon information and

belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal

knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which

included, among other things, documents and other information obtained from the Company

pursuant to 8 *Del. C.* §220 ("Section 220"); a review of public filings with the U.S. Securities and

Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly

available sources. Plaintiff believes that substantial evidentiary support will exist for the

allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal

Defendant Charles River against members of its board of directors (the "**Board**") and members of

upper management. The wrongdoing alleged herein has caused substantial damage to Charles

River's reputation, goodwill, and standing in the business community and has exposed Charles

River to substantial potential liability for violations of federal securities laws and the costs

associated with defending itself. The violations of the law outlined herein have damaged Charles

River in the form of, among other things, millions of dollars in losses to the Company's market

capitalization. This action seeks to remedy wrongdoing committed by Charles River's directors

and officers from May 7, 2020, through the present (the "**Relevant Period**").

2.      Charles River is a full-service, non-clinical global drug development company that

assists drug developers in the discovery and development of new products, and purports to be the

largest provider of outsourced drug discovery, non-clinical development, and regulated safety

testing services worldwide. Among other services, Charles River sells small and large animals

(animal models) to drug developers for use in animal safety studies. Separately, the Company uses

these animals in its drug safety assessment studies that its customers outsource to Charles River. Charles River's "Safety Assessment" business is part of the Company's Discovery and Safety Assessment segment ("**DSA**"), reportedly its largest source of revenue.

3. The Company has three reporting segments: Research Models and Services ("RMS"); DSA and Manufacturing Solutions. The DSA segment accounts for approximately 60% of the Company's total revenue and offers, among other things, safety assessment studies required for regulatory submission of therapeutic solutions.

4. Under the U.S. Food and Drug Administration ("**FDA**") regulations, safety assessment studies on animals are required to demonstrate safety before a drug can be tested in humans. Key animal models used in the Company's Safety Assessment studies are non-human primates ("**NHPs**"), a group of animals, like monkeys or apes, that are biologically similar to humans. For biologic drugs, like monoclonal antibodies, NHPs are the only animals approved for preclinical safety studies. Indeed, as Defendant Foster stated during the Relevant Period, "biologic drugs cannot be approved for commercial use without NHPs" and "you don't do work in large molecule drug development without nonhuman primates. End of sentence, full stop." A particular specifies of NHP called macaca fascicularis, also known as the long-tailed macaque, the crab-eating macaque, or the cynomolgus monkey ("**long-tailed macaque**"), is the NHP used most frequently in preclinical safety studies for biologic drugs.

5. There are no domestic breeding sources for long-tailed macaques and nearly all are imported into the U.S. A single Safety Assessment study could employ the use of dozens of long-tailed macaques. Charles River does not breed NHPs and the Company relies on external suppliers to obtain NHPs. According to U.S. Department of Agriculture ("**USDA**") reports, Charles River is the largest commercial user of NHPs in the United States.  Accordingly, before and during the

Relevant Period, a steady and timely supply of long-tailed macaques was material to Charles River's Safety Assessment business and the Company's revenue and operating margin.

6.      The long-tailed macaque is a protected species under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("**CITES**" or "**CITES Convention**"), which is enforced in the U.S. under the Endangered Species Act ("**ESA**"). The U.S. Fish and Wildlife Service ("**USFWS**"), an agency within the U.S. Department of the Interior, is designated by Congress under the ESA as the CITES enforcement authority within the United States.  In addition, the Lacey Act combats trafficking of illegally taken wildlife.[1] Because of the legal protections accorded to long-tailed macaques under CITES and that nearly all long-tailed macaques are imported into the United States, Charles River and its suppliers of long-tailed macaques were subject to U.S. and international law governing the commercial trade of long-tailed macaques.

7.      Before the Relevant Period, Charles River imported over 60% of its long-tailed macaques from China. Indeed, in 2019, the Company acquired a majority equity interest in a breeding farm in China to ensure a timely and steady supply of long-tailed macaques for the Company's Safety Assessment business.

8.      That changed as a result of the COVID-19 pandemic. In early 2020, China imposed export restrictions applicable to many animal species including long-tailed macaques and Chinese exports of long-tailed macaques to the United States declined to zero. At or around the same time, the demand for the Company's Safety Assessment services and long-tailed macaques increased

---

[1] The ESA provides "[i]t is unlawful for any person ... to engage in any trade in any specimens [of wildlife] contrary to the provisions of . . . [CITES] or to possess any specimens [of wildlife] traded contrary to the provisions of ... [CITES]." 16 U.S.C. § 1538(c). The Lacey Act makes it unlawful for any person to import, export, transport, sell, receive, acquire, or purchase any wildlife taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the U.S. 16 U.S.C. § 3372(a)(l).

due to an increase in COVID-19 related drug research, an increase in the number of biologic drugs in development generally, and because many of Charles River's customers were unable to access or use their facilities due to COVID-19 related restrictions.

9.     To continue to meet its customers' demand for Safety Assessment services and in light of the loss of China as a supply source of long-tailed macaques to the United States, Defendant Foster reassured investors that the Company had alternative suppliers of long-tailed macaques, stating shortly before the beginning of the Relevant Period that "we've made arrangements with other supply sources around the world. So we won't be interrupted there to any material degree."

10.    Throughout the Relevant Period, Defendants represented that the Company had a timely and steady supply of long-tailed macaques to meet client demand and that the Company and its suppliers complied with the requirements of CITES and U.S. law. For example, Defendants represented that to avoid disruption to the supply of "large research models," which include long-tailed macaques, the Company took "steps to find alternative supply channels and lock in supply with preferred sources through multi-year and/or minimum commitment contracts to ensure a steady and timely supply" and that "[w]e proactively engaged with our suppliers beginning in January 2020 to limit any potential disruption to our supply chain."

11.    And when asked during Charles River's conference calls with analysts and investors throughout the Relevant Period about the Company's supply of long-tailed macaques in light of the increased demand for the Company's Safety Assessment services, COVID-related disruptions to the Company's supply chain, and a scarcity of long-tailed macaques and increased prices, Defendant Foster represented, for example:

-     we work really hard to have multiply supply sources from multiply geographies and multiple suppliers within those geographies and

have close working relationships with them to ensure exceptional veterinary oversight and supply numbers . . . [a]nd we feel really good about our supply situation . . . we're doing very well in resourcing in [N]HPs. (Oct. 29, 2020 conference call;

- we've done an exceptional job in adding, ensuring, tightening up, expanding our supply sources so that have multiple supply sources for multiple countries such that we can support the demand, which is quite significant. . . . (Feb. 16, 2021 conference call); and

- we work really hard at making sure we have sufficient supply of all of our animal models, particularly some of the larger models. And we've had to identify and validate multiple new sources of supply of multiple countries to accommodate just the increase in demand and the pace of demand and just to ensure that the supply is there. It's an ongoing complex challenge, one that I think we're managing well. (Nov. 3, 2021 conference call).

12.     Unknown to investors, while Defendants represented that Charles River took steps "to find alternative supply channels" and was "doing very well resourcing NHPs," to meet customer demand for its Safety Assessment services and to secure a timely and steady supply of long-tailed macaques, Charles River engaged non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques, including wild-caught long-tailed macaques that were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers,  Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; 2) that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations; and 3) that the Company's supply chain of long-tailed macaques would be materially interrupted thereby reducing the Company's revenue and operating margin from its Safety Assessment studies.

13.     With Chinese suppliers out of the international market, in 2020 Cambodian suppliers increased exports of long-tailed macaques to the U.S. by up to 86% over 2019, with

similar increases in 2021 and 2022 compared to 2019, causing Cambodian-sourced animals to replace China as a source for over 60% of Charles River's supply of long-tailed macaques in less than one year. In 2019, Cambodia reportedly produced for export 13,922 (CITES data) to 14,931 (UN Comtrade data) long-tailed macaques, with 10,902 to 11,351 exported to the U.S. In 2020, Cambodia reportedly produced for export between 24,500 (CITES data) to 28,295 (UN Comtrade data) long-tailed macaques, with 19,035 to 20,277 exported to the U.S.

14.     However, the rapid increase in production and export of long-tailed macaques from Cambodia in response to the increased demand at or around the start of the Relevant Period could not have been achieved through captive, legal breeding alone. The gestation period for long-tailed macaques is roughly six months and provided a pregnancy results in a live birth, a long-tailed macaques pregnancy typically results in one offspring. Long-tailed macaques are not usually exported for medical research until they are at least two years old. Thus, a minimum period of 30 months from the onset of pregnancy to the animals being ready for shipment is needed to produce an offspring ready for export. Cambodia's scaled up production and export of long-tailed macaques in 2020 in response to the COVID-19 pandemic could not have been available for export until at least late 2022 at the earliest. Indeed, after the Relevant Period, Charles River's Executive Vice President and Chief Operating Officer Birgit Girshick ("**Girshick**") confirmed that "none of the nonhuman primate farms can scale really, really quickly. So that – as you said, the gestation doesn't allow that. The animals have to be a certain age."

15.     As one analyst framed the issue during the Relevant Period: "Cambodia increased from ~11.4k US imports in 2019 to 18.6l U.S. imports in 2021 . . . How did Cambodia ramp to that? . . . the answer may be . . . illegally." (Jefferies Feb 23, 2023 research report). According to another report, from a supply chain due diligence perspective, the rapid increase in Cambodian

supply was a red flag: "given the gestation period and fecundity of primates, the rapid increase in supply originating in Cambodia simply was not possible without including (illegally-sourced) wild animals into the mix." (June 13, 2023 UBS research analyst report).

16.     By no later than the start of the Relevant Period, Charles River engaged suppliers that were under criminal investigation for sourcing long-tailed macaques from the wild (not captive or purpose-bred) in Southeast Asia, specifically Cambodia. Charles River's suppliers included companies that Defendant Foster described during the Relevant Period as brokers that Charles River had "historically" used "that get animals from wherever . . . We prefer not to use them. Reputationally, I just don't think they're the best possible people to use. And I don't actually think they care where the animals come from or what the background is . . . ."

17.     With a steady and timely supply of long-tailed macaques from Charles Rivers' suppliers, the Company's Safety Assessment business boomed and the Company reported increased revenue and operating margin in the Company's DSA segment. As a result, Charles River's stock price increased from $156.56 per share at the start of the Relevant Period, to a relevant period high of $460.21 per share on September 24, 2021.

18.     Certain of the Individual Defendants took full advantage of the artificially inflated stock price collectively, selling over $67 million in Charles River stock (net proceeds), and gifted shares of Charles River stock valued at over $14 million to family members and others. As shown below, Defendants Foster and Smith sold inflated Charles River stock at unusual and suspicious times:



19.     One such Charles River supplier of Cambodian long-tailed macaques during the Relevant Period is a Company called Inotiv, Inc. ("**Inotiv**"), which supplied Charles River Cambodian long-tailed macaques through Inotiv's subsidiaries Orient BioResource Center, Inc. ("**Orient BioResource**") and Envigo Global Services, Inc. ("**Envigo**"). After Charles River, Inotiv is the second largest importer of long-tailed macaques into the U.S.

20.     During the Relevant Period, facts emerged that put the Individual Defendants on notice that both Envigo and Orient BioResource were under criminal investigation for supplying illegally sourced long-tailed macaques. On August 4, 2021, the U.S. Department of Justice ("**DOJ**") disclosed through a press release that an executive of Orient BioResource, Gary Tucker, pled guilty to lying to USFWS agents about his involvement in the procurement and importation to the U.S. of long-tailed macaques in connection with what was described publicly by the DOJ as the USFWS's ongoing "criminal investigation into international trafficking of primates into the United States."

9

21.      Just days later, on August 6, 2021, Defendant Foster sold 10,000 shares of Charles River common stock for proceeds of over $4 million, and he gifted 2,500 shares with a value of over $1 million.

22.       On August 9, 2021, Defendant Smith sold 1,750 shares of Charles River common stock for proceeds of approximately $712,954.

23.      On October 14, 2021, the DOJ issued a press release concerning the sentencing of Mr. Tucker in connection with "a criminal investigation of international trafficking of primates into the United States."

24.      Days later on October, 26, 2021, Defendant Foster gifted $6.3 million in Charles River stock to his children.

25.      On February 16, 2022, Inotiv disclosed that Envigo received a grand jury subpoena in June 2021 issued by the DOJ related to the importation into the U.S. "of live non-human primates originating from or transiting through China, Cambodia and/or Vietnam . . . ."

26.      On February 22-23, 2022, Defendant Foster exercised 37,732 options to acquire shares of Charles River common stock and sold 100% of them for net proceeds of over $6.1 million.

27.      On May 16, 2022, Inotiv disclosed that in addition to Envigo, Orient BioResource received a grand jury subpoena in June 202,1 issued by the DOJ related to the importation into the U.S. "of live non-human primates originating from or transiting through China, Cambodia and/or Vietnam . . . ." By May 2022, Envigo and Orient BioResource had supplied Charles River with at least 1,990 long-tailed macaques since the start of the Relevant Period, including at least 1,247 expressly identified as Cambodia long-tailed macaques according to government records obtained through freedom of information requests.

10

28.     Inotiv's subsidiaries had obtained approximately 60% of its Cambodia long-tailed macaques from the Vanny Group, a network of related companies based in Hong Kong, China, Cambodia and Vietnam, which include Vanny Bio-Research Center ("**Vanny HK**"), KHI Vioservices Ltd. ("**KHI**"), Vanny Bio-Research (Cambodia) Corp. Ltd. ("**Vanny Cambodia**"), and Nafovanny (based in Vietnam). Another broker which supplied Charles River with Cambodian long-tailed macaques is Worldwide Primates, Inc. based in Miami ("**WW Primates**"). WW Primates supplied Charles River with at least 956 long-tailed macaques in 2022.

29.     Furthermore, Charles River obtained long-tailed macaques directly from suppliers in Southeast Asia. A Company called K.F. (Cambodia) Ltd. ("**KF Cambodia**"), directly supplied Cambodian long-tailed macaques to Charles River during the Relevant Period. Another director supplier of long-tailed macaques to Charles River was Nafovanny, which, as noted above, is part of the Vanny Group. During the Relevant Period, Nafovanny directly supplied Charles River with live animals, extracts and specimens sourced from Vietnam.

30.     By no later than September 2022, the USFWS's ongoing investigation, which had focused on at least Inotiv's subsidiaries and the Vanny Group, had turned its focus on the conduct of Charles River and its direct supplier, KF Cambodia. On or around September 21, 2022, the USFWS refused to clear a shipment of 360 long-tailed macaques with a reported value of $3.24 million from KF Cambodia to Charles River at Dulles International Airport in Virginia in connection with the USFWS's criminal ongoing investigation. During the Relevant Period, the USFWS blocked Charles River's import of 1,269 Cambodian long-tailed macaques with a value of at least $17 - $20 million directly from KF Cambodia. To this day, Charles River has not been permitted by the USFWS to use these animals for Safety Assessment studies.

31.     On November 16, 2022, a DOJ indictment was unsealed in which two Cambodian

11

government officials responsible for implementation and oversight of CITES, and six executives

of the Vanny Group, including executives at Vanny HK and Vanny Cambodia, were charged with

taking part in a scheme to smuggle long-tailed macaques into the U.S. (the "**Indictment**"). The

Indictment identified two "unnamed" co-conspirators, which are Inotiv or its subsidiaries Orient

BioResource and Envigo, in Alice, Texas and WW Primates in Miami, Florida – both suppliers to

Charles River during the Relevant Period.

32.     According to a DOJ press release, dated November 16, 2022:

> Members of an international primate smuggling ring have been
> charged with multiple felonies for their role in bringing wild long-
> tailed macaques into the United States.
>
> The eight-count indictment charges two officially of the Cambodian
> Forestry Administration, Ministry of Agriculture, Forestry and
> Fisheries; the owner/founder of a major primate supply organization
> and its general manager; and four of its employees with smuggling
> and conspiracy to violate the Lacy Act and the Endangered Species
> Act. . . .
>
> "Wild populations of long-tailed macaques, as well as the health and
> well-being of the American public, are put at risk when these
> animals are removed from their natural habitat and illegally sold in
> the United States and elsewhere," said Edward Grace, U.S. Fish and
> Wildlife Service Assistant Director, Officer of Law Enforcement.
> "The Service spearheaded this complex, multi-year investigation
> that exposes the large-scale illegal laundering of wild long-tailed
> macaques for use in biomedical and pharmaceutical research. We
> led multiple U.S. federal agencies to provide a one-government
> approach to ender the wholesale poaching of long tailed macaques
> from the wild and shut down this criminal organization."

33.     The Indictment alleges, in part, the following:

> -       The defendants and their unindicted co-conspirators
> **engaged with customers in the United States[2]** and elsewhere and
> entered into contractual agreements to sell and export purportedly
> captive-bred macaques from Cambodia to the United States.
>
> -       The defendants and their unindicted co-conspirators

---

[2] All emphasis is added unless otherwise denoted.

> established a logistics system to allow buyers to inspect
> macaques prior to sale, including through the use of
> veterinarians, to test the monkeys for disqualifying conditions,
> quarantine shipments prior to export, and arrange the necessary
> ground and air transportation to facilitate the transactions.
>
> -       The defendants and their unindicted co-conspirators
> arranged to illegally purchase additional long-tailed macaques from
> black market suppliers in Cambodia and Thailand to make up for
> the lack of supply of suitable monkeys at their purported
> breeding operations. . . .
>
> -       The defendants and their unindicted co-conspirators
> delivered and caused the delivery of wild-caught long-tailed
> macaques to various international airports in the United States,
> accompanied by Cambodian CITES Permits and FWS From 3-177s
> falsely identifying the monkeys as captive bred.

34.     On November 16, 2022, Charles River shares declined from a closing price on

November 15, 2022 of $250.07 per share, a decline of $10.68 per share or approximately 4.3% on

heavier than usual volume.

35.     On November 17, 2022, Inotiv filed a report with the SEC on Form 8-K that stated

that it had previously disclosed that grand jury subpoenas were issued to Envigo and Orient Bio

Resource in June 2021, and that further confirmed Vanny Cambodia was Inotiv's principal

supplier of long-tailed macaques:

> On November 16, 2022, Inotiv, Inc. (the "Company") became aware
> that the U.S. Attorney's Office for the Southern District of Florida
> ("USAO-SDFL") has criminally charged employees of the
> Company's principal supplier of non-human primates ("NHPs"),
> along with two Cambodian officials, with conspiring to illegally
> import NHPs into the United States from December 2017 through
> January 2022 and in connection with seven specific imports between
> July 2018 and December 2021.

36.     Despite obtaining a material number of long-tailed macaques from Inotiv or its

subsidiaries Envigo or Orient Bio Resource, WW Primates, and Vanny Group companies

Nafovanny and KHI since the start of the Relevant Period, Charles River waited two weeks to

13

publicly comment on the Indictment.

37. On November 30, 2022, despite knowing, or disregarding with a high degree of recklessness: 1) that Charles River's suppliers of long-tailed macaques included Inotiv subsidiaries Envigo and Orient BioResource, and WW Primates, the unnamed conspirators in the Indictment; 2) that starting in September 2022, the USFWS blocked the Company's importation of Cambodian long-tailed macaques directly from KF Cambodia; and 3) that Charles River had directly obtained live long-tailed macaques and animal extracts and specimens from Nafovanny and KHI, both Vanny Group companies, the Company and Defendant Foster made the following materially false and misleading statements in a report filed with the SEC on Form 8-K and during a Charles River investor conference:

    a. Charles River was not named or referenced in the DOJ proceedings, and **the Company does not have any direct supply contracts with the indicted Cambodia supplier**.

    b. **Charles River has global supply sources, including other sources in Cambodia,** which is the primary country of origin of NHP imports to the United States and to Charles River. However, in light of the indictment, and subsequent statements made by the Cambodia government, Charles River is operating under expectation that for some time period supply of Cambodia-sourced NHPs will be difficult to obtain in the United States . . . .

                             \* \* \*

[Defendant Foster:] there were also a couple of Cambodian officials that were named in this indictment, and **we don't have any direct contacts with that supplier either**. . . .

We're **working really hard to mitigate any potential adverse impact with other supply sources with out current supplier in Cambodia** . . . .

So really complex [] situation at the moment, more complex by the fact that **one of the big suppliers from Cambodia, who's not a supplier of ours is unable to ship. So that's going to hurt some folks**. . . .

[the] **[f]acility that we work with in Cambodia is extremely high quality one, all the ones that we work with are high quality ones**. .

. .

**We have a really good supplier over there and a good relationship and a big supply contract** . . .

The sort of allegations on the supplier in Cambodia was sort of dramatic. **It's not a supplier of ours. It's not directed to us**. . . .

38.     On this news, Charles River's shares declined from $239.50 per share at the close of trading on November 29, 2022, to trade as low as $210.36 per share during trading on November 30, 2022, or a decline by over 12%, and closed at $228.57 per share on November 30, 2022, a decline of $10.93 per share or 4.6%, on heavier than usual trading volume due to the disclosure that Charles River's supply chain of long-tailed macaques was overly concentrated in Cambodia, that the supply chain from Cambodia was negatively impacted, and that for some time period its supply of Cambodia-sourced NHPs will be difficult to obtain in the U.S.

39.     However, while Defendants Charles River and Foster represented that Charles River does not have any "direct supply contracts" or "contracts" with the indicted supplier, Vanny Cambodia, this representation was materially false and misleading because Charles River and Foster failed to disclose that Charles River had obtained long-tailed macaques indirectly from Vanny Cambodia through the unnamed co-conspirators in the Indictment, Envigo or Orient BioResource, and WW Primates.

40.     Moreover, Defendant Foster's representations were false and misleading because he created the false impression that Charles River had no direct supply contracts with Vanny Cambodia or its executives. In truth, Charles River had a direct relationship with Vanny Group companies Nafovanny and KHI from whom, according to USFWS records, Charles River directly imported a material number of live long-tailed macaques as well as extracts and specimen during the Relevant Period.

41.     Defendant Foster's representations that "one of the big suppliers from Cambodia,

15

who's not a supplier of ours is unable to ship. So that's going to hurt some folks" created the false impression that Charles River's supplier, KF Cambodia, with which the Company purportedly had a "big supply contract," was able to ship animals to the U.S. and was not implicated in the DOJ and USFWS investigation that led to the Indictment. However, Defendant Foster failed to disclose that, starting the September 2022, the USFWS had already refused or rejected Charles River's import of at least 360 live long-tailed macaques from KF Cambodia, and that KF Cambodia, like Vanny, was "unable to ship" to the U.S. due to the ongoing criminal investigation.

42.     Indeed, Defendant Foster's statements that "It's not a supplier of ours. It's not directed to us" and that Vanny Cambodia's inability to ship is "going to hurt some folks" created the false impression among investors and analysts that Charles River's conduct and its direct supplier KF Cambodia were not implicated in the ongoing criminal investigation that led to the Indictment. For example, on December 15, 2022, UBS published a research report concerning Charles River that stated "[w]e think CRL would be in a positive position relative to peers in case of a[n] export ban to Cambodia, due to its alternatives sources and could potentially leverage further price increases due to shortages."

43.     On January 12, 2023, Jefferies published a report concerning its shifting view on Charles River that stated:

> Our previous NHP supply chain work concluded CRL's NHP tox business was in a privileged position and controlled its own destiny. The indictment of Vanny and other Cambodian officials alters that viewpoint as we estimate ~24% of CRL's U.S. NHP usage relies on Vanny supply (likely through an indirect relationship), a perspective underappreciated by investors. Immediately finding new supply in an undersupplied market seems unlikely, putting at risk a high growth contributor. . . .

44.     On January 12, 2023, in response to this news, Charles River's stock declined from

a close on January 11, 2023 of $246.94 per share to close at $232.25 per share, a decline of $14.69 per share, or approximately 6% on heavier than usual trading volume.

45.     On January 24, 2023, the USFWS blocked additional shipments to Charles River from KF Cambodia, and by this date the USFWS had refused or rejected Charles River's importation of 1,269 long-tailed macaques with a value of approximately $17-20 million directly from KF Cambodia.

46.     On February 15, 2023, Defendant Foster, while knowing material, nonpublic negative information concerning the Company, executed another suspiciously timed sale of Charles River stock, reaping over $5 million just days before the Company's stock price crashed. On February 16, 2023, Ms. Girshick, the Company's Chief Operating Officer who oversaw the RMS segment, which acquired long-tailed macaques, and Shannon M. Parisotto ("**Parisotto**"), Executive VP Discovery and Safety Assessment, who oversaw the Company's Safety Assessment studies for which long-tailed macaques were essential, sold Charles River stock for net proceeds of $464,875 and $661,247, respectively.

47.     On February 22, 2023, before the market opened, Charles River revealed that it had received a subpoena from the DOJ relating to an ongoing investigation in conjunction with the USFWS into the supply chain and illegal importation of NHPs for research. The Company noted that it was voluntarily suspending shipments of primates from Cambodia, which would negatively impact its earnings for the year and would reduce revenue growth by 200 basis points to 400 basis points, which based on Charles River's 2022 reported revenue, was a reduction in revenue growth of approximately $80-160 million for the Company's Safety Assessment business. Charles River disclosed that DOJ and USFWS commenced an investigation concerning non-human primates and voluntary suspended the receipt of NHPs from Cambodia:

On February 16, 2023, we were informed by the U.S Department of Justice (DOJ) that in conjunction with the U.S. Fish and Wildlife Service (USFWS), it had commenced an investigation **into our conduct** regarding several shipments of non-human primates from Cambodia. On February 17, 2023 we received a grand jury subpoena requesting certain documents related to such investigation. We are aware of a parallel civil investigation being undertaken by the DOJ and USFWS. . . .

**We have voluntarily suspended future shipments of non-human primates from Cambodia until such time that we and USFWS can agree upon and implement additional procedures to reasonably ensure that non-human primates imported to the United States from Cambodia are purpose-bred.**

48.     The Company further disclosed information concerning the shipments of 1,269 long-tailed macaques from KF Cambodia that the USFWS blocked starting in September 2022:

While these discussions with USFWS are ongoing, we have also agreed to continue to care for the Cambodia-sourced non-human primates from certain recent shipments that are now in the United States. The carrying value of the inventory related to these shipments is approximately $20 million. . . .

49.     On this news, Charles River's stock price fell an additional 10%, or $24.51, to close at $219.09 per share on February 22, 2023, on unusually heavy trading volume.

50.     On March 15, 2023 when, after the opening of trading, Barclays hosted a conference call for analysts and investors in which Defendant Foster participated on behalf of Charles River. During the conference call, Defendant Foster admitted that Charles River used non-preferred suppliers of long-tailed macaques from Cambodia:

**Defendant Foster:** So there are no U.S. breeding sources. There are a couple of companies that sort of brokers that get animals from wherever. **We have used those folks to some extent historically.** I'm trying to be careful picking my words here. **We prefer not to use them. Reputationally, I just don't think they're the best possible people to use. And I don't actually think they care where the animals come from or what the background is** and they've been kind of inappropriate with pricing. So there are probably – people say there are, I assume they're telling the truth.

18

> There are probably animals in country brought in from the outside, including it could be from Cambodia. It could be from the source that DOJ is looking at. I don't know that. We're just not using them, number one. Number two, I don't think it's large numbers of the [animals]. Number three, I don't know how sustainable that is. . .

51.     On March 15, 2023, Charles River's stock declined from a closing price on March 14, 2023 of $205.02 per share to close at $194.90 per share, a decline of $10.12 per share or approximately 5% on heavier than usual trading volume.

52.     Since at least May 2022, the Company has been under investigation by the SEC. On May 16, 2023, the Company received an inquiry from the Enforcement Division of the SEC requesting it provide information "primarily related to the sourcing of non-human primates in Asia." Relatedly, on May 23, 2023, Inotiv received a request from the SEC seeking documents and information regarding Inotiv, Envigo, and Orient Bio Resource's "importation of NHPs from Asia, including information relating to whether their importation practices complied with the U.S. Foreign Corrupt Practices Act."

53.     In connection with the meeting of CITES's Animal Committee on June 19-23, 2023, the U.S. government indicated that there was new information concerning Cambodian long tailed macaques and indicated that "urgent action may be needed concerning problems relating to the implementation of provisions under the Convention for captive production of specimens."

54.     Shortly after the disclosure of the heightened scrutiny including criminal and civil investigations into Charles Rivers and its suppliers' conduct, Defendant Foster stated "we're quite confident from what we know that our supplier—he has [been] purpose breading these animals according to all of our expectations, and we can demonstrate that . . . . we're confident that **we can prove it and demonstrate it scientifically without a shadow of a doubt** . . . ."

55.     However, to date, rather than demonstrate Charles River's long-tailed macaques

imported to the U.S. from Cambodia were captive or purpose-bred, Charles River shifted Safety Assessment studies to its facilities outside of the U.S. to circumvent further U.S. government scrutiny of its long-tailed macaque supply chain.

56.     As of June 17, 2024, Charles River's stock price has not recovered, closing at $208.41 per share.

57.     Throughout the Relevant Period, the Individual Defendants breach their fiduciary duties to Charles River by personally making and/or causing Charles River to issue materially false and misleading statements, as well as failing to disclose material adverse facts about the Company's business, operations, and prospects, including that: (1) Charles River had engaged in illegal activity with respect to its importation of NHPs for research; (2) as a result, Charles River was at a heightened risk of criminal and regulatory investigation by, *inter alia*, the DOJ; and (3) as a result, Charles River would be forced to suspend shipments of primates from Cambodia. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

58.     Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this action, Charles River will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

59.     As detailed herein, and as alleged in the ongoing federal securities class action pending in the District of Massachusetts styled *State Teachers Retirement System of Ohio v. Charles River Laboratories International, Inc., et al.*, Case No. 1:23-cv-11132-DJC, (the "**Securities Class Action**"), Charles River's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts about the

Company's importation of NHPs and subjecting the Company to investigation by the DOJ.

## JURISDICTION AND VENUE

60.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

61.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

62.     The court has personal jurisdiction over each defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

63.     Venue is proper in this District because the Company is incorporated in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

## THE PARTIES

**Plaintiff**

64.     Plaintiff is and has continuously been a stockholder of Charles River during the wrongdoing complained of herein.

**Nominal Defendant**

65.     Defendant Charles River is a Delaware corporation with its principal executive offices located at 251 Ballardvale Street, Wilmington, Massachusetts 01887. Charles River's

shares trade on the New York Stock Exchange ("**NYSE**") under the ticker symbol "CRL."

### **Individual Defendants**

66.    Defendant James C. Foster ("**Foster**") served as the Company's President since 1991, Chief Executive Officer ("**CEO**") since 1992, and Chair since 2000. He has served as a director since 1989. He initially joined the Company as General Counsel in 1976. He is also a member of the Responsible Animal Use Committee ("**Animal Committee**"), and the Strategic Planning and Capital Allocation Committee ("**Planning Committee**"). According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Foster was reported to receive $14,096,924 in total compensation for his role in the Company. For the 2022 fiscal year, he was reported to receive $13,447,872 in total compensation. For the 2021 fiscal year, he was reported to receive $13,705,581 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2020 fiscal year, he was reported to receive $13,483,411 in total compensation. During the Relevant Period, Defendant Foster sold over $68 million worth of Charles River stock on the basis of adverse, material non-public information ("**MNPI**").

67.    Defendant David R. Smith ("**Smith**") served as the Company's Chief Financial Officer ("**CFO**") from August 2015 until May 2022. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, Defendant Smith was reported to receive $2,172,415 in total compensation for his role in the Company. For the 2021 fiscal year, he was reported to receive $3,611,028 in total compensation. For the 2020 fiscal year, he was reported to receive $3,113,563 in total compensation. During the Relevant Period, Defendant Smith sold over $12 million worth of Charles River stock on the basis of adverse MNPI.

68.    Defendant Flavia Pease ("**Pease**") served as the Company's CFO since May 2022. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023

fiscal year, Defendant Pease was reported to receive $3,811,326 in total compensation for her role in the Company. For the 2022 fiscal year, she was reported to receive $4,484,150 in total compensation.

69.    Defendant Nancy C. Andrews ("**Andrews**") served as a Company director since 2020. Defendant Andrews is the Chair of the Science and Technology Committee ("Science Committee") and is a member of the Corporate Governance and Nominating Committee ("Governance Committee") and the Animal Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Andrews was reported to receive $339,773 in total compensation for her role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, she was reported to receive $337,426 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, she was reported to receive $303,139 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, she was reported to receive $339,121 in total compensation.

70.    Defendant Robert J. Bertolini ("**Bertolini**") served as a Company director since 2011. Defendant Bertolini is Chair of the Planning Committee and is a member of the Audit Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Bertolini was reported to receive $346,023 in total compensation for his role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, he was reported to receive $343,676 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, he was reported to receive $328,139 in total compensation.

According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, he was reported to receive $328,447 in total compensation.

71.     Defendant Deborah T. Kochevar ("**Kochevar**") served as a Company director since 2008. Defendant Kochevar is Chair of the Governance Committee and is a member of the Science Committee and Animal Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Kochevar was reported to receive $339,773 in total compensation for her role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, she was reported to receive $333,676 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, she was reported to receive $318,139 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, she was reported to receive $318,447 in total compensation. During the Relevant Period, Defendant Kochevar sold approximately $1.9 million worth of Charles River stock on the basis of adverse MNPI.

72.     Defendant George Llado, Sr. ("**Llado**") served as a Company director since 2020. Defendant Llado is a member of the Audit Committee, Governance Committee, and Science Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Llado was reported to receive $324,773 in total compensation for his role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, he was reported to receive $318,676 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, he was reported to receive $303,139 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020

fiscal year, he was reported to receive $154,565 in total compensation.

73.    Defendant Martin W. Mackay ("**Mackay**") served as a Company director since 2017. Defendant Mackay is Chair of the Animal Committee and is a member of the Finance Committee and Science Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Mackay was reported to receive $336,023 in total compensation for his role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, he was reported to receive $329,772 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, he was reported to receive $318,139 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, he was reported to receive $318,447 in total compensation.

74.    Defendant George E. Massaro ("**Massaro**") served as a Company director since 2003. Defendant Massaro is a member of the Audit Committee and a member of the Compensation Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Massaro was reported to receive $371,023 in total compensation for his role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, he was reported to receive $368,676 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, he was reported to receive $313,139 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, he was reported to receive $328,447 in total compensation. During the Relevant Period, Defendant Massaro sold over $2.8 million worth of Charles River stock on the basis of adverse MNPI.

75.     Defendant Craig B. Thompson ("**Thompson**") served as a Company director since 2022. Defendant Thompson is a member of the Animal Committee, Planning Committee, and Science Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Thompson was reported to receive $437,783 in total compensation for his role as a director.

76.     Defendant Richard F. Wallman ("**Wallman**") served as a Company director since 2011. Defendant Wallman is Chair of the Finance Committee and is a member of the Compensation Committee and Planning Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Wallman was reported to receive $339,773 in total compensation for his role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, he was reported to receive $333,676 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, he was reported to receive $318,139 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, he was reported to receive $318,447 in total compensation. During the Relevant Period, Defendant Wallman sold over $2.1 million worth of Charles River stock on the basis of adverse MNPI.

77.     Defendant Virginia M. Wilson ("**Wilson**") served as a Company director since 2019. Defendant Wilson is Chair of the Audit Committee and is a member of the Compensation Committee and Governance Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Wilson was reported to receive $346,023 in total compensation for her role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, she was reported to

receive $343,676 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, she was reported to receive $323,139 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, she was reported to receive $311,155 in total compensation.

78.     Collectively, Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Thompson, Wallman, and Wilson may be referred to herein as the "**Current Director Defendants**."

79.     Together, Defendants Smith and Pease may be referred to herein as the "**Officer Defendants**."

80.     Defendant Stephen D. Chubb ("**Chubb**") served as a Company director from 1994 until May 2021. Defendant Chubb was a member of the Audit Committee and the Science Committee. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, he was reported to receive $16,250 in total compensation for his role as a director. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, he was reported to receive $308,447 in total compensation. During the Relevant Period, Defendant Chubb sold over $400,000 worth of Charles River stock on the basis of MNPI.

81.     Defendant George M. Milne, Jr. ("**Milne**") served as a Company director from 2002 until May 2022. Defendant Milne was a member of the Governance Committee, the Science Committee, the Executive Committee, and the Finance Committee. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, he was reported to receive $15,000 in total compensation for his role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, he was reported

27

to receive $348,139 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, he was reported to receive $348,447 in total compensation. During the Relevant Period, Defendant Milne sold over $1 million worth of Charles River stock on the basis of MNPI.

82.     Defendant C. Richard Reese ("**Reese**") served as a Company director from 2007 until May 2024. Defendant Reese was Chair of the Compensation Committee and a member of the Planning Committee. According to the Company's Proxy Statement filed with the SEC on March 29, 2024, for the 2023 fiscal year, Defendant Reese was reported to receive $341,023 in total compensation for his role as a director. According to the Company's Proxy Statement filed with the SEC on March 30, 2023, for the 2022 fiscal year, he was reported to receive $338,676 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 30, 2022, for the 2021 fiscal year, he was reported to receive $323,139 in total compensation. According to the Company's Proxy Statement filed with the SEC on March 26, 2021, for the 2020 fiscal year, he was reported to receive $323,447 in total compensation.

83.     Collectively, Defendants Chubb, Milne, and Reese may be referred to herein as the "**Former Director Defendants**."

84.     Collectively, the Current Director Defendants, the Officer Defendants, and the Former Director Defendants are referred to herein as the "**Individual Defendants**."

85.     The Individual Defendants, because of their positions with Charles River, possessed the power and authority to control the contents of Charles River's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their

issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to MNPI, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false or misleading.

**Non-Parties**

86.     Non-party Reshema Kemps-Polanco ("**Kemps-Polanco**") served as a Company director since 2024. Non-party Kemps-Polanco is a member of the Compensation Committee and the Planning Committee.

**SUBSTANTIVE ALLEGATIONS**

**Background**

**A.  Charles River is a Provider of Animal Research Models and Contract Drug Research Services**

87.     Charles River is a non-clinical (animal or preclinical), global drug development company that assists drug developers in the discovery and development of new products. According to its annual report for the quarter and year ended December 31, 2022 filed with the SEC on Form 10-K on February 22, 2023 ("**2022 10-K**"), for over 75 years, Charles River has been "in the business of providing the research models required in the research and development of new drugs, devices and therapies," and it purports to be the "largest provider of outsourced drug discovery, non-clinical development and regulated safety testing services worldwide." In 2022, Charles River reported revenue of over $4 billion.

88.     The Company has three reporting segments: RMS, DSA, and Manufacturing Solutions.

89.     The RMS segment supplies animals, referred to as research or animal models, to the drug development industry, and internally to the Company's DSA segment for use in the

Company's Safety Assessment studies. In 2022, RMS reportedly accounted for 18.6% of the Company's revenues. RMS includes the commercial production and sale of small research models, like rats and mice, as well as the supply of large research models, including NHPs.

90.     The DSA segment reportedly accounted for approximately 61.6% of the Company's total revenue in 2022. DSA provides services that enables Charles River's customers to outsource their drug discovery research, their related nonclinical drug development activities, and regulatory-required safety testing of potential new drugs, vaccines, industrial and agricultural chemicals, consumer products, veterinary medicines and medical devices. Charles River's DSA services support the research, development, and regulatory-required safety testing of potential new drugs before they can be tested in human trials.

91.     According to its annual report filed on Form 10-K for the quarter and year ended December 25, 2021 filed with the SEC on February 16, 2022 ("**2021 10-K**"), Charles River purports to be "a premier provider of high quality, purpose bred, SPF [specific-pathogen-free] large research models to the biomedical research community." Unlike rodents, Charles River does not breed NHPs. Rather, the Company procures NHPs from external suppliers for sale in the RMS segment or for use in connection with Safety Assessment studies within the Company's DSA segment.

92.     During a Charles River conference call with investors and analysts on February 11, 2020, Defendant Foster explained that the Company's DSA segment is the largest customer of the Company's RMS segment. In other words, the research animals used in Charles River's Safety Assessment studies for its customers in the DSA segment are, in material part, obtained intercompany through the RMS segment:

> Research models remain an essential regulatory required scientific
> tool for early-stage research and toxicology and a vital component

30

of our portfolio to support our clients and our own DSA segment, which remains the largest client of our research models business [RMS].

**B. Charles River's Research Models Are Used in Nonclinical or Animal Studies Required for Approval of New Drug or Biologic Products**

93.     In the U.S. applicants of new drug and biologic products are required to provide to the FDA, among other information and data, pharmacology and toxicology information based on non-clinical or animal studies from which they have concluded that it is reasonably safe to conduct clinical or human trials and ultimately to support marketing. 21 C.F.R. § 312.23 (Investigational New Drug Application content and format); 21 C.F.R. § 314.5 (Content and format of a New Drug Application); 21 C.F.R. § 601.2 (Applications for biologics licenses; procedures for filing).

94.     According to Charles River's 2023 Proxy Statement filed with the SEC on Schedule 14A on March 30, 2023 ("**2023 Proxy**"), before a "drug can be evaluated in the clinic on humans, in the absence of a validated alternative, the FDA requires testing in two animal species, including one non-rodent species, to ensure patient safety. Because of their close genetic, physiological, and behavioral similarity to humans, [NHPs] are often the only scientifically relevant animal models for critical translational research and the required safety testing of biologic drugs." NHPs are useful because their similarities to humans with respect to genetic makeup, anatomy, physiology, and behavior make it possible to approximate the human condition.[3]

95.     According to the FDA, in contrast to most prescription drugs, which are chemically synthesized, "biologics" or biological products are derived from natural sources, including living entities, and include products such as vaccines, blood and blood components, and other therapies.[4]

---

[3] Nonhuman Primate Models in Biomedical Research: State of the Science and Future Needs (2023), at 1.
[4] https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/what-are-biologics-questions-andanswers

96.     The drug development pipeline has been shifting toward biologics for which NHPs are critical.



97.     In connection with preclinical development of biologic drugs, substitutes for NHPs are limited to non-existent. Indeed, according to Defendant Foster, "biologic drugs cannot be approved for commercial use without NHPs" (May 11, 2023 Charles River conference call), and "So you don't do work in large molecule drug development without nonhuman primates. End of sentence, full stop." (March 15, 2023 Barclays investor conference).

98.     Because immune system response is the primary safety concern for biologics and the NHP immune system most closely matches humans for testing purposes, NHPs are the model of choice for preclinical studies for biologics.

**C.  The Steady and Timely Supply and Sale of NHPs is Critical to Charles Rivers' Business**

99.     A timely and steady supply of NHPs is important to Charles River's business, financial results and results of operations.

100.    According to the USDA, Charles River is the largest user of NHPs in the U.S. Of

the 65,674 NHPs reportedly used in the U.S. in 2021 for teaching, research, experiments or tests, Charles River accounted for 17,105 NHPs used, or approximately 26%. According to the USDA, Charles River use of NHPs in its business since 2018 was as follows:

2018—13,022 NHPs

2019—14,899 NHPs

2020—15,769 NHPs

2021—17,105 NHPs

2022—16,460 NHPs

101.    The long-tailed macaque is a species of NHP used for drug and biological efficacy and safety studies.

102.    The long-tailed macaque and rhesus macaque are the predominant NHP species used in biomedical research, however, rhesus macaques are available domestically whereas long-tailed macaques are not and are sourced internationally.[5] The long-tailed macaque is reportedly the most heavily internationally traded NHP species.[6]

103.    According to the CDC, during the period 2019-22, the vast majority of NHPs imported into the U.S. were long-tailed macaques (referred to in the chart below as cynomolgus macaques), accounting for a yearly average of 95% of all NHP imports in 2019-22:

---

[5] Weinbauer, Gerhard & Mecklenburg, Lars. (2022). Does Geographical Origin of Long-Tailed Macaques (Macaca fascicularis) Matter in Drug Safety Assessment?: A Literature Review and Proposed Conclusion. Toxicologic pathology. 50. 1926233221095443. 10.1177/01926233221095443.
[6] https://onlinelibrary.wiley.com/doi/epdf/10.1002/ajp.23547; https://cites.org/sites/default/files/eng/com/ac/28/Inf/EAC28-Inf-32.pdf (stating "M. fascicularis is the most heavily-traded species of live mammal listed on the CITES Appendices.")

|  | Number of Nonhuman Primates Imported | | | |
|---|---|---|---|---|
| Nonhuman Primate Species | FY2019 | FY2020 | FY2021 | FY2022 |
| Cynomolgus macaque | 32,273 | 24,879 | 30,649 | 31,617 |
| Rhesus macaque | 964 | 724 | 80 | 0 |
| African green monkey | 328 | 720 | 711 | 808 |
| Common marmoset | 195 | 326 | 284 | 172 |
| Squirrel monkey | 30 | 34 | 68 | 60 |
| Capuchin | 15 | 0 | 40 | 86 |
| Other* | 13 | 45 | 12 | 68 |
| Total | 33,818 | 26,728 | 31,844 | 32,811 |

104.   The total value of the long-tailed macaque trade from 2010 to 2019 has been estimated to be valued at nearly $1.26 billion.[7]

105.   The international trade in long-tailed macaque involves both live animals as well as specimens and extracts, such as blood and tissue.

106.   During a Charles River earnings conference call with investors and analysts on October 29, 2020, Defendant Foster stated that the Company's supply of NHPs were nearly all imported: "Supply sources are pretty much external. They're coming from places like China and Mauritius and Cambodia and Vietnam."

107.   Charles River's business benefitted from the COVID-19 pandemic in large part due to shut downs that hindered drug development companies' ability to conduct research internally and therefore sought Charles River's services to outsource their preclinical studies. According to Defendant Foster during a Charles River conference call at the Robert W. Baird Global Healthcare Conference on September 14, 2021: "[p]robably the biggest benefit that we had, which is probably impossible to calculate, is we had an accelerant—sort of accelerating impact from COVID from the inability of clients to do work in a whole host of businesses . . . because they have had to close

---

[7]https://www.researchgate.net/publication/358580560_Monetary_Value_of_Live_Trade_in_a_Commonly_Traded_Primate_the_Long-Tailed_Macaque_Based_on_Global_Trade_Statistics

down their own sites or our competitors couldn't support them and they pivoted more quickly to Charles River than perhaps they would have otherwise and/or tried us when they wanted to do the work internally . . . ."

108.    Due to an increased demand for the Company's Safety Assessment services, principally due to new biologics drug products, demand for long-tailed macaques for use in Charles River's Safety Assessment substantially increased during the Relevant Period.

109.    The increased demand for long-tailed macaques caused the value of long-tailed macaques to significantly increase. According to data from the USFWS, the declared value per macaque was stable during the period 2017-19, with a long-tailed macaque being declared to have a value of around $2,400. According to USFWS data, Charles River reported the value per long-tailed macaque increased from an average value per animal of $2,300 in May 2020, to an average value of $15-17,500 per animal during the Relevant Period, an increase in value per animal of over 660%.

**D.  Long-Tailed Macaques are a Protected Species Under International and U.S. Law**

110.    Owing to the fact that Charles River's supply of long-tailed macaques were imported into the U.S., Charles River and its suppliers were subject to international and U.S. legal regulations applicable to the trade of long-tailed macaques.

111.    In order to protect certain species against over-exploitation, in 1975 the U.S. became a signatory to an international treaty known as the Convention on International Trade in Endangered Species of Wild Fauna and Flora, or the CITES Convention. Depending on the required level of protection needed by a species, CITES uses a system of appendices to classify protected wildlife and plants, and monitor and regulate their usage.

112.    Long-tailed macaques are protected under Appendix II of CITES. Appendix II

includes all species which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival. CITES, Art. II, ¶2; 50 C.F.R. § 23.4.

113.    In a March 7, 2022 assessment, the International Union for Conservation of Nature and Natural Resources ("**IUCN**") reassessed the long-tailed macaque's classification as vulnerable and added it to its "Red List of Threatened Species," which is used as a guide for the appendices to CITES Convention.[8] The IUCN found:

> Reports throughout Southeast Asia indicate a continued and even increased persecution of M. fascicularis [long-tailed macaques] throughout large expanses of its current range. Hunting and trapping have been occurring and are now happening at unprecedented levels . . . most ominously, to fuel both the legitimate and illicit trade for research and other usages (Lee 2011, Hamada et al. 2011, Hansen et al. 2021). Both price and demand for M. fascicularis as a trade commodity has skyrocketed during the Covid-19 pandemic, relative to the already regular and heavy pre-pandemic capture and trade (Hansen et al. 2021, 2022). . . . the demand for non-human primates in research is threatening the species. As such, the research industry needs to become accountable for the effects of their actions on wild nonhuman primate populations. . . . Therefore, we assess the species as Endangered . . . .[9]

114.    On or around July 21, 2022, the ICUN's reassessment was widely publicized and disseminated in news media.

115.    The U.S. along with over 180 other countries are parties to CITES Convention, and bound to abide by its provisions and restrictions. Both Cambodia and Vietnam are signatories to the CITES convention.[10]

116.    Parties to the CITES convention regulate trade in specimens of various species and

---

[8] https://www.iucnredlist.org/about/uses
[9] https://www.iucnredlist.org/species/12551/221666136#assessment-information (stating date of assessment Mar. 7, 2022).
[10] https://cites.org/eng/disc/parties/chronolo.php (stating Viet Nam joined in 1994 and Cambodia joined in 1997).

their parts, products, and derivatives through a system of permits ("**CITES Permits**"). CITES Permits enable the Convention parties to monitor the effects of the volume and type of trade to ensure trade is legal and not detrimental to the survival of the species included in the various Appendices.

117.    Before importing a long-tailed macaque under Appendix II of CITES into the U.S., a valid CITES export permit must be obtained from the competent authority of the country of export or re-export. A separate original or a true copy of a CITES Permit must be issued before import occurs and the document must accompany each shipment and be presented to USFWS upon importation into the U.S. See CITES, Art. IV §§ 1 and 2; 50 C.F.R. § 23.20(c), 23.26(b).

118.    CITES Permits for live long-tailed macaques or specimens are individually numbered and include information such as the importer of record, exporter, a description of the specimens, the CITES Appendix number, a source code, the quantity, and the date of issuance. The source codes indicate the particulars of the specimen(s) listed on the CITES Permit: among others, the code "W" denotes a specimen taken from the wild; "R" denotes a ranched specimen, taken as an egg or juvenile from the wild and reared in a controlled environment; "C" denotes animals bred in captivity; all subject to certain other terms and provisions on the Convention.

119.    Since 2010, Cambodia has outlawed the use of wild-caught long-tailed macaques in breeding farms and for export, which is monitored through CITES Permits.[11]

---

[11] REVIEW OF MACACA FASCICULARIS IN CAMBODIA AND VIET NAM, CITES 28th meeting of Animals Committee, 2015, https://cites.org/sites/default/files/eng/com/ac/28/Inf/E-AC28-Inf-32.pdf (stating "in October 2010 permits for the collection and/or harvesting of M. fascicularis from the wild were suspended for a minimum of five years. Cambodia states that the breeding stock in each of the captive breeding farms has been sufficient to produce enough F1 and F2 offspring for export and, as a result, no augmentation with wild M. fascicularis has been required . . . . Viet Nam states that M. fascicularis live in protected areas where trapping and trading are prohibited."); CITES Mgm't Authority in Cambodia, Aug. 25, 2014, https://cites.org/sites/default/files/eng/com/ac/28/AC28-09-03-A2.pdf (same).

120.    Under the CITES Convention, source code "C" indicates an animal has been bred in captivity, which is defined to mean that the animals' parents mated in a controlled environment and the breeding stock is maintained without the introduction of specimens from the wild, except under limited circumstances.[12]

121.    Under U.S. law, all imports of wildlife, including long-tailed macaques, must be declared to the USFWS on a completed, signed, and certified Declaration for Importation or exportation of Fish and Wildlife (Form 3-177) and made available for inspection. 50 C.F.R. §§ 14.61, 14.63. Form 3-177 requires importers or their agents to provide, among other information, the source of the wildlife they are importing, specifically whether the wildlife was captive-bred, farm-raised, or wild-caught. Importers or their agents must furnish all applicable information requested on the Form 3-177 and must certify that the information furnished is true and complete to the best of his/her knowledge and belief. 50 C.F.R. § 14.61.

**E.  The Endangered Species Act Implements the CITES Convention**

122.    USFWS, an agency within the U.S. Department of the Interior, is designated by Congress pursuant to the ESA as the CITES enforcement authority within the U.S. The Department of the Interior publishes regulations to implement CITES in 50 C.F.R. Part 23. A list of all species protected by CITES and the ESA implementation program is maintained pursuant to the Convention by the CITES Secretariat. 50 C.F.R. §§ 23.7 and 23.9.

123.    The provisions of CITES are implemented through the ESA, which states in relevant part, "[i]t is unlawful for any person . . . to engage in any trade in any specimens [of wildlife] contrary to the provisions of . . . [CITES] or to possess any specimens [of wildlife] traded contrary to the provisions of . . . [CITES]." "Trade" means, among other things, "export." CITES,

---

[12] https://cites.org/eng/node/130909

Art. I, ¶(c). "Specimen" means "any animal . . . whether alive or dead." CITES, Art. I, ¶(b).

124.     Separately, the Lacey Act combats trafficking of illegally taken wildlife, fish, or plants. The Lacey Act made it unlawful for any person to import, export, transport, sell, receive, acquire, or purchase any wildlife taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the U.S. 16 U.S.C. § 3372(a)(l). The Lacey Act also made it unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any wildlife which has been, or is intended to be (1) imported, exported, transported, sold, purchased, or received from any foreign country; or (2) transported in interstate or foreign commerce. 16 U.S.C. §§ 3372(d)(l) and (2). The Lacey Act defines "wildlife" as "any wild animal, whether alive or dead, including without limitations any wild mammal . . . whether or not bred, hatched, or born in captivity, and includes any part, product, egg, or offspring thereof." 16 U.S.C. § 3371(a).

## F.  Charles River Assured Investors That it Monitored its Supply Chain for Legal Compliance

125.     During the Relevant Period, Charles River assured investors that it maintained and enforced standards of conduct concerning its suppliers. In response to the COVID-19 pandemic, the Company stated that it modified its business practices, including suppliers, management of production inventory, and supply chain risk management and the Individual Defendants repeatedly stated that Charles River formed a tiered structure of designated COVID-19 crisis management teams throughout the Company to identify, implement and monitor such actions as required by the dynamic exigencies arising from the pandemic.

126.     Before and during the Relevant Period, Charles River referred investors to the Company's Code of Business Conduct and Ethics and Supplier Code of Conduct that, among other requirements, provided that Charles River's executives, officers and employees, and the

Company's suppliers "must comply with the international agreements and conventions, as well as the national, regional and local laws and regulations that apply to our global and international business," "[b]e truthful and accurate in all representations and certifications made to government agencies," "[w]e must always be truthful and accurate about our products and services," and "we must all be vigilant in meeting and going beyond our responsibilities to comply with relevant laws and regulations . . . ." The Company's Code of Business Conduct and Ethics and Supplier Code of Conduct were posted on Charles River's website throughout the Relevant Period.

127.     Charles River's reputation for regulatory compliance and monitoring its supply chain were materially important to its customers and investors. Indeed, on May 27, 2021, Ms. Girshick, Charles River's Executive VP and Chief Operating Officer stated: "[o]ur integrated comprehensive portfolio is taking complexity out of our clients' drug development efforts and supply chain. Our reputation for deep science and regulatory compliance as well as our broad geographic coverage gives our clients the confidence that we are a reliable partner for their programs."

### G.  Charles River Loses Access to its Principal Supply of Long-Tailed Macaques Due to China's Export Ban and Charles River Pivots to Cambodia

128.     Before the Relevant Period, Charles River obtained over 60% of its supply of long-tailed macaques from China. According to the CDC, in 2019 32,273 long-tailed macaques were imported into the U.S., with 19,322, or approximately 60%, from China.

129.     Before the Relevant Period, in early 2020, the Chinese government banned the transport and sale of wild animals in response to the spread of COVID-19.[13,14] While the ban

---

[13] https://www.washingtonpost.com/world/asia_pacific/china-bans-wild-animal-trade-until-coronavirus-epidemiceliminated/2020/01/26/0e05a964-4017-11ea-971f-4ce4f94494b4_story.html.

[14] https://www.nytimes.com/2020/02/27/science/coronavirus-pangolin-wildlife-ban-china.html

reportedly provided an exemption for use in research, subject to "strict approvals" by the Chinese government, in practice strict application of the new ban effectively halted the trade in NHPs from China.[15]

130.    At that time, Charles River had a majority ownership interest in a Chinese supplier of NHPs. As explained by Defendant Foster after the Relevant Period, the rationale for an economic stake in a Chinese supplier of NHPs was to secure a preferred supply source: "[o]ur preference was to get those animals out of China and use that for safety assessment [in Charles River's Safety Assessment studies in the DSA segment]."[16]

131.    Having access to a preferred supplier was important to Charles River because it provided the Company with control over its supply chain, including the Company's ability to monitor and control compliance with applicable laws and regulations concerning the breeding and import of NHPs into the U.S., and ensured a steady and timely supply of long-tailed macaques.

### H.  Cambodia Replaces China as Charles River's Primary Source of Long-Tailed Macaques

132.    Following China's export ban, Charles River pivoted to Cambodia for its supply of long-tailed macaques.

133.    During the Relevant Period, Cambodia substantially increased the export of long-tailed macaques based on data from CITES and the United Nations Comtrade databases, with

---

[15] April 2, 2020, *The Globe and Mail* published a story titled "Chinese wildlife ban freezes export of test monkeys amid worldwide push for COVID-19 vaccine."

[16] According to a May 11, 2023 research report published by Evercore ISI, during a call with Evercore representatives, Charles River management stated that "several years ago, CRL had acquired a business in China with the intent of supplying their SA [Safety Assessment] needs. As a result of China shutting down exports, CRL has been supplying the local market with NHPs sourced from that region," and according to a March 27, 2023 research report published by Jefferies, Charles River owns 90% of the Chinese NHP supplier. According to Charles River's Annual Report filed with the SEC on Form 10-K on February 11, 2020, "[o]n August 28, 2019, the Company acquired an 80% equity interest in a supplier, which included a 20% redeemable noncontrolling interest."

exports to the U.S. increasing in 2020 by up to 86% over 2019.

134.    On February 22, 2023, Defendant Foster stated, "in recent years, NHPs sourced from Cambodia have been responsible for approximately 60% of the NHPs supplied to the United States and to Charles River for drug research and development."

### I. The Rapid Increase in Supply of Long-Tailed Macaques Was Implausible Based on Captive Breeding Alone

135.    It was very unlikely that captive-breeding farms in Cambodia legally increased their numbers of long-tailed macaques from the production levels in 2019 to the massive increases reported in 2020-22 given the constraints on breeding long-tailed macaques.

136.    The gestation period for long-tailed macaques is roughly six months, and provided a pregnancy results in a live birth, a long-tailed macaques pregnancy typically results in one offspring.

137.    Long-tailed macaques are not usually exported until they are at least two years old, which is the age required by medical researchers because the animal has sufficiently matured. Thus, a minimum period of 30 months from the onset of pregnancy to the animals being ready for shipment (six months gestation plus 24 months of post-natal growth before animals can be shipped at 2 years old) is needed to produce an offspring ready for export.

138.    Thus, the scaled production reported in 2020 in response to the COVID-19 pandemic could not have been available for export until at least late 2022 at the earliest.

139.    A major supplier of long-tailed macaques, the Vanny Group (defined below), confirms the constraints on the rapid increase in production from Cambodian breeding farms. The website of the Vanny Group indicates a minimum period of 30 months from the onset of pregnancy to animals being ready for shipment (macaque gestation length is roughly 6 months plus 24 months of post-natal growth before animals can be shipped at 2 years old), and further indicates that it

42

could take up to five years to have offspring to export.[17]

140.    Given the constraints of rapidly increasing the production of captive-bred animals, Defendants knew, or at least disregarded with a high degree of recklessness, that after losing China as a supply source, Cambodia's supply chain of long-tailed macaques could not have been rapidly increased from captive breeding alone. Indeed, the major constraints in increasing supply outlined above have been acknowledged by Ms. Girshick, Charles River's Executive Vice President and Chief Operating Officer, who admitted after the Relevant Period: "none of the nonhuman primate farms can scale really, really quickly. So that—as you said, the gestation doesn't allow that. The animals have to be a certain age."[18]

141.    According to one report, from a supply chain due diligence perspective, the rapid increase in production from Cambodia was a red flag: "given the gestation periods and fecundity of primates, the rapid increase in supply originating in Cambodia simply was not possible without including (illegally-sourced) wild animals into the mix." (June 13, 2023 UBS analyst report).

**J.   Charles River's Suppliers of Long-Tailed Macaques From Southeast Asia**

142.    During the Relevant Period, Charles River directly imported or otherwise obtained long-tailed macaques from Cambodia from various suppliers or animal brokers, including the following:

**1.   Inotiv, Inc.**

143.    Inotiv, a publicly traded U.S. Company, was a supplier of long-tailed macaques to Charles River through its subsidiaries, Orient BioResource and Envigo. According to its annual report filed with the SEC on Form 10-K on December 21, 2021 for the fiscal year ending

---

[17] http://vannylifesciences.com.hk/perdiemprogram.html (last accessed Sept. 26, 2023).

[18] Transcript of Charles River Laboratories International Inc at Jefferies Healthcare Conference event, June 8, 2023.

September 30, 2021, Inotiv purported to be the "largest importer of NHPs in North America, with long-established relationships with the source breeders around the world," including from "breeding farms principally located in Cambodia, Vietnam, and Mauritius Island," and "focuses on "securing critical supply chain issues particularly related to research models."

144.    On November 5, 2021, Inotiv acquired Envigo, and on January 27, 2022, Inotiv acquired Orient BioResource. According to records obtained through freedom of information requests, during the Relevant Period, Charles River obtained at least 2,262 long-tailed macaques from Orient BioResource and Envigo.

### 2. Inotiv's Primary Supplier of Long-Tailed Macaques in Cambodia is the Vanny Group

145.    Inotiv's principal supply of long-tailed macaques came from Cambodia. Inotiv's principal supplier of long-tailed macaques in Cambodia was a network of related companies that does business as the "Vanny Group," which is based in Hong Kong, China, and has operations in Cambodia and Vietnam. Mr. James Lau is the Vanny Group CEO ("Mr. Lau").

146.    The Vanny Group's product is "Indochinese cynomolgus" monkeys, i.e., longtailed macaques, and its principal business is production, breeding, husbandry of long-tailed macaques for use in scientific and academic research.

147.    The Vanny Group companies include Vanny HK, KHI, Vanny Cambodia, Vanny Chain Technology (HK) Ltd. ("**Vanny Chain Tech**"), and Nafovanny, also known as the Vietnam Monkey Breeding and Development Joint-Venture, based in Vietnam, of which the Vanny Group is reportedly the joint owner with the government of Vietnam.

### 3. Inotiv's Primary Supplier of Long-Tailed Macaques in Cambodia is the Vanny Group

148.    KF Cambodia directly supplied Charles River long-tailed macaques throughout the Relevant Period. According to the CITES Management Authority of Cambodia, since 2005, KF

Cambodia manages a farm to breed and export young animals from Golden China Group Co., Ltd. Prior to 2005, the farm had been managed by Golden China Group Co., Ltd.

149.    Golden China Group Co., Ltd. reportedly has been involved in the capture of wild long-tailed macaques for export to the U.S., and Cambodian authorities have asserted that the company had engaged in illegal wildlife trading.[19]

150.    According to records obtained through freedom of information requests, during the Relevant Period, Charles River obtained over 10,000 long-tailed macaques from KF Cambodia with a total value of approximately $86 million—ranging from a value per animal at the start of the Relevant Period of $2,300, to as high as $17,500 per animal in late 2022, an increase of over 660%. In 2020, Charles River directly imported approximately 3,763 live long-tailed macaques from KF Cambodia; in 2021, Charles River directly imported approximately 3,182 live long-tailed macaques from KF Cambodia; and in 2022 Charles River directly imported approximately 3,096 live long-tailed macaques from KF Cambodia.

### 4.  Worldwide Primates, Inc.

151.    WW Primates is a Miami, Florida-based company that purports to be a "leading supplier of **premium quality** non-human primate models for research, including government, university, and pharmaceutical level facilities" and purportedly strives "to be the **Go To** company not only for **on demand** and **last minute** needs, but also for your standard day to day requirements." (Emphasis in original). WW Primates Primate Research Models include long-tailed macaques. According to records obtained through freedom of information requests, during 2022, Charles River obtained at least 956 long-tailed macaques from WW Primates.

### 5.  Nafovanny

---

[19] https://www.phnompenhpost.com/national/road-gangs-turn-monkey-business

152.    In addition to sourcing long-tailed macaques from Cambodia, Charles River obtained long-tailed macaques directly from Nafovanny, a member of the Vanny Group of companies based in Vietnam. Nafovanny was established by Mr. Lau of the Vanny Group through a joint venture between Vanny Chain and the government of Vietnam. According to records obtained through freedom of information requests, during the Relevant Period, Charles River obtained at least 512 long-tailed macaques directly from Nafovanny.

### 6. KHI Bioservices Ltd.

153.    According to records obtained through freedom of information requests, during the Relevant Period, Charles River directly obtained over 1,000 specimens or extracts derived from longtailed macaques from KHI, a member of the Vanny Group of companies.

### K. Defendant Foster Assured Investors that Charles River Had Alternative Supplies for Long-Tailed Macaques

154.    As a result of the abrupt interruption of the supply of long-tailed macaques from China in early 2020, Charles River pivoted to obtain NHPs directly or indirectly from suppliers in Southeast Asia, principally from suppliers who obtained animals in Cambodia.

155.    On March 11, 2020, during a Charles River conference call with analysts and investors, Defendant Foster stated the following concerning the impact of COVID-19 on the Company's supply of NHPs from China:

> So we use some large animals in our toxicology business. There was some noise about supply sources being limited out of China. That doesn't seem to be an ongoing problem. Even if it was, **we've made arrangements with other supply sources around the world. So we won't be interrupted there to any material degree.**

156.    According to an April 20, 2020 report published by Jefferies, "[o]n its 4Q19 earnings call, CRL referenced a limited 1Q20 financial impact from the restricted movement of NHPs in and out of China. According to our checks, alternative sources in Vietnam, Cambodia,

and the US mitigate the initial shock. The alternative supply should extend continuity out to late3Q, early-4Q20. The industry expects, by that time, to see resumption of supply out of China. While not a significant source of revenue themselves, NHPs are necessary for certain SA [Safety Assessment] studies and the supply challenges into 2H20 could delay those studies."

**The Individual Defendants' False and Misleading Statements**

157.    During the Relevant Period, Defendants made representations that at the time were materially false or omitted to disclose material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as alleged below.

**A.  Charles River's Financial Results for the First Quarter of 2020**

158.    The Relevant Period begins on May 7, 2020 when the Company disclosed its financial results for the quarter ended March 28, 2020 and Defendants Foster and Smith caused the Company to issue a press release that was filed with the SEC on Form 8-K ("**May 7, 2020 Press Release**").

159.    The May 7, 2020 Press Release quoted Defendant Foster as follows:

> [a]s the global COVID-19 pandemic intensified during the first quarter, we moved swiftly to mitigate the anticipated impact, which will be most pronounced in the research models business. **We implemented measures that are focused on maintaining** . . . the continuity of our operations; sustaining our solid financial position; **and ensuring our ability to support our clients' critical programs**. As a result of these measures, **all of our operating sites have remained open and adequately staffed to accommodate significant client demand across most of our businesses.**

160.    Defendant Foster's representations were materially false and misleading at the time they were made, and he failed to disclose material facts that he had a duty to disclose in order to make the statements made by him, in light of the circumstances under which they were made, not misleading because Defendant Foster failed to disclose that to accommodate significant client

demand for the Company's Safety Assessment studies, for which long-tailed macaques were essential, the Company implemented measures to ensure a supply of long-tailed macaques by engaging non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations; and 3) materially increased the risk that the Company's supply chain of long-tailed macaques would be materially interrupted thereby reducing the Company's revenue and operating margin from its Safety Assessment studies.

161.    Also on May 7, 2020, Defendants Foster and Smith caused the Company to file its Form 10-Q with the SEC for the quarter ended March 28, 2020 (the "**Q1 2020 10-Q**"), which was signed by Defendants Foster and Smith. The Q1 2020 10-Q stated the following concerning Charles River's supply chain:

> We are focused on ensuring that we have adequate inventory and supplies on hand given the potential disruption of the COVID-19 pandemic to our suppliers and their supply chain. Accordingly, **we have and expect to continue to increase inventory and supplies through the second quarter of 2020 and beyond as deemed appropriate. We proactively engaged with our suppliers beginning in January 2020 to limit any potential disruption to our supply chain.** However, notwithstanding generally successful efforts to maintain supply chain continuity, we have experienced and expect to experience increased costs and potential delays throughout our supply chain during the pandemic.

162.    Defendants Foster and Smith's representations were materially false and

misleading at the time they were made because they failed to disclose that in order to increase inventory and supply of long-tailed macaques for use in the Company's Safety Assessment studies and to limit disruption in the supply chain of long-tailed macaques, the Company engaged nonpreferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques.. By engaging and purchasing from such suppliers, Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; and 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations.

163.    The Q1 2020 10-Q included the following representation concerning Charles River's supply chain that warned of potential, future risks:

> **Several of our product and service offerings are dependent on a limited source of supply that, when interrupted, adversely affects our business.**
>
> **We depend on a limited international source of supply for certain products, such as large research models.** Disruptions to their continued supply from time to time arise from health problems (including as a result of the COVID-19 pandemic and the spread of other diseases), export or import laws/restrictions or embargoes, tariffs, international trade regulations, foreign government or economic instability, severe weather conditions, increased competition among suppliers for models, disruptions to the air travel system, activist campaigns, commercial disputes, supplier insolvency, geopolitical disputes, measures intended to slow the spread of COVID-19 or other ordinary course or unanticipated events. Any disruption of supply could materially harm our business if we cannot remove the disruption or are unable to secure an alternative or secondary supply source on comparable commercial terms. **While we continue to take steps to find alternative supply channels and lock in supply with preferred sources through multi-year and/or minimum commitment contracts**, such mitigating efforts may not prove successful **at ensuring a steady**

> **and timely supply** or may require (and in the past have required) us
> to pay significantly higher prices for such products during periods
> of global shortage or restrictions on the transportation of products.
> In addition, **limited global supply or regional restrictions on
> transportation for certain products may require us to source
> products from non-preferred vendors.**

164. Defendants Foster and Smith's representations again were materially false and
misleading because Defendants failed to disclose that in order to ensure a "steady and timely
supply" of long-tailed macaques and avoid disruption to the supply chain of long-tailed macaques,
the Company engaged non-preferred suppliers of animals from Cambodia at a time when
Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production
and export of long-tailed macaques. By engaging and purchasing from such suppliers, Charles
River received animals trapped from the wild, which materially and substantially increased the
risk: 1) that shipments received from these non-preferred suppliers contained animals that were
not purpose-bred; and 2) materially increased the risk that the Company's conduct and its supply
chain would be subject to heightened scrutiny including criminal and civil investigations. Further,
while Defendants represented that Charles River "may" in the future source products from "non-
preferred vendors," the Company had at that time already engaged non-preferred suppliers of
Cambodian long-tailed macaques like Orient BioResource and Envigo who sourced Cambodian
long-tailed macaques from the Vanny Group.

165. Further, the Q1 2020 10-Q represented the following concerning Charles River's
suppliers:

> The COVID-19 pandemic **has caused us to modify** our business
> practices, including . . . **suppliers** . . . **supply chain risk
> management** . . . . We have formed a tiered structure of designated
> COVID-19 crisis management teams throughout our organization to
> identify, implement and monitor such actions as required by the
> dynamic exigencies arising from the pandemic. Such measures and
> others **may not** be sufficient to mitigate all the risks posed by
> COVID-19, and our ability to perform critical functions could be

50

materially adversely affected.

166.    Defendants Foster and Smith's representations were materially false and misleading because while Defendants represented that the measures implemented to modify the Company's suppliers and supply chain risk management may not be sufficient to mitigate risks posed by COVID-19, far from mitigating risks, Defendants had at this time substantially increased the risks to the Company by engaging non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; and 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations.

167.    The Q1 2020 10-Q stated the following concerning Charles River's compliance with U.S. law and standards set by CITES and the USFWS:

> **Any failure by us to comply with applicable regulations and related guidance could harm our reputation and operating results, and compliance with new regulations and guidance may result in additional costs.**
>
> Any failure on our part to comply with applicable regulations could result in the termination of ongoing research or the disqualification of data for submission on behalf of our clients to regulatory authorities. This could harm our reputation, our prospects for future work and our operating results. . . . **If** our operations are found to violate any applicable law or other governmental regulations, we **might** be subject to civil and criminal penalties, damages and fines or the temporary closure of our facilities. Any action against us for violation of these laws or regulations, even if we successfully defend against it, **could** cause us to incur significant legal expenses, divert our management's attention from the operation of our business and damage our reputation. . . .

> Although we believe **we are currently in compliance in all material respects with applicable national, regional and local laws, as well as other accepted guidance used by oversight bodies (including . . . the standards set by . . . the Convention on International Trade in Endangered Species of Wild Fauna and Flora, U.S. Fish and Wildlife Service**, The Centers for Disease Control . . .), **failure to comply could subject us to denial of the right to conduct business, fines, criminal penalties and other enforcement actions.**

168. Defendants Foster and Smith's representations were materially false and misleading at the time they were made because, while Defendants represented that the Company was presently in compliance with U.S. law and standards, they failed to disclose that the Company had already engaged in conduct that substantially and materially increased the risk to the Company.

169. In fact, at this time, the Company was in desperate need of primates because China has imposed an embargo and the Company had already taken steps to locate NHP's from various locations.

170. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

171. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



172.   Thereafter,

173.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

**B.  Charles River's Financial Results for the Second Quarter 2020**

174.    On August 5, 2020, the Company disclosed its financial results for the quarter ended June 27, 2020 and Defendants Foster and Smith caused the Company to issue a press release that was filed with the SEC on Form 8-K. Also on August 5, 2020, Defendants Foster and Smith caused the Company to file its Form 10-Q with the SEC for the quarter ended June 27, 2020 (the "Q2 2020 10-Q"), which was signed by Defendants Foster and Smith.

175.    The Q2 2020 10-Q repeated representations that were substantially similar to the representations delineated above concerning Charles River's supply chain compliance with U.S. law and standards set by CITES and the USFWS.

176.    Later that day on August 5, 2020, during a Charles River earnings conference call with analysts and investors attended by Defendants Foster and Smith, Defendant Foster made the following statements:

> **Rivka Regina Goldwasser – Morgan Stanley, Research Division – MD**: Okay. And the next one is just on supply sourcing a little bit. Last time we spoke, you mentioned that you're actively reevaluating outsourcing strategy and also reducing dependency on Asia. So any updates there in how it impacts the business and opportunities for the future?
>
> **Defendant Foster:** Yes. We're working really hard at our supply chain and critical tools that we need to do our work. And I think we've done a very good job ensuring that **we have sufficient products to do our work, both living and in inanimate from a variety of sources, some new, many increase from where they**

**were historically** and some reduced from where they were historically. **So we feel really good about supply chain for the balance of this year, and we'll be very well prepared for next year as well.**

177.    Defendant Foster's representations were materially false and misleading at the time they were made because he failed to disclose that in order for the Company to have a "sufficient" number of long-tailed macaques "from a variety of sources" to perform work in the Company's Safety Assessment studies and to have a sufficient supply of long-tailed macaques to be prepared for 2021, the Company had engaged non-preferred suppliers who sourced long-tailed macaques from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques.

178.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████

179.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

### C.  Charles River's Financial Results for the Third Quarter 2020

180.    On October 29, 2020, the Company disclosed its financial results for the quarter ended September 26, 2020 and Defendants Foster and Smith caused the Company to issue a press release that was filed with the SEC on Form 8-K. Also on October 29, 2020, Defendants Foster and Smith caused the Company to file its Form 10-Q with the SEC for the quarter ended September 26, 2020 (the "**Q3 2020 10-Q**"), which was signed by Defendants Foster and Smith.

181.    The Q3 2020 10-Q stated the following concerning Charles River's supply chain:

> We are focused on ensuring that we have adequate inventory and supplies on hand given the potential disruption of the COVID-19 pandemic to our suppliers and their supply chain. Accordingly, **we have and expect to continue to increase inventory and supplies through 2020 and beyond as deemed appropriate. We proactively engaged with our suppliers beginning in January 2020 to limit any potential disruption to our supply chain**. However, notwithstanding generally successful efforts to maintain supply chain continuity, we have experienced and expect to experience increased costs and potential delays throughout our supply chain during the pandemic.

182.    The Q3 2020 10-Q also included the following risk factor concerning Charles River's supply chain:

> **Several of our product and service offerings are dependent on a limited source of supply that, when interrupted, adversely affects our business.**
>
> **We depend on a limited international source of supply for certain products, such as large research models.** Disruptions to their continued supply from time to time arise from health problems (including as a result of the COVID-19 pandemic and the spread of other diseases), export or import laws/restrictions or embargoes, tariffs, international trade regulations, foreign government or economic instability, severe weather conditions, increased competition among suppliers for models, disruptions to the air travel system, activist campaigns, commercial disputes, supplier insolvency, geopolitical disputes, measures intended to slow the spread of COVID-19 or other ordinary course or unanticipated events. Any disruption of supply could materially harm our business

56

if we cannot remove the disruption or are unable to secure an alternative or secondary supply source on comparable commercial terms. For example, as with other industry participants, **certain of our activities rely on a sufficient supply of large research models, which has seen increasing demand as compared to supply in 2020 due to a variety of factors. First, the surge of research relating to COVID-19 has increased short term demand. Second, China supplies a significant portion of certain critical large research models, which have been subject to geographic export restrictions applicable to many animal species since the beginning of the COVID-19 pandemic. While we continue to take steps to find alternative supply channels and lock in supply with preferred sources through multi-year and/or minimum commitment contracts,** such mitigating efforts may not prove successful at ensuring a steady and timely supply or may require (and in the past have required) us to pay significantly higher prices for such products during periods of global shortage or restrictions on the transportation of products. **In addition, limited global supply or regional restrictions on transportation for certain products may require us to source products from non-preferred vendors.**

183.    The foregoing statements were materially false and misleading for the reasons stated in ¶¶ 162, 164 above

184.    On October 29, 2020, during a Charles River earnings conference call with investors and analysts attended by Defendants Foster and Smith, Defendant Foster made the following representations concerning Charles River's long-tailed macaque supply chain:

> **Jack Meehan – Nephron Research LLC – Research Analyst**: Jim, there's been some [discussion] around some supply chain constraints when it comes to nonhuman primates just being shipped around. I was curious if you've seen any of that? And how you manage through it?

> **Defendant Foster**: So an important part of research in a whole host of areas, particularly for large molecules and have – it's a model that's been important for years. Supply sources are pretty much external. They're coming from places like China and Mauritius and Cambodia and Vietnam.

> And so **we work really hard to have multiple supply sources from multiple geographies and multiple suppliers within those geographies and have close working relationships with them to**

**ensure exceptional veterinary oversight and supply numbers that are consistent and preferably and hopefully always well in advance of when we need these animals because it's an important resource. And so we have always worked really hard at ensuring that supply – overall supply** and the numbers have ticked up over the last few years, so more suppliers are necessary.

And **we feel really good about our supply situation about our road to have certainly a sufficient number of [animals] for the balance of this year and well into next year.**

And it's a continual dialogue with the suppliers to try to match the supply with what we anticipate the need will be based upon what we hear from our clients. But I think **we're doing very well resourcing in [N]HPs.**

185.    Defendant Foster's representations were materially false and misleading. Contrary to having "multiple supply sources from multiple geographies and multiple suppliers within those geographies" and "close working relationships with them to ensure exceptional veterinary oversight," the Company had acquired a material number of long-tailed macaques from suppliers or brokers that were noncompliant and from Cambodia.  The statements were also false and misleading for the reasons stated at ¶¶ 162, 164, 166 above.

**Charles River's Financial Results for the Fourth Quarter and Full Year 2020**

186.    On February 17, 2021, the Company disclosed its financial results for the quarter and year ended December 26, 2020 and Defendants Foster and Smith caused the Company to issue a press release that was filed with the SEC on Form 8-K. Also on February 17, 2021, Defendants Foster and Smith caused the Company to file its Form 10-K with the SEC for the quarter and year ended December 26, 2020 (the "**2020 10-K**"), which was signed by Defendants Foster and Smith.

187.    The 2020 10-K repeated representations that were substantially similar to the representations in the Q3 10-Q 2020 delineated above concerning Charles River's supply chain.

188.    Defendants Foster and Smith's representations were materially false and

misleading at the time they were made, and they failed to disclose material facts that they had a duty to disclose in order to make the statements made by them, in light of the circumstances under which they were made, not misleading, for the reasons delineated above.

189.    The 2020 10-K contained representations that were substantially similar to the representations in the Q1 10-Q 2020 delineated above concerning Charles River's compliance with U.S. law and standards set by CITES and the USFWS. See ¶¶ 167 above.

190.    The 2020 10-K also represented the following concerning Charles River's large research models:

> The research models we supply have been, and continue to be, some of the most extensively used in the world, largely as a result of our geographic footprint and continuous commitment to innovation and quality. . . . **We are also a premier provider of** high quality, **purpose bred, SPF large research models to the biomedical research community.**

191.    Defendants Foster and Smith's representations were materially false and misleading at the time they were made because contrary to the representation that Charles River was a provider of "purpose bred" "large research models," the Company had engaged nonpreferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk that shipments received from these non-preferred suppliers contained animals that were not purpose-bred.

192.    Furthermore, due to the increased risk that the Company was receiving Cambodian long-tailed macaques from the wild, there was a substantially increased risk that the animals Charles River received and provided to its customers were not SPF, or specific pathogen free

animals, as represented. For long-tailed macaques, an SPF colony is usually free of Herpes-B virus and certain retroviruses. There is little chance that wild long-tailed macaques that have reached the age to be ready for export will be Herpes-B free, as almost all long-tailed macaques, unless isolated before sexual maturity in a controlled environment like a breeding farm, are expected to be Herpes-B positive. Accordingly, maintenance of a SPF free colony requires SPF animals to be kept separate from any non-SPF animals, something not possible with wild-caught animals. SPF animals were materially important to Charles River's business and its reputation because such animals are the preferred research models type for scientific studies and the majority of research institutions will not allow non-SPF long-tailed macaques in their facilities.

193.   The 2020 10-K stated the following concerning Charles River's "Code of Ethics":

> We have adopted a Code of Business Conduct and Ethics that applies to all of our employees and directors, including our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions. Our Code of Business Conduct and Ethics is posted on our website and can be accessed by selecting the "Corporate Governance" link at http://ir.criver.com.

194.   Under Charles River's Code of Business Conduct and Ethics (effective July 12, 2012 and last updated September 17, 2018) ("**Sept. 2018 Code**"), "[c]ompliance with legal requirements and standards of honesty, safety, fairness and integrity are central to our success" and "we expect our **suppliers, vendors, and other business partners** to comply with the high ethical and legal standards described in the Code, as further described in our **Supplier Code of Conduct . . . .**" (Emphasis in original and hyperlink to Supplier Code of Conduct omitted). The Sept. 2018 Code included an introductory message from Defendant Foster that stated it "describes our values and outlines the requirements and expected behavior for all of us who work on behalf of the Company."

195.   Charles River's Code of Business Conduct and Ethics stated the following, which

applied to the Company's suppliers:

> • **"Global Trade Compliance . . . We must comply with the international agreements and conventions,** as well as the national, regional and local laws and regulations that apply to our global and international business. This includes required certifications, standards, procedures and documentation relating to the humane treatment, care and handling of animals by dealers and research facilities. It also includes compliance with other laws concerning the importing or exporting of goods, services and technology."

> • **"Be truthful and accurate in all representations and certifications made to government agencies"**

> • "We must also make sure that **all information furnished to any customs officials or anyone we engage to facilitate our imports and exports is accurate and truthful.** To help ensure our compliance with applicable trade bans and restrictions, we need to keep accurate records of all international transactions."

> • "We must always be **truthful and accurate about our products and services.**"

> • "We are committed to compliance with both the letter and spirit of the laws and regulations relating to the care and use of research animals and to the other services and products we offer to support the activities of our clients. Since we operate in a highly regulated environment, **we must all be vigilant in meeting and going beyond our responsibilities to comply with relevant laws and regulations and in complying with all applicable policies and operating procedures.** Each of us plays a critical role in ensuring that we meet these high standards."

196. While the Sept. 2018 Code represented the Company and its suppliers "must comply with the international agreements and conventions" and "must all be vigilant in meeting and going beyond our responsibilities to comply with relevant laws and regulations and in complying with all applicable policies and operating procedures," Charles River actually had engaged non-preferred suppliers of animals from Cambodia.

197. Moreover, in contrast to the 2018 Code's requirement that all Charles River's executive, officers and employees and its suppliers "[b]e truthful and accurate in all representations

and certifications made to government agencies" and that "all information furnished to . . . anyone we engage to facilitate our imports and exports is accurate and truthful," the Company engaged non-preferred suppliers of animals from Cambodia in order to maintain a steady and timely supply of long-tailed macaques into the U.S

198.    The Sept. 2018 Code's representation that Charles River's executive, officers and employees must be "truthful and accurate about our products and services," was false because the Company failed to provide "purpose bred," "SPF" long-tailed macaques and the Company engaged suppliers of Cambodian long-tailed macaques for use in Charles River's Safety Assessment at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk that shipments received from these non-preferred suppliers contained animals that were not purpose-bred or SPF.

**D. Charles River's Financial Results for the First Quarter 2021 and June 2, 2021 Investor Conference**

199.    On May 4, 2021 the Company disclosed its financial results for the quarter ended March 27, 2021 and Defendants Foster and Smith caused the Company to issue a press release that was filed with the SEC on Form 8-K. Also on May 4, 2021, Defendants Foster and Smith caused the Company to file its Form 10-Q with the SEC for the quarter ended March 27, 2021 ("Q1 2021 10-Q"), which was signed by Defendants Foster and Smith.

200.    The Q1 2021 10-Q incorporated by reference the risk factor in the 2020 10-K concerning Charles River's supply chain ("you should carefully consider the factors discussed in Part I, "Item 1A. Risk Factors" in [the 2020-10-K] . . . There have been no material changes to the risk factors set forth in [the 2020 10-K] . . . ") delineated above regarding Charles River's supply

chain.

201.    Defendants Foster and Smith's representations were materially false and misleading for the reasons detained at ¶¶ 164, 166.

202.    On June 2, 2021, during a conference call in connection with the William Blair Growth Stock Conference in which Defendant Foster participated on behalf of the Company, Defendant Foster was asked "[w]e all hear a lot of questions about sort of supply chain stresses in the new every day. Are you seeing any of that in your business?"

203.    In response, Defendant Foster stated "I think we did a very good job throughout COVID in protecting our supply chain with a whole host of different thing[s] that we buy. So it was never a problem for us and doesn't feel like a challenge at the moment. I think we're managing that well and not having any sort of external or artificial roadblocks."

204.    Defendant Foster's representations were materially false and misleading because in order to avoid "roadblocks" and to protect the Company's supply chain, the Company engaged non-preferred suppliers of animals from Cambodia that were not purpose bred..

### E.  An Executive of a Charles River NHP Supplier is Indicted in Connection with a U.S. Government Investigation of the NHP Supply Chain

205.    As a result of a nonpublic investigation that began before the Relevant Period (in or around 2017), on or around August 4, 2021, the DOJ issued a press release titled "Man Convicted of Lying to Federal Agents During International Wildlife Trafficking Investigation," in connection with *U.S. v. Tucker*, 21-cr-20263 (S.D. Fl.) (the "***Tucker*** Action").

206.    According to the press release, Mr. Tucker, an executive of Orient BioResource, a Charles River supplier of Cambodian long-tailed macaques, admitted to lying to Special Agents of the USFWS during an interview concerning potential illegal trafficking of wildlife:

> During the interview, **agents asked Tucker about his involvement in the procurement and importation to the United States of long-**

> tailed macaques -- small non-human primates regularly
> employed in scientific research -- from Southeast Asia. . . . In
> particular, agents asked Tucker whether he or others working for his
> employer, Orient BioResource Center (OBRC), prepared or
> submitted to OBRC any audits or reports concerning visits to
> supplier sites in Cambodia. . . the existence of site visit reports or
> audits was material to **the ongoing investigation into the
> trafficking of the primates**, whose possession, sale, export and
> import is highly regulated by the international community and the
> United States under the Convention on International Trade in
> Endangered Species of Wild Fauna and Flora, to which the United
> States is a party, and the U.S. Endangered Species Act, Title 16,
> United States Code, Section 1538, et seq. Congress has tasked the
> USFWS to administer and enforce the provisions of the Treaty.

207.   On October 14, 2021, the DOJ issued a press release titled "Man Sentenced for

Lying to Federal Agents During International Wildlife Trafficking Investigation" concerning Mr.

Tucker of Orient Bio Resource that stated:

> A Texas man was sentenced in federal district court in Fort
> Lauderdale, Florida yesterday for knowingly and willfully making a
> materially false, fictitious, and fraudulent statement and
> representation to Special Agents of the United States Fish &
> Wildlife Service during **a criminal investigation of international
> trafficking of primates into the United States**.
>
> Gary Tucker, 64, of Alice, Texas, was sentenced to serve a three-
> year term of probation, with a special condition of home
> confinement for a period of three months, and to pay a criminal fine
> in the amount of $5,000 by U.S. District Judge William P.
> Dimitrouleas. . . . In connection with his guilty plea, Tucker
> admitted that in the course of an interview by Special Agents of the
> United States Fish & Wildlife Service (USFWS) **about potential
> illegal trafficking of wildlife, he was asked about his involvement
> in the procurement and importation to the U.S. of long-tailed
> macaques -- small non-human primates regularly employed in
> scientific research -- from Southeast Asia. . . .**

208.   The Sentencing Memorandum in the Tucker Action, dated October 7, 2021 (ECF

No. 27 in the Tucker Action), identified Tucker as Vice President of Orient BioResource, and

stated the following:

> **the Government has been investigating whether foreign**

**exporters and, potentially, U.S. importers are improperly importing wild-caught non-human primates into the United States despite the animals being labeled as captive bred in regulatory and related documents** . . . The conduct at issue in this case arose from the U.S. Attorney's Office for the Southern District of Florida and **the USFWS's ongoing investigation into the non-human primate importation industry** . . . news of [Tucker's] conviction has been disseminated by local and national sources. . . . Gary [Tucker]'s conduct, especially **the widespread knowledge of it among members of the industry** and his community, will forever stain his reputation and legacy.

209.    Tucker was a Vice President of Orient BioResource, which is a subsidiary of Inotiv. Inotiv was a supplier of long-tailed macaques to Charles River through Orient BioResource.

210.



## F.  Charles River's Financial Results for Third Quarter 2021

211.    On November 3, 2021 the Company disclosed its financial results for the quarter ended September 25, 2021 and Defendants Foster and Smith caused the Company to issue a press release that was filed with the SEC on Form 8-K ("**Nov. 3, 2021 Press Release**"). Also on November 3, 2021, Defendants Foster and Smith caused the Company to file its quarterly report on Form 10-Q with the SEC for the quarter ended September 25, 2021 ("**Q3 2021 10-Q**"), which was signed by Defendants Foster and Smith.

212.    The Nov. 3, 2021 Press Release reported that the DSA segment revenue increased:

"[f]rom a client perspective, biotechnology clients were the primary driver of DSA revenue growth, with solid contributions from global biopharmaceutical clients as well." The Q3 2021 10-Q similarly reported DSA revenue and operating income increased "due primarily to service revenue which increased in both the Safety Assessment and Discovery Services businesses due to demand from biotechnology and global biopharmaceutical clients; increased pricing of services . . . ."

213.    Defendants Foster and Smith's representations were materially false and misleading at the time they were made, and they failed to disclose material facts that they had a duty to disclose in order to make the statements made by them, in light of the circumstances under which they were made, not misleading, because they failed to disclose that the client demand for large research models, i.e., long-tailed macaques, and Charles River's Safety Assessment studies caused the Company to engage non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations; and 3) materially increased the risk that the Company's supply chain of long-tailed macaques would be materially interrupted thereby reducing the Company's reportedly "robust" revenue and backlog growth from its Safety Assessment studies.  They were also false and misleading for the reasons stated at ¶¶ 167.

214. On November 3, 2021, during a Charles River earnings conference call with investors and analysts attended by Defendants Foster and Smith, Defendants Foster and Smith made the following statements:

> **Defendant Smith**: Although cost inflation and supply chain pressures have made headlines recently, we believe **we are effectively managing . . . our supply chain**, and higher costs in these areas have been reflected in our updated guidance. . . . we are fortunate to be in the industry that we're in. We're not as buffeted by those issues as some, but neither are we immune. So that said, we believe **we're effectively managing those tighter . . . supply chains**, but it will take effort and it will take investment.
>
> ***
>
> **David Howard Windley - Jefferies LLC, Research Division - MD & Equity Analyst**: And then a related follow-up question is around the mix in that business. I'm thinking broadly about a pipeline that's moving toward large molecule in general, but also maybe at the bleeding edge moving towards cell and gene therapy and you've highlighted that part of your business. And so the shifting mix but also in that the supply chain for that shifting mix, how does that change the type of animal models that you need to use in those studies? And do you have access to all of those?
>
> **Defendant Foster**: Yes. There's -- **we work really hard at making sure we have sufficient supply of all of our animal models, particularly some of the larger models. And we've had to identify and validate multiple new sources of supply of multiple countries to accommodate just the increase in demand and the pace of demand and just to ensure that the supply is there**.
>
> It's an ongoing complex challenge, one that I think we're managing well. And we feel that **we are directionally managing it quite well in terms of having sufficient numbers for '22**.
>
> So yes, I mean the -- I think the animal models will become increasingly more complex, particularly some of the larger ones for the Biologics, in particular. I think that's been the case for some period of time.

215. Defendant Foster's representations were materially false and misleading at the time they were made, and he failed to disclose material facts that he had a duty to disclose as detailed

in ¶ 160.

216.     Moreover, Defendant Foster's representations were materially false and misleading at the time they were made because Defendant Foster failed to disclose that in order to avoid disruptions to the supply chain for long-tailed macaques, which were hampered and tightened due to COVID-19, Charles River had "expanded" its "supply sources" and had "greater access" by engaging suppliers like Orient BioResource and Envigo at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations; and 3) materially increased the risk that the Company's supply chain of long-tailed macaques would be materially interrupted thereby reducing the Company's revenue and operating margin from its Safety Assessment studies. Moreover, in contrast to Foster's representation that Charles River "meaningfully expanded" its supply sources in terms of "countries of origin" and "numbers of suppliers in those countries or origin," Charles River's supply chain of long-tailed macaques was over concentrated in Cambodia and in its use of animal suppliers or brokers that, as Defendant Foster admitted after the Relevant Period, "get animals from wherever," are not "the best possible people to use," and do not "care where the animals come from or what the background is," And included multiple non-preferred suppliers of Cambodian animals from Envigo, Orient BioResource and the Vanny Group.

217. 

Indeed, WWP  has a long, ugly history of violating state, federal, and international laws and was a frequent target of animal activist criticism.

**G.  Charles River Supplier Envigo Receives DOJ Grand Jury Subpoena**

219.    On February 16, 2022, Inotiv disclosed in a filing with the SEC that on "June 15, 2021, Envigo Global Services, Inc., a subsidiary of the Company acquired in the Envigo acquisition, was served with a grand jury subpoena issued by the Department of Justice in Miami, Florida requiring the production of documents related to the importation into the United States of live non-human primates originating from or transiting through China, Cambodia and/or Vietnam . . . ."

220.    By this point in time, Charles River had acquired at least 1,918 long-tailed macaques from Inotiv or through its subsidiaries since the start of the Relevant Period. In 2021 Envigo and Orient BioResource supplied over 814 long-tailed macaques to Charles River, accounting for approximately 5% of long-tailed macaques Charles River used in 2021 according to the USDA.

**H.  Charles River's Financial Results for the Fourth Quarter and Full Year 2021**

221.    Also on February 16, 2022 the Company disclosed its financial results for the quarter and year ended December 25, 2021 and Defendants Foster and Smith caused the Company to issue a press release that was filed with the SEC on Form 8-K ("**Feb. 16, 2022 Press Release**"). Also on February 16, 2022, Defendants Foster and Smith caused the Company to file a form 10-K with the SEC (the "**2021 10-K**"), which was signed by Defendants Foster and Smith.

222.    The Feb. 16, 2022 Press Release reported that during the quarter ended December 25, 2021 revenue in the Company's DSA segment increased "principally by the Safety Assessment business" and that revenue and operating margin increased in 2021. Similarly, the 2021 10-K represented that in the DSA segment "Robust Safety Assessment revenue growth was primarily driven by unprecedented client demand and increased pricing, which was supported by record backlog levels."

223.    Defendants Foster and Smith's representations were materially false and misleading at the time they were made, and they failed to disclose material facts that they had a duty to disclose in order to make the statements made by them, in light of the circumstances under which they were made, not misleading, because they failed to disclose that the client demand for large research models, i.e., long-tailed macaques, and Charles River's Safety Assessment studies caused the Company to engage non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production

and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations; and 3) materially increased the risk that the Company's supply chain of long-tailed macaques would be materially interrupted thereby reducing the Company's reportedly "robust" revenue and backlog growth from its Safety Assessment studies.

224.    The 2021 10-K stated "[t]he research models we supply have been, and continue to be, some of the most extensively used in the world, largely as a result of our geographic footprint and continuous commitment to innovation and quality. . . . We are also a premier provider of high quality, **purpose bred, SPF** large research models to the biomedical research community."

225.    Defendants Foster and Smith's representations were materially false and misleading at the time they were made, and they failed to disclose material facts that they had a duty to disclose in order to make the statements made by them, in light of the circumstances under which they were made, not misleading, because contrary to the representation that Charles River was a provider of "purpose bred" "large research models," the Company had engaged nonpreferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk that shipments

received from these non-preferred suppliers contained animals that were not purpose-bred.

226.    Furthermore, due to the increased risk that the Company was receiving Cambodian long-tailed macaques from the wild, there was a substantially increased risk that the animals Charles River received and provided to its customers were not SPF, or specific pathogen free animals, as represented. For long-tailed macaques, an SPF colony is usually free of Herpes-B virus and certain retroviruses. There is little chance that wild long-tailed macaques that have reached the age to be ready for export will be Herpes-B free, as almost all long-tailed macaques, unless isolated before sexual maturity in a controlled environment like a breeding farm, are expected to be Herpes-B positive. Accordingly, maintenance of a SPF free colony requires SPF animals to be kept separate from any non-SPF animals, something not possible with wild-caught animals. SPF animals were materially important to Charles River's business and its reputation because such animals are the preferred research models type for scientific studies and the majority of research institutions will not allow non-SPF long-tailed macaques in their facilities.

227.    The 2021 10-K stated the following concerning Charles River's supply chain:

> We are focused on ensuring that we have adequate inventory and supplies on hand given the potential disruption of the COVID-19 pandemic to our suppliers and their supply chain. Accordingly, **we have and expect to continue to increase inventory and supplies in 2022. We continuously engage with our suppliers to limit any potential disruption to our supply chain**. However, notwithstanding generally successful efforts to maintain supply chain continuity, we have experienced increased costs and delays throughout our supply chain during the pandemic.

228.    Defendants Foster and Smith's representations were materially false and misleading at the time they were made, and they failed to disclose material facts that they had a duty to disclose in order to make the statements made by them, in light of the circumstances under which they were made, not misleading, because they failed to disclose that in order to increase inventory and supply of long-tailed macaques for use in the Company's Safety Assessment studies

72

and to limit disruption in the supply chain of long-tailed macaques, the Company engaged nonpreferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; and 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations.

229.    The 2021 10-K stated the following risk factor concerning Charles River's supply chain:

> **Several of our product and service offerings are dependent on a limited source of supply that, when interrupted, adversely affects our business.**
>
> **We depend on a limited international source of supply for certain products, such as large research models.** Disruptions to their continued supply from time to time arise from health problems (including as a result of the COVID-19 pandemic and the spread of other diseases), export or import laws/restrictions or embargoes, tariffs, inflation, international trade regulations, foreign government or economic instability, severe weather conditions, increased competition among suppliers for models, disruptions to the air travel system, activist campaigns, commercial disputes, supplier insolvency, geopolitical disputes, measures intended to slow the spread of COVID-19 or other ordinary course or unanticipated events. Any disruption of supply could materially harm our business if we cannot remove the disruption or are unable to secure an alternative or secondary supply source on comparable commercial terms. For example, as with other industry participants, **certain of our activities rely on a sufficient supply of large research models, which has seen increasing demand as compared to supply in 2020 and 2021 and into 2022 due to a variety of factors. First, the surge of research relating to COVID-19 has increased short term demand. Second, China supplies a significant portion**

**of certain critical large research models, which have been subject to geographic export restrictions applicable to many animal species since the beginning of the COVID-19 pandemic. While we continue to take steps to find alternative supply channels and lock in supply with preferred sources through multi-year and/or minimum commitment contracts,** such mitigating efforts may not prove successful at ensuring a steady and timely supply or may require (and in the past have required) us to pay significantly higher prices for such products during periods of global shortage or restrictions on the transportation of products. **Limited global supply or regional restrictions on transportation for certain products may require us to source products from non-preferred vendors, which may not be successful**.

230.     Defendants Foster and Smith's representations were materially false and misleading at the time they were made, and they failed to disclose material facts that they had a duty to disclose in order to make the statements made by them, in light of the circumstances under which they were made, not misleading, because Defendants failed to disclose that in order to ensure a "steady and timely supply" of long-tailed macaques and avoid disruption to the supply chain of long-tailed macaques, the Company engaged non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; and 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations. Further, while Defendants represented that Charles River "may" in the future source products from "non-preferred vendors," the Company had at that time already engaged non-preferred suppliers of Cambodian long-tailed macaques like Orient BioResource and Envigo who sourced Cambodian long-tailed macaques from the Vanny

Group.

231.    The 2021 10-K stated the risk factor concerning Charles River's compliance with

U.S. law and standards set by CITES and the USFWS:

> **Any failure by us to comply with applicable regulations and related guidance could harm our reputation and operating results, and compliance with new regulations and guidance may result in additional costs.**
>
> Any failure on our part to comply with applicable regulations could result in the termination of ongoing research or the disqualification of data for submission on behalf of our clients to regulatory authorities. This could harm our reputation, our prospects for future work and our operating results. . . . **If** our operations are found to violate any applicable law or other governmental regulations, we **might** be subject to civil and criminal penalties, damages and fines or the temporary closure of our facilities. Any action against us for violation of these laws or regulations, even if we successfully defend against it, could cause us to incur significant legal expenses, divert our management's attention from the operation of our business and damage our reputation. . . .
>
> Although we believe **we are currently in compliance in all material respects with applicable national, regional and local laws, as well as other accepted guidance used by oversight bodies (including . . . the standards set by the . . . . the Convention on International Trade in Endangered Species of Wild Fauna and Flora, U.S. Fish and Wildlife Service,** The Centers for Disease Control . . .), **failure to comply could subject us to denial of the right to conduct business, fines, criminal penalties and other enforcement actions.**

232.    Defendants Foster and Smith's representations were materially false and

misleading at the time they were made, and they failed to disclose material facts that they had a

duty to disclose in order to make the statements made by them, in light of the circumstances under

which they were made, not misleading. While Defendants represented that the Company was in

compliance with U.S. law and standards set by CITES and the USFWS, and warned that in the

future the Company could subject to enforcement actions, they failed to disclose that the Company

had already engaged in conduct that substantially and materially increased the risk to the Company. By engaging and purchasing long-tailed macaques from non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques, it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; and 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations.

233. The 2021 10-K stated the following concerning Charles River's "Code of Ethics":

> We have adopted a Code of Business Conduct and Ethics that applies to all of our employees and directors, including our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions. Our Code of Business Conduct and Ethics is posted on our website and can be accessed by selecting the "Corporate Governance" link at http://ir.criver.com.

234. Under Charles River's Code of Business Conduct and Ethics (updated December 31, 2021) ("**2021 Code**"), "[c]ritical to the Company's success is our compliance with legal requirements and standards of honesty, safety, and integrity" and "we expect our **suppliers, vendors, and other business partners** to comply with the high ethical and legal standards described in the Code, as further described in our **Supplier Code of Conduct** . . . ." (Emphasis in original). The Code of Business Conduct and Ethics included a hyperlink to the Company's Supplier Code of Conduct.

235. The representations in both the 2021 Code and the Supplier Code of Conduct are substantially similar to the representations delineated above in the Sept. 2018 Code and the Charles

76

River's Supplier Code of Conduct (dated 2016).

236.    Defendants Charles River and Foster's representations were materially false and misleading at the time they were made, and they failed to disclose material facts that they had a duty to disclose in order to make the statements made by them, in light of the circumstances under which they were made, not misleading. While the 2021 Code represented the Company and its suppliers "must comply with the international agreements and conventions" and "must all be vigilant in meeting and going beyond our responsibilities to comply with relevant laws and regulations and in complying with all applicable policies and operating procedures," at that time Charles River had engaged non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; and 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations.

237.    In contrast to the 2021 Code's requirement that all Charles River's executive, officers and employees and its suppliers "[b]e truthful and accurate in all representations and certifications made to government agencies" and that it "[f]urnish[es] accurate and complete information to any customs officials or anyone we engage to facilitate our imports and exports", in order to maintain a steady and timely supply of long-tailed macaques into the U.S., the Company engaged non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers

of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; and 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations.

238.    Finally, the 2021 Code's representation that Charles River's executive, officers and employees must be "truthful and accurate about our products and services," was not true at the time and was materially misleading because contrary to the representation that the Company provided "purpose bred," "SPF" long-tailed macaques, the Company engaged suppliers of Cambodian long-tailed macaques for use in Charles River's Safety Assessment at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk that shipments received from these non-preferred suppliers contained animals that were not purpose-bred or SPF.

239.    Under Charles River's Supplier Code of Conduct (dated 2016), Charles River represented that its suppliers "are expected to comply with all applicable laws, rules and regulations as well as the standards set forth" in the Supplier Code of Conduct and "[w]e consider you a part of the Charles River team" and "[s]uppliers are expected to conduct business in

accordance with the highest ethical standards and act with integrity."

240.    Charles River's representations were materially false and misleading at the time they were made, and it failed to disclose material facts that it had a duty to disclose in order to make the statements made by it, in light of the circumstances under which they were made, not misleading. At this time Charles River had engaged non-preferred suppliers of animals from Cambodia at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; and 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations. Indeed, the Company had engaged nonpreferred suppliers, namely Orient BioResource, Envigo, the Vanny Group who, based on the facts alleged herein, there is a strong inference were not complying with "all applicable laws and regulations of the countries of their operations" and were not exercising responsible sourcing in the supplier's supply chain."

### I.   Charles River's Financial Results for the First Quarter 2022

241.    On May 4, 2022, the Company disclosed its financial results for the quarter ended March 26, 2022 and Defendants Foster and Smith caused the Company to issue a press release that was filed with the SEC on Form 8-K ("**May 4, 2022 Press Release**"). Also on May 4, 2022, Defendants Foster and Smith caused the Company to file its Form 10-Q with the SEC for the quarter ended March 26, 2021 ("**Q1 2022 10-Q**"), which was signed by Defendants Foster and Smith.

242.    The May 4, 2022 Press Release reported that DSA segment revenue and operating margin increased. Similarly the Q1 2022 10-Q reported that revenue and operating margin increased in the DSA segment "primarily to service revenue which increased in both the Safety Assessment and Discovery Services businesses due principally to increased pricing of services . . . ."

243.    Defendants Foster and Smith's representations were materially false and misleading at the time they were made, and they failed to disclose material facts that they had a duty to disclose in order to make the statements made by them, in light of the circumstances under which they were made, not misleading for the reasons stated at ¶¶ 163, 165.

**J.  Charles River Supplier Orient BioResource Receives DOJ Grand Jury Subpoena**

244.    On May 16, 2022, Inotiv disclosed in a filing with the SEC that not only had the DOJ's investigation of Envigo continued, but also that Orient BioResource was under investigation:

> On June 15, 2021, Envigo Global Services, Inc. ("EGSI"), a subsidiary of the Company acquired in the Envigo acquisition, received a grand jury subpoena requested by the U.S. Attorney's Office for the Southern District of Florida ("USAO") for the production of documents related to the procurement of non-human primates ("NHPs") from foreign suppliers for the period January 1, 2018 through June 1, 2021. The subpoena relates to an earlier grand jury subpoena requested by the USAO and received by EGSI's predecessor entity, Covance Research Products, in April 2019. Envigo acquired EGSI from Covance, Inc. ("Covance"), a subsidiary of Laboratory Corporation of America Holdings, in June 2019. . . .

> On January 27, 2022, EGSI acquired OBRC, which owns and operates a primate quarantine and holding facility located near Alice, Texas. In 2019, OBRC received grand jury subpoenas requested by the USAO requiring the production of documents and information related to its importation of NHPs into the United States. On June 16, 2021, OBRC received a grand jury subpoena requested by the USAO requiring the production of documents related to the procurement of NHPs from foreign suppliers for the

period January 1, 2018 through June 1, 2021.

245. ██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

### K. Charles River's Financial Results for the Second Quarter 2022

246.     On August 3, 2022 the Company disclosed its financial results for the quarter ended June 25, 2022 and Defendant Foster caused the Company to issue a press release that was filed with the SEC on Form 8-K ("**Aug. 3, 2022 Press Release**"). Also on August 3, 2022, Defendant Foster caused the Company to file its Form 10-Q with the SEC for the quarter ended June 25, 2022 ("**Q2 2022 10-Q**"), which was signed by Defendant Foster.

247.     The Aug. 3, 2022 Press Release stated the following:

> James C. Foster, Chairman, President and Chief Executive Officer, said, "Our second-quarter financial results reflect the sustained trends that continue to support our business, particularly our **DSA and RMS business segments for which demand continues to be strong** and the performance remains consistent with our initial outlook for the year. **Safety Assessment continues to benefit from a growing backlog that is well above the prior-year level and solid booking activity**, which support the anticipated DSA growth acceleration in the second half of the year."

248.     Notably, the forgoing information does not discuss ███████████████

████████████████████████████████████████████████

██████████████████████████████████████  ████████

### L. USFWS Refuses to Clear Shipment of over 1,000 Long-Tailed Macaques Sourced from KF Cambodia to Charles River

249.     On or around September 21, 2022, the USFWS, which along with the DOJ was conducting an ongoing criminal investigation into the NHP importation industry, refused to clear

a shipment of 360 long-tailed macaques with a reported value of $3,240,000 from KF Cambodia to Charles River at Dulles International Airport in Virginia.

250. Under 50 C.F.R. § 14.53, any USFWS officer may refuse clearance of imported or exported wildlife when there are responsible grounds to believe that a federal law or regulation has been violated. When a shipment is refused, the USFWS "will mail a notice of detention by registered or certified mail, return receipt requested, to the importer or consignee, or exporter, if known or easily ascertainable. Such notice must describe the detained wildlife or other property, indicate the reason for the detention, describe the general nature of the tests or inquiries to be conducted, and indicate that if the releasability of the wildlife has not been determined within 30 days after the date of the notice, or a longer period if specifically stated, that the Service will deem the wildlife to be seized and will issue no further notification of seizure."

251. According to USFWS data, before the refusal to clear the shipment on or around September 21, 2022, no imports of long-tailed macaques imported from KF Cambodia had ever been refused by the USFWS.

252. At or around that time, USFWS contacted primate sanctuaries to determine whether they had capacity to host the blocked shipment of 360 long-tailed macaques, presumably for purposes of preserving evidence in connection with its ongoing criminal investigation.

253. Subsequently, the USFWS refused to clear additional shipments from KF Cambodia to Charles River in the U.S.

254. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████

### M. The DOJ Indictment of Charles River's Suppliers

255.    On November 16, 2022, the Indictment was unsealed in which two Cambodian government officials responsible for implementation and oversight of CITES, and six executives of the Vanny Group were charged with taking part in a smuggling scheme involving long-tailed macaques.

256.    The indictment identifies two unnamed co-conspirators, a Florida company with its principal place of business in the Southern District of Florida that is engaged in the importation and sale of NHPs, including long-tailed macaques, and a Texas company with its principal place of business in Alice, Texas.

257.    The unnamed co-conspirators are Worldwide Primates in Miami, Florida, and Inotiv or its subsidiaries Orient BioResource and Envigo, in Alice, Texas.

258.    The action is captioned *U.S. v. Omaliss Keo, et al.*, 22cr20240 and is pending in U.S. District Court for the Southern District of Florida. According to a DOJ press release, dated November 16, 2022:

> Members of an international primate smuggling ring have been charged with multiple felonies for their role in bringing wild long-tailed macaques into the United States.
>
> The eight-count indictment charges two officials of the Cambodian Forestry Administration, Ministry of Agriculture, Forestry and Fisheries; the owner/founder of a major primate supply organization and its general manager; and four of its employees with smuggling and conspiracy to violate the Lacey Act and the Endangered Species Act. The defendants facing these felony charges are:
>
> • Omaliss Keo, 58, of Phnom Penh, Cambodia, Director General of the Cambodian Forestry Administration, Ministry of Agriculture, Forestry and Fisheries
>
> • Masphal Kry, 46, of Phnom Penh, Cambodia, Deputy Director of

the Department of Wildlife and Biodiversity for the Cambodian Forestry Administration, Ministry of Agriculture, Forestry and Fisheries

• James Man Sang Lau, 64, of Hong Kong, Founder/Owner Vanny Resources Holdings, Ltd., and Vanny Bio Research (Cambodia) Corporation Ltd.[20]

• Dickson Lau, 29, of Hong Kong, General Manager Vanny Resources Holdings Ltd.

• Sunny Chan, a resident of Hong Kong, Deputy General Manager (Operations) at Vanny Group

• Raphael Cheung Man, 71, of Phnom Penh, Cambodia, Public Relations and Export Manager for Vanny Bio Research (Cambodia) Corporation Ltd.

• Sarah Yeung, a Hong Kong resident and Finance Officer of Vanny Group

• Hing Ip Chung, 61, of Phnom Penh, Cambodia, General Manager of Vanny Bio Research (Cambodia) Corporation Ltd.

If convicted, each defendant faces up to 5 years in prison on the charge of conspiracy in count 1 and up to 20 years imprisonment on each of the smuggling charges in counts 2 through 8. There also are potential fines with respect to each count of up to $250,000 or twice the financial gain to the defendants.

259.    The Indictment alleges that Mr. Lau and Dickson Lau, operating from Hong Kong, owned and managed a series of related corporations (Vanny Group) that conspired with black market collectors and corrupt officials in Cambodia to acquire wild-caught macaques and launder them through the Cambodian entities for export to the U.S. and elsewhere, falsely labelled as captive bred.

260.    In order to make up for a shortage of suitable monkeys at the putative breeding

---

[20] Mr. Lau, as noted above, is affiliated with Vanny Chain Tech, which is a joint venture partner with the government of Vietnam in Nafovanny.

facilities in Cambodia, the co-conspirators enlisted the assistance of the CITES authority in Cambodia and the Ministry of Agriculture, Forestry and Fisheries (MAFF) to deliver wild-caught macaques taken from national parks and protected areas in Cambodia. These macaques were taken to breeding facilities and provided false CITES export permits. A collection quota of 3,000 "unofficial" monkeys was allowed, for which MAFF officials received cash payments.

261.    The conspiracy charge of the indictment lists 31 representative "overt acts" undertaken by one or more of the co-conspirators in their efforts to carry out their criminal enterprise. These include meetings, financial transactions, shipments of hundreds of macaques— wild caught mixed in with captive bred—to locations in Florida (Worldwide Primates) and Texas (Inotiv) under false documents. Wild long-tailed macaques also were said to have been delivered by Kry and other employees of MAFF to a facility in Pursat, Cambodia.

262.    Between December 2017 and September 2022, Kry is alleged to have taken part in conversations regarding the pricing for wild macaques to be captured and delivered to monkey breeding facilities operated by the co-conspirators. Kry, who participated personally in delivering these "unofficial" macaques to the facilities, including Vanny Cambodia, also was provided payments for the illegal monkeys from the co-conspirators.

263.    The Indictment alleges, in part, the following:

> 4. The defendants and their unindicted co-conspirators established facilities in Cambodia purporting to breed long-tailed macaques for sale on the world market.
>
> 5. The defendants and their unindicted co-conspirators engaged with customers in the United States and elsewhere and entered into contractual agreements to sell and export purportedly captive-bred macaques from Cambodia to the United States.
>
> 6. The defendants and their unindicted co-conspirators established a logistics system to allow buyers to inspect macaques prior to sale, including through the use of veterinarians, to test the

monkeys for disqualifying conditions, quarantine shipments prior to export, and arrange the necessary ground and air transportation to facilitate the transactions.

7. The defendants and their unindicted co-conspirators arranged to illegally purchase additional long-tailed macaques from black market suppliers in Cambodia and Thailand to make up for the lack of supply of suitable monkeys at their purported breeding operations. The black market suppliers, including MAFF, identified in Vanny HK and VBRC records through the use of the letters A, B, C, D, E, F, G, H, K, P, and X, would primarily deliver the illegally acquired monkeys to the VBRC facility at Pursat.

8. The defendants and their unindicted co-conspirators utilized the services of MAFF and its employees to further the purpose and objects of the conspiracy, and:

a. To secure CITES export permits which falsely identified wild-caught macaques as captive bred in the VBRC facilities;

b. To act as the source, under the designation of Black Market Supply "A," of wild-caught macaques from National Parks and protected areas which MAFF employees delivered to VBRC for later sale and export;

c. To provide Transport Permits which allowed macaques unsuitable for the export trade to be sent from the Pursat facility to the Phnom Penh facility where they were euthanized and their identification tags transferred to wild-caught macaques to make it appear the black-market monkeys were captive bred at VBRC facilities;

d. To provide unofficial collection quotas, for which cash payments to MAFF were authorized at Vanny HK and made by VBRC employees.

9. The defendants and their unindicted co-conspirators delivered and caused the delivery of wild-caught long-tailed macaques to various international airports in the United States, accompanied by Cambodian CITES Permits and FWS Form 3-177s falsely identifying the monkeys as captive bred.

10. Upon entry into the United States, the long-tailed macaque shipments would be forwarded by truck from the port of entry to a quarantine facility designated by the

importers/consignees, who were located in various states, including
the Southern District of Florida.

264.    On November 16, 2022, Charles River shares declined from a closing price on
November 15, 2022 of $250.07 per share, to close at $239.39 per share, a decline of $10.68 per
share or approximately 4.3% on heavier than usual volume.

265.    On November 17, 2022, Inotiv filed a report with the SEC on Form 8-K that stated
the Indictment has "criminally charged employees of **the Company's principal supplier of
nonhuman primates ("NHPs"),** along with two Cambodian officials, with conspiring to illegally
import NHPs into the United States from December 2017 through January 2022 and in connection
with seven specific imports between July 2018 and December 2021." (Emphasis added).

266.    At the time, investors were unaware that Inotiv was a material supplier of
Cambodian long-tailed macaques to Charles River. Indeed, analysts concluded that Charles River
had no exposure to Vanny Cambodia or Inotiv and in fact could benefit from a further restriction
of the supply of long-tailed macaques. On November 29, 2022, Wells Fargo issued a research
report concerning Charles River that stated "pre-clinical CROs with secure supply, such as CRL
**who has no direct or indirect exposure to the supplier in question, could stand to benefit** from
share gains as well as increased pricing power as a result of potential price elasticity leaking into
the small animal model market (CRL does not breed/sell NHPs, only small animal models)
supported by the FDA's 1Q22 guidance update effectively increasing the fungibility of large
animal models for small animal models in-lieu of NHP shortages . . . ." (Emphasis added).

267.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

[redacted]

[redacted]

[redacted]

268.  [redacted]

[redacted]

[redacted]

**N. Charles River and Defendant Foster's False and Misleading Statements In Response to the Indictment**

269.    On November 30, 2020, Charles River filed a report with the SEC on Form 8-K

that stated the following in advance of Defendant Foster's representations at the Evercore ISI 5th

Annual HealthCONx Conference:

> a. Charles River was not named or referenced in the DOJ proceedings, and **the Company does not have any direct supply contracts with the indicted Cambodian supplier**.
>
> b. **Charles River has global supply sources, including other sources in Cambodia**, which is the primary country of origin of NHP imports to the United States and to Charles River. However, in light of the indictment, and subsequent statements made by the Cambodia government, Charles River is operating under the expectation that for some time period supply of Cambodia-sourced NHPs will be difficult to obtain in the United States; and
>
> c. The Company is diligently working to mitigate any Cambodia NHP supply impact with ongoing efforts to procure NHPs under different supply arrangements and from other global sources.

270.    During the Evercore ISI 5th Annual HealthCONx Conference, Defendant Foster

made the following statements:

> **Elizabeth Hammell Anderson Evercore ISI Institutional Equities, Research Division - MD & Fundamental Research Analyst**: I know this has become a hot topic this fall, but can you sort of provide us an update with supply situation given recent developments, there's been a lot of speculation and whatnot. So how does that -- what's the lay of the land right now on that?

**Defendant Foster**: So very complex. NHP situation is always complex. It's a very fluid situation, and NHPs have been an increasingly higher demand over time as biologics have exploded and that's kind of the model of choice for testing biologics. And during recent times, we've seen analysts and media reports talk about pricing and supply chain. And most recently, there's been an indictment of one of the Cambodian NHP suppliers.

So we get a bunch of our NHPs from Cambodia. Charles River was named or referenced and these proceedings that charge the Cambodian supplier, there were also a couple of Cambodian officials that were named in this indictment, and **we don't have any direct contacts with that supplier either**. So the supplier runs [afoul] of the sort of transportation and shipping laws with the Department of Justice and they pulled back. So we have -- as we've talked about a lot, we worked arduously for the last few years, in particular, to have additional supply sources, which we have.

We have multiple supply sources and multiple suppliers in individual countries, including Cambodia, but Cambodia is still the primary country of origin of most of the imports into the U.S. and into Charles River. But in light of this indictment and subsequent statements made by the Cambodian government, we anticipate that for some period of time, there's going to be some disruption and difficulty in getting NHPs into the U.S. That is speculation. We have no idea how pronounced that will be, how long it will be.

And as I said, it's totally fluid. Obviously, we're **working really hard to mitigate any potential adverse impact with other supply sources with our current supplier in Cambodia**, with government, et cetera. So we're all over this to enhance and improve our supply arrangements. And I guess the last thing I would say is we work really hard with our supplier due diligence in terms of their management practices, veterinary practices, shipping practices, husbandry practices to ensure the quality of the supplier relationships and to ensure that what we do is fully compliant with U.S. and international regulations.

So really complex [] situation at the moment, more complex by the fact that **one of the big suppliers from Cambodia, who's not a supplier of ours is unable to ship. So that's going to hurt some folks**. And we have a little bit of a dialogue from government officials who were displeased with the action taken by the DOJ with regard to one of the Cambodian suppliers. They were, I think, defensive and a bit reverent about the U.S. government saying that

things aren't being done well that there's – we're concerned about some pushback by the government. So we don't know that for a fact, but watching it closely. So I would say that the complex NHP situation at the moment is more complex, but we're confident that we will work through as well.

**Elizabeth Hammell Anderson Evercore ISI Institutional Equities, Research Division - MD & Fundamental Research Analyst**: Got it. And then when do you sort of see like from a COVID perspective, like obviously, there's been changing in the supply arrangement. When do you see that supply constraint kind of easing? Is that like a -- like a cross 2023 event? Is that more of a 2024 event in terms of supply increases in that market?

**Defendant Foster**: Tough to say. I would say as a general proposition, we have had a sufficiency of supply for '22. And directionally, have had – have developed sufficient supply for the next fiscal year, subject to our now concern that the government of Cambodia could be problematic. So I think that we have and will continue to do a really positive job in staying close to our suppliers, increasing our relationships with our suppliers both contractually and otherwise, we have some joint ventures. We have the elongation of contracts. We have new geographies.

COVID made it a little bit difficult for us to go and inspect all of these facilities. **Facility that we work with in Cambodia is extremely high quality one, all the ones that we work with are high quality ones**. So we'll keep up that oversight and our intention, obviously, is to work really hard. So we don't have any disruption of supply for ourselves and obviously for our clients. . .

**Elizabeth Hammell Anderson Evercore ISI Institutional Equities, Research Division - MD & Fundamental Research Analyst**: . . . Is there anything you can say on either one, the percentage of revenues from NHPs and then -- or maybe like the percent of NHP supply that comes from Cambodia and sort of like -- can you replace all of that? Can you replace most of it? Is that like a work in progress? Is there anything else you can say on that front?

**Defendant Foster**: Sure. Without being too granular, it's a -- the majority of the animals that come for everyone, including us at the moment from Cambodia. So it's a central supply source. And just a quick history for people that don't recall, most of the monkeys used to come from China, who stopped shipping them a couple of years ago to keep them in China for their own benefit. So we all pivoted to Cambodia where the quality is actually good, and the genetics is

similar and the health status is good and the numbers are good. So -
- and **we have a really good supplier over there and a good
relationship and a big supply contract**.

So if we don't have undue government -- Cambodian government
intrusion and preventing that from happening, it's possible we'll be
fine. This is just -- and obviously, we have other sources of supply,
some of which we've had for years, some of which are new, some
of which are more nascent than others and kind of the background
data on the animal models is not quite as well known, but I do think
that both we and our clients will be comfortable using whatever
models are available because we don't want to just have a chilling
effect on drug development.

So – it's -- this whole thing is so new, the sort of allegations on the
supplier in Cambodia was sort of dramatic. **It's not a supplier of
ours. It's not directed to us**. . . . So has no real short-term impact.
We'll do everything we can to reduce the impact, obviously, on our
clients.

271.    On this news, Charles River's shares declined from $239.50 per share at the close

of trading on November 29, 2022, to trade as low as $210.36 per share during trading on November

30, 2022, or by over 12%, and closed at $228.57 per share on November 30, 2022, a decline of

$10.93 per share or 4.6%, on heavier than usual trading volume.

272.    Analysts attributed the stock price decline to the potential impact on Charles

River's financial results from the loss of supply of long-tailed macaques from Cambodia. For

example, on November 30, 2022, UBS issued a research report concerning Charles River that

based on Foster's statements "we believe the impact of this news to be modest, but note that the

Discovery and Safety Assessment (DSA) business performs a wide variety of studies, some of

which require NHPs. . . we believe the issues to be temporary and note that the company is already

working to obtain supply from alternative sources."

273.    Also on November 30, 2020, Stephens issued a research report concerning Charles

River that stated the following:

this is new news to ourselves and the Company . . . CRL does not

91

have any direct supply contracts with the indicated Cambodian supplier. However, CRL did suggest there could be an impact on the export of these models out of Cambodia in the near-term (CRL's largest NHP supplier is located in Cambodia).

**Some Context**. . . . If we assume NHPs generate $40 thousand - $60 thousand of revenue/animal, this would imply $545 mil. - $818 mil. of revenue from NHPs in FY22. This would represent ~28% of DSA revenue or ~17% of FY22 revenue.

• CRL said today the majority of their (and the industry's) NHPs come from Cambodia after China stopped exporting in recent years. . . .

• CRL does not believe this will impact near-term results, but it could impact their FY23 outlook.

274.    However, on November 30, 2022, Defendants Charles River and Foster's false and misleading statements concerning Charles River's suppliers in Cambodia maintained the artificial inflation in the price of Charles River's common stock. While Defendant Foster represented that Charles River does not have any "direct supply contracts" with the specific Vanny Group company whose executives were indicted (Vanny Cambodia), this representation was materially false and misleading because Charles River and Foster failed to disclose Charles River had obtained longtailed macaques from the Vanny Group through the unnamed co-conspirators in the Indictment, Worldwide Primates and Inotiv through Envigo and Orient BioResource. Furthermore, while Charles River and Foster represented that the Company did not have "direct" supply contracts with Vanny Cambodia whose executives were indicted, Charles River had and continued to directly acquire live long-tailed macaques or animal specimen from other companies within the Vanny Group, namely Nafovanny and KHI. Moreover, Defendant Foster's statement that the Indictment was "not related to us," failed to disclose that in September 2022 the USFWS had already refused or rejected Charles River's import of long-tailed macaques from its direct supplier, KF Cambodia, in connection with its ongoing criminal investigation and, like Vanny, KF

Cambodia was unable to export to the U.S.

275. 

276.

277.

278. On December 12, 2022, Inotiv filed a report with the SEC on Form 8-K and issued a press release that stated, "[t]he Company is proactively discussing these matters with its NHP customers," which includes Charles River because it purchased long-tailed macaques from Inotiv or its subsidiaries Envigo and Orient Bioresource throughout the Relevant Period and as recently as on or around November 7, 2022. Inotiv further stated:

> Since learning of the issues related to the Supplier, the Company has been focused on attempting to obtain additional information, assessing the impact on its NHP sale activities, **communicating with its customers** . . .

> The Company has not been directed to refrain from selling the
> Cambodian NHPs in its possession in the U.S. However, due to the
> allegations contained in the indictment involving the Supplier and
> the Cambodian Government officials, the Company believes that it
> is prudent, at the present time, to refrain from selling or delivering
> any of its Cambodian NHPs held in the U.S. until the Company's
> staff and external experts can evaluate what additionally can be done
> to satisfy itself that the NHPs in inventory from Cambodia can be
> reasonably determined to be purposebred. . . .
>
> We have been informed that Cambodia has currently ceased any
> exports of NHPs, and therefore we are not currently importing any
> NHPs from Cambodia. We do not know when or if they intend to
> resume allowing shipments or when and if the U.S. Fish and
> Wildlife Service will allow shipments. . . .

279.   Also on December 12, 2022, Evercore ISI issued a research report concerning

Charles River that stated:

> **What Happened?**: This morning, Inotiv (NOTV) reported
> preliminary 4Q'22 revenues and a delay to their earnings call. . . .
> Cambodia has thus ceased any exports of NHPs. **CRL also sources
> a portion of their NHPs from Cambodia, though they previously
> had no relationship with NOTV's supplier**. It is currently unclear
> when Cambodia will resume shipments or if the US Fish and
> Wildlife Service will allow shipments.
>
> **Our Take**: . . . To size the potential impact on CRL, the USDA
> noted that CRL used ~17,105 NHPs in 2021. Given pricing of $20-
> 25k/NHP, we see CRL's total revenue from NHPs in 2021 as ~$350-
> $450 MM or ~$450-$500 MM in 2022. Given the timing for 2022,
> we see this disruption as minimally impactful for the current year.
> For 2023 and beyond, there are many moving pieces, with the
> biggest swing factors being the potential re-opening of Cambodia
> exports (and timing) as well as the potential for additional supply
> from other geographies and further price increases. If CRL is unable
> to source additional NHPs and does not raise price further
> (unlikely), we see the full-year potential impact of the Cambodian
> embargo at ~$200 MM in 2023 (again, an extreme analysis) – with
> a more likely impact being ~$100 MM or less (price rises + relaxing
> embargo at some point in 2023). Given the recent 10% pullback in
> CRL's stock, we see the magnitude of this impact as already priced
> in pending additional updates of the situation.

280.    On December 15, 2022, UBS published a research report that, in response to Charles River's statements on November 30, 2022, stated that "[w]e think CRL would be in a positive position relative to peers in case of a[n] export ban from Cambodia, due to its alternatives sources and could potentially leverage further price increases due to the shortages."

281.    On December 17, 2022, NBC News published an article titled "How the race for a Covid vaccine enriched monkey poachers and endangered macaques" that stated:

> The smuggling of monkeys caught in the wild is believed to have been going on for years due to the colossal demand for laboratory monkeys in the U.S. and the limited supply at breeding facilities at home and abroad. The arrival of the pandemic and the race to find a Covid vaccine squeezed the market even further, experts say, setting off a mad scramble for the animals that fueled a spike in monkey poaching and contributed to the endangerment of the species most commonly used in drug studies — the long-tailed macaque. . . .
>
> With the demand soaring, the price of monkeys skyrocketed. A single long-tailed macaque could fetch $40,000 at the height of the pandemic — up from $3,000 just a couple of years earlier. . . .
>
> With China out of the game, countries such as Mauritius and Cambodia stepped in. . . It wasn't long before conservationists began noticing an increase in reports of monkeys being pulled out of the wild by poachers in Southeast Asia lured by the huge profits at stake. Cambodia has faced accusations of "monkey laundering" for a number of years now. In 2015, a research arm of CITES called the Species Survival Network submitted a document to the convention that said field investigations in Cambodia found that long-tailed macaques were being trapped without permits in two provinces and transferred to breeding farms.
>
> "To avoid detection by the authorities, the animals were reportedly brought into the farms during the night, hidden under packs of ice in vehicles which had been adapted to hold cages," the document says.
>
> The Fish and Wildlife Service has been concerned about the industry for years, former agents told NBC News . . . . Two unidentified companies in the U.S. -- one in Florida and one in Alice, Texas -- imported hundreds of the wild-caught monkeys, according to the indictment, which referred to the companies as unindicted co-conspirators.

> The tiny town of Alice was the home of Orient BioResource Center, the company where Tucker was a vice president when he was charged with lying to federal agents. . . . .

282.     On or around December 29, 2022, the USFWS refused to clear two shipments of 360 long-tailed macaques (720 into total) with a reported value of $5.4 million for each shipment ($10.8 million in total value) from KF Cambodia to Charles River at Dulles International Airport in Virginia.

283.     On January 10, 2023, during a conference call with investors and analysts in which Defendant Foster participated on behalf of Charles River, Defendant Foster made the following statements:

> **Casey Rene Woodring - JPMorgan Chase & Co, Research Division - Research Analyst**: Jim, just to start, want to dig into the NHP situation. So you previously stated that more than 50% of your NHP supply comes from Cambodia. And there's been estimates out there around the percentage of DSA revenue tied to NHPs as high as 50%. Can you maybe just walk through what your NHP revenue exposure is? And by how much mitigation measures around supplier diversification could limit the impact of a complete Cambodian supply shutdown, if that were to occur?
>
> **Defendant Foster**: Yes. So I'm not going to unpack it. Can you hear me? I'm not going to unpack it -- that finally. It's a fluid situation. It's a really critical model for all large molecule work, including cell and gene therapy. **We have a multiplicity of supply arrangements with several countries and several players within those countries. We had -- I think we did a really good job ensuring a sufficient supply in '21 and '22**. We intend to do everything we can to have a sufficient supply in '23. And we'll go really deep on the details. I'm still not sure if we'll go that deep. But we'll go really deep on the details when we give our guidance in February.

284.     Defendant Foster's representations were materially false and misleading at the time they were made because they failed to disclose that in order to avoid disruptions to the supply chain for long-tailed macaques, which were hampered and tightened due to COVID-19, Charles

River had "expanded" its "supply sources" and had "greater access" by engaging suppliers like Orient BioResource and Envigo at a time when Cambodian suppliers of long-tailed macaques had suspiciously and rapidly increased production and export of long-tailed macaques and it was very likely that wild-caught long-tailed macaques were introduced into the Cambodian supply chain. By engaging and purchasing from such suppliers, it is very likely that Charles River received animals trapped from the wild, which materially and substantially increased the risk: 1) that shipments received from these non-preferred suppliers contained animals that were not purpose-bred; 2) materially increased the risk that the Company's conduct and its supply chain would be subject to heightened scrutiny including criminal and civil investigations; and 3) materially increased the risk that the Company's supply chain of long-tailed macaques would be materially interrupted thereby reducing the Company's revenue and operating margin from its Safety Assessment studies. Moreover, in contrast to Foster's representation that Charles River "meaningfully expanded" its supply sources in terms of "countries of origin" and "numbers of suppliers in those countries or origin," Charles River's supply chain of long-tailed macaques was over concentrated in Cambodia and in its use of animal suppliers or brokers that, as Defendant Foster admitted after the Relevant Period, "get animals from wherever," are not "the best possible people to use," and do not "care where the animals come from or what the background is," And included multiple non-preferred suppliers of Cambodian animals from Envigo, Orient BioResource and the Vanny Group.

### O. Jefferies January 12, 2023 Report Links Charles River's Supply of Long-Tailed Macaques to Vanny Cambodia

285.     On January 12, 2023, Jefferies published a research report titled "Sponsor Survey; CRL to Hold on Weak Early Dev and NHP Risks," that following up on its September 29, 2022 report, stated:

Our previous NHP supply chain work concluded CRL's NHP tox business was in a privileged position and controlled its own destiny.

**The indictment of Vanny and other Cambodian officials alters that viewpoint** as we estimate ~24% of CRL's U.S. NHP usage relies on Vanny supply (likely through an indirect relationship), a perspective underappreciated by investors. Immediately finding new supply in an undersupplied market seems unlikely, putting at risk a high growth contributor. . .

After further investigation we believe CRL received 20%+ of its NHP supply from Vanny in '21 and '22, through an indirect relationship . . . .

CRL issued in a statement that, "the Company [CRL] does not have any direct supply contracts with the indicted Cambodian supplier [Vanny]". However, data suggests that other Cambodian suppliers do not export enough animals to fill the 50% of total NHPs that CRL gets from Cambodia . . . .

From public data sources, we know that the number of NHPs exported to the U.S. from Cambodia has hovered around 19,000/year. In our channel checks, we were told that Vanny supplied between 40-50% range of total US NHPs. This was supported by a tweet from the head of Cambodia's Ministry of Agriculture, Forestry and Fisheries (MAFF), Dith Tina. According to Mr. Tina, Vanny has exported an average of ~13,500 HNPs annually into the U.S. over the last 3 years which coincides with the 40-50% range of U.S. supply we hear from industry contacts. That would leave the number of Cambodian NHPs from non-Vanny sources at ~4,000/year over the last 2 years.

We then compared non-Vanny exports to CRL imports. CRL uses ~17,000 NHPs in U.S. tox studies each year. Allowing for some double-counting in certain types of studies (per CRL), the 4,000 does not come close to the 50%+ from Cambodia of CRL total imports (17,000 – minus the double-counted). . . . which would suggest that CRL is getting 3,500+ NHPs from an intermediate supplier than does source from Vanny.

Industry conversations have backed our analysis on CRL's NHP suppliers . . . .



**Exhibit 4 - CRL Likely Getting Some NHPs from Vanny**

| | 2020 | 2021 | 2022TD | Source: |
|---|---|---|---|---|
| (1) Cambodian Exports to US | 19,751 | 18,586 | 17,278 | Public Data |
| (2) Vanny Exports to US | 12,978 | 14,684 | 13,102 | Dith Tina Tweet |
| (3) **Cambodian Exports, Non-Vanny** | **6,773** | **3,902** | **4,176** | (1)-(2) |
| | | | | |
| (4) CRL NHP Usage (US only) | 15,769 | 17,105 | 15,675 | Public Data |
| (5) CRL Reused | 2,057 | 2,231 | 2,045 | Reuse rate: 15% |
| (6) CRL Imports | 13,712 | 14,874 | 13,630 | (4)-(5) |
| (7) **CRL Cambodian Imports** | **7,542** | **8,181** | **7,497** | % CRL Imports from Cambodia: 55% |
| | | | | |
| (8) **CRL Imports from Vanny** | **769** | **4,279** | **3,321** | (3)-(7) |

Source: Public Data and Jefferies

286.    On January 12, 2023, Charles River's stock declined from a close on January 11, 2023 of $246.94 per share to close at $232.25 per share, a decline of $14.69 per share, or approximately 6% on heavier than usual trading volume

287.    On or around January 22, 2023, the USFWS refused to clear two shipments of 105 long-tailed macaques and 84 long-tailed macaques, respectively, with a reported value of $1,837,500 and $1,470,000, respectively ($3,307,500 in total reported value) from KF Cambodia to Charles River at Houston International Airport in Texas.

288.    In total, permits for 1,269 purportedly captive-bred long-tailed macaques from KF Cambodia with a market value over $17.4 million were refused by the USFWS, which represented nearly 8% of the total NHPs used by Charles River in 2022 as reported by the USDA.

289.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

290.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

291. ███████████████████████████████████

████████████████████

292. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████   ████████████████████████

█████████████████████████████

293. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████

294. ███████████████████████████████████

███████████████████████████████████████

████████

295. ███████████████████████████████████

███████████████████████████████████████



296.

297.

298.

299.

300.

301. 

302. On February 22, 2023, before the market opened, the Company issued a press release titled "Charles River Laboratories Announces Fourth-Quarter and Full-Year 2022 Results and Provides 2023 Guidance" in which the following statements were made:

> James C. Foster, Chairman, President and Chief Executive Officer, said, . . . "2023 presents challenges with respect to NHP supply that we will proactively manage . . . .
>
> **U.S. Department of Justice Investigation into Non-Human Primate Supply Chain**
>
> On February 17th, the Company received a subpoena from the U.S. Department of Justice relating to an investigation into the Cambodian non-human primate (NHP) supply chain. The Company has been informed that **this investigation relates specifically to several shipments of NHPs received by Charles River from its Cambodian supplier**. Charles River intends to fully cooperate with the U.S. government as part of their investigation. Due to ongoing investigations and the heightened focus on the Cambodian NHP supply chain in recent months, Charles River has voluntarily suspended NHP shipments from Cambodia at this time.
>
> **2023 Guidance**
>
> The Company is providing financial guidance for 2023. The 2023 revenue growth outlook reflects the impact of NHP supply constraints, which is expected to reduce our consolidated revenue growth forecast by approximately 200 to 400 basis points this year. This will pressure the DSA segment's revenue growth rate in 2023 . . . .
>
> Earnings per share in 2023 will be affected by the impact of NHP supply constraints. . . .

(Emphasis added).

303.    Also on February 22, 2023, following the issuance of the press release and before

the market opened, Charles River hosted a conference call with investors and analysts in which

Defendant Foster participated. The following statements were made during the conference call:

> **Defendant Foster**: I want to provide an update on the nonhuman
> primate or NHP supply situation. As many of you are aware, there
> has been an ongoing industrywide investigation into NHP imports
> from Cambodia.
>
> On February 17, we received a subpoena from the U.S. Department
> of Justice related to an investigation into the Cambodian NHP
> supply chain. We have been informed **this investigation relates
> specifically to shipments of NHPs received by Charles River
> from our Cambodian supplier**. . . .
>
> Based on ongoing investigations and a heightened focus on the
> Cambodia NHP supply chain, in recent months, we have voluntarily
> suspended planned future shipments of Cambodian NHPs **until
> such time that we and the U.S. Fish and Wildlife Service can
> develop and implement new procedures to reinforce confidence
> that the NHPs we import from Cambodia are purpose-bred**.
> This will take time to implement and the duration of which is
> unknown.
>
> **The investigation in current NHP supply situation will result in
> study delays in our Safety Assessment business**. By way of
> background, NHPs are the most scientifically relevant large model
> for the regulatory required safety testing of biologic drugs as
> mandated by the FDA and other international regulatory agencies.
>
> Biologic drugs cannot be approved for commercial use without
> NHPs. And given the proliferation of biologic drug development
> activity in recent years, NHPs have been in high demand. . . . In
> recent years, NHPs sourced from Cambodia have been responsible
> for approximately 60% of the NHPs supplied to the United States
> and to Charles River for drug research and development. While
> there is no other nearterm global source to replace this supply, we
> are continuing to actively work to diversify our NHP supply chain.
> . . .
>
> The current Cambodian NHP supply constraints and the
> corresponding impact to our Safety Assessment business are
> expected to reduce our consolidated revenue growth forecast by

approximately 200 to 400 basis points this year, resulting in organic revenue growth guidance of 4.5% to 7.5% for the total company.

The non-GAAP earnings per share are expected to be in a range of $9.70 to $10.90 in 2023 with the wider ranges encompassing a number of scenarios related to the timing of the resumption of Cambodian NHP imports this year. . . .

\*\*\*

**CFO Pease**: Our 2023 guidance ranges reflect multiple scenarios with regards to the estimated impact from the NHP supply constraint, as [Defendant Foster] outlined, the impact of which is expected to result in reported revenue growth of 1.5% to 4.5% and organic revenue growth of 4.5% to 7.5% in 2023. . . As a reminder, the Cambodian NHP supply situation does not have an impact on our RMS segment as these large models are sourced and used to support our Safety Assessment operation.

For the DSA segment, we expect the organic growth rate will be between low to mid-single digits based on our NHP supply assumptions around the timing of the resumption of imports. . . .

For the operating margin, we would have expected to generate moderate margin improvement in 2023 without an NHP supply impact. But given this meaningful headwind, we expect the 2023 operating margin to be flat to down 150 basis points depending on the timing of the resumption of Cambodia NHP shipment. . . .

(Emphasis added).

304.    During the question and answer segment of the conference call, an analyst asked Defendant Foster about the impact of the criminal and civil investigations on the Company's customers, to which Defendant Foster stated:

**Defendant Foster**: . . . with regard to Cambodia, where 60% of the animals come from, we are all at least temporarily foreclosed from bringing new animals in and utilizing them on studies in the United States. . . .

So we are -- our focus now is to work with [USFWS] to come up with a collaborative methodology that they're in agreement with, and we can execute to show parentage, which is sort of the underlying issue here. . . They're saying that they're concerned about parentage. . . .

104

\*\*\*

> **Daniel Louis Leonard - Crédit Suisse AG, Research Division - Research Analyst**: And if I could ask a quick follow-up, can you help me better understand the complexity of showing parentage for NHPs? Presumably, this isn't just a 23andMe test. It's more complicated than that, but I'd love to be able to better understand that?

> **Defendant Foster**: Yes. It's -- I don't think it's all that complicated. You just – you're proving genetics. And there are also sort of genetic assays that are available.

305.   Furthermore, Defendant Foster confirmed that USFWS blocked the use of long-tailed macaques from KF Cambodia until the Company could confirm that the animals were legally sourced:

> **Defendant Foster**: . . . Subpoena is relatively recent, Eric. And we're a subject here, meaning that they want to get information from us. Just to back up, you know that another Cambodian supplier was indicted in November, and that's not somebody that we work with. And [we think] a couple of our competitors [] work with, and that started the whole questioning and to prove through the methodology. And so they are now looking at all of the suppliers in Cambodia, one of whom we get our monkeys from. . . .

\*\*\*

> **Defendant Foster**: . . . The U.S. government is saying, you can't bring them in yet. And the ones that you have in country, and we have some in country, you can't use yet until we sort of work out and ensure that they are indeed purpose-bred. . . .

306.   Also on February 22, 2023, before the market opened, Defendant Foster caused Charles River to file a form 10-K with the SEC (the "**2022 10-K**"), which was signed by Defendant Foster. The 2022 10-K stated the following:

> in November 2022 the U.S. Department of Justice (DOJ) announced that a Cambodia supplier of non-human primates and two Cambodian officials had been criminally charged in connection with illegally importing non-human primates into the United States.

While the Company was not named or referenced in the November 2022 proceedings, **the Company shortly thereafter announced that Cambodia was the primary country of origin of non-human primates imports to Charles River**, and that it had begun to operate under the expectation that for some time period supply of Cambodia-sourced non-human primates (which according to CDC statistics, account for approximately 60% of supply to the United States) would be difficult to obtain in the United States. Subsequent to the Company's announcement, USFWS denied clearance to certain shipments of nonhuman primates the Company had received from Cambodia. . . .

***

### U.S. Department of Justice Investigation into Non-Human Primate Supply Chain

On February 16, 2023, we were informed by the U.S. Department of Justice (DOJ) that in conjunction with the U.S. Fish and Wildlife Service (USFWS), it had commenced an investigation into our conduct regarding several shipments of nonhuman primates from Cambodia. On February 17, 2023 we received a grand jury subpoena requesting certain documents related to such investigation. We are aware of a parallel civil investigation being undertaken by the DOJ and USFWS. . . . we have voluntarily suspended future shipments of non-human primates from Cambodia until such time that we and USFWS can agree upon and implement additional procedures to reasonably ensure that non-human primates imported to the United States from Cambodia are purpose-bred. While these discussions with USFWS are ongoing, we have also agreed to continue to care for the Cambodia-sourced non-human primates from certain recent shipments that are now in the United States. The carrying value of the inventory related to these shipments is approximately $20 million. . . . .

(Emphasis added).

307.    On this news, Charles River's stock price declined from a close on February 21, 2023 of $243.60 per share to close at $219.09 per share at the close of trading on February 22, 2023, a decline of $24.51 per share, or over 10% on unusually heavy trading volume.

308.    ███████████████████████████████████████████████

████████████████████████████████████████████████████



309.    On February 23, 2023, Jefferies published a research report titled "4 Key Insights+: CRL 4Q22" that stated:

> The previous view was that the DOJ might be gathering information from industry players to better inform its previously disclosed case against Vanny and Cambodia MAFF officials. Now, **this is a grand jury investigation and specifically into CRL conduct**. . . .
>
> A frequent investor response in the context of these NHP supply issues has been "won't they just find other suppliers/more volume?" In 1Q23, statements by CRL's primary competitor that it had secured domestic supply and added more NHP vendors.
>
> Investors and observers of this situation should keep in mind the parameters.
>
> • These animals generally have one offspring per pregnancy, not a litter. This point was reinforced on CRL's call.
> • The gestation period is ~6 months.
> • The "yield" of research animals annually is ~20% of the breeding stock.
> • **Multiple mgt teams in this sector have told us that building up an adequate breeding stock to supply research animals takes years**. Mr. Foster called CRL's previous effort a decade of losses.
> • These animals have been in short supply for years, and more

107

specifically since China stopped exporting. CRL mgt mentioned 2018. We see China imports to the US going to zero in the US data in 2H20. One should assume that preclinical players have been exhausting sources of additional supply for a couple of years. This didn't just start in the last 6 months.
• Total US imports had averaged 31.6k in '18-'19. In 2020, that dropped to 28.9k with China ceasing exports during the year. However, that recovered to 32.3k in 2021.
• Cambodia increased from ~11.4k US imports in 2019 to 18.6k US imports in 2021. The ex-US volumes are not adequate to explain the difference (e.g., if Cambodia pivoted a bunch of volume away from ex-US clients to US).
• **How did Cambodia ramp to that? Based on the DOJ's actions, the answer may be . . . illegally**.

We acknowledge the country of origin does matter. What makes the alleged actions by Vanny illegal is 1) shipping wild-caught animals for research is illegal in Cambodia. . . . 2) Falsifying the export documents (saying wild-caught NHPs are captive-bred) is a violation of the Lacey Act. . . .

Long story short, **if a player in the NHP market (RMS or DSA) says they've secured thousands more animals from Cambodia, we should be cautious until either a "parentage" test is successfully developed and scaled or the DOJ is unsuccessful in its case to show illegal wild-catching of NHPs in Cambodia**.

(Emphasis added).

### The Truth Fully Emerges

310.     On March 15, 2023, after the opening of trading, Barclays hosted a conference call for analysts and investors in which Defendant Foster participated on behalf of Charles River. During the conference call, Defendant Foster admitted that Charles River had used non-preferred suppliers of long-tailed macaques from Cambodia:

> **Defendant Foster**: So there are no U.S. breeding sources. There are a couple of companies that sort of brokers that get animals from wherever. **We have used those folks to some extent historically**. I'm trying to be careful picking my words here. **We prefer not to use them. Reputationally, I just don't think they're the best possible people to use. And I don't actually think they care where the animals come from or what the background is** and they've been kind of inappropriate with pricing. So there are

probably -- people say there are, I assume they're telling the truth. There are probably animals in country brought in from the outside, including it could be from Cambodia. It could be from the source that DOJ is looking at. I don't know that. We're just not using them, number one. Number two, I don't think it's large numbers of the [animals]. Number three, I don't know how sustainable that is. . . .

311.    On March 15, 2023, Charles River's stock declined from a closing price on March 14, 2023 of $205.02 per share to close at $194.90 per share, a decline of $10.12 per share approximately 5% on heavier than usual trading volume.

312.    On March 16, 2023, NBC News published an article titled "The fate of 1,000 research monkeys is unclear after government intervention" that reported on the 1,269 long-tailed macaques Charles River sought to import from KF Cambodia during the Relevant Period and that were blocked by the USFWS in connection with its ongoing investigation:

> The more than 1,000 long-tailed macaques were imported by Charles River Laboratories, a research company based in Massachusetts. . . . [A USFWS] spokesperson said the monkey shipments were refused clearance as a result of an ongoing investigation . . . . The Justice Department has for years been investigating whether American companies, including Charles River, were involved in the smuggling of monkeys poached from the wild and brought to the U.S. with falsified paperwork. . . . Angela Grimes, the chief executive of Born Free USA, said the organization was first contacted by Fish and Wildlife in September [2022]. The agents were looking for a home for 360 monkeys. Fish and Wildlife officials called by in February and said the number of monkeys had ballooned to 1,200, Grimes said. . . .

313.    On March 27, 2023, Jefferies published a research report concerning Charles River that stated "Vanny (#1) and KF (#2) are Cambodia's largest exporters of NHPs. At [the March 2023 Society of Toxicology meeting in Nashville, Tennessee], [Charles River] mgt confirmed KF is CRL's supplier and CRL owns 90% of a related company in China, and reaffirmed it is not accepting Cambodian NHP shipments globally. Our data suggest Vanny shipped >12,500 NHPs to the US in 2022 vs. >4,500 from KF (data through ~Dec 15). Thus, Vanny and KF may account

for >95% of Cambodian exports to the US, which totaled 17,998 in 2022" and stated the following:

> we see some risk that the investigation includes all NHP suppliers in Cambodia (not just Vanny), which could result in setbacks to reopening that supply source. . . . CRL describes Cambodia as 60% of its supply.
>
> Based on usage numbers, that should be ~9,000 NHPs annualized (allowing for some reuse rate), or about 4,500 for half the year. At current pricing discussed on the [Society of Toxicology meeting] floor ($35k "wholesale", $42k "retail"), that would be $155M-$190M before taking into account the other elements of the study bid (facility, study director, lab techs, histology, pathology, etc.) The 400 bp headwind (high end) equates to $159M. . . .

314.   On March 30, 2023, Charles River filed its 2023 Proxy Statement pursuant to Section 14(a) of the Exchange Act on Schedule 14 that stated:

> We recognize that recent events have raised questions regarding non-human primate importation practices, which are affecting the biomedical research industry, including investigations into shipments of non-human primates received by our Company from Cambodia. We are committed to working with the U.S. government and our industry partners to develop and implement additional procedures to reinforce confidence that the non-human primates we import are purpose-bred in accordance with applicable laws.

315.   On May 11, 2023, Charles River issued a press release that disclosed its financial results for the quarter ended April 1, 2023 that was filed with the SEC on Form 8-K and filed a quarterly report with the SEC on Form 10-Q ("**Q1 2023 10-Q**"). The May 11, 2023 press release characterized the ongoing investigation of Charles River by the U.S. government as "investigations by the U.S. government into the NHP supply chain applicable to our Safety Assessment business."

316.   Also on May 11, 2023, Charles River hosted an earnings conference call for analysts and investors in which Defendant Foster participated on behalf of Charles River. During the conference call, the following statements were made:

> **Defendant Foster**: As you know, we suspended shipments of Cambodian NHPs into the U.S. in February. We took this action so that we could develop and implement new testing procedures that

110

would reinforce our confidence that the NHPs we import from Cambodia, are purpose bred. We have made advancements towards identifying a new testing platform and implementing the new testing procedures and are engaged with the relevant government agencies in furtherance of the needed resolution. . . . **And we're quite confident from what we know that our supplier -- he has purpose breading these animals according to all of our expectations, and we can demonstrate that**. . . .

But we're confident that we can prove it and demonstrate it scientifically **without a shadow of a doubt**. . . .

317.    In response to an analyst's question, Pease confirmed that the Company's supply

of long-tailed macaques had impacted revenue and margin in the DSA segment:

> **David Howard Windley - Jefferies LLC, Research Division - MD & Equity Analyst**: . . . Are the NHPs contributing to margin? Or are they a detriment to margin?
>
> **Pease**: Dave. So a couple of things. Yes, the DSA margin was very robust in the first quarter. . . . The timing on when we start NHP studies can have an impact on the mix that they have -- that they contribute towards or not to the margin. So depending on that and how we ended up the year in how many new NHP studies were starting or not in each quarter can have a modest impact on the margin. . . . .

## A.   Jefferies January 12, 2023 Report Links Charles River's Supply of Long-Tailed Macaques to Vanny Cambodia

318.    As later revealed in Charles River's quarterly report for the quarter ended July 1,

2023 filed with the SEC on Form 10-Q on August 9, 2023 ("**Q2 2023 10-Q**"), on May 16, 2023,

the Company received an inquiry from the Enforcement Division of the SEC requesting it to

voluntarily provide information primarily related to the sourcing of non-human primates in Asia,

and the Company is cooperating with the request. Relatedly, on May 23, 2023, Inotiv received a

voluntary request from the SEC seeking documents and information for the period December 1,

2017 to the present regarding the Company, Envigo, and Orient BioResource's importation of

NHPs from Asia, including information relating to whether their importation practices complied

with the U.S. Foreign Corrupt Practices Act.

319.    On June 8, 2023, Jefferies hosted a conference call in which Ms. Girshick, Charles

River's Executive Vice President and Chief Operating Officer participated on behalf of Charles

River. During the June 8, 2023 conference call, Ms. Girshick made the following statements:

> **Girshick**: . . . none of the nonhuman primate farms can scale really,
> really quickly. So that -- as you said, the gestation doesn't allow that.
> The animals have to be a certain age. So what we are looking at is,
> in many cases, how many animals do we need on a study? What is
> the age range of an animal on a study? But would we -- and with
> that, we can maximize supply.

320.    On June 13, 2023, UBS published a report that discussed a UBS-hosted call with a

contract research organization expert that stated the following:

> From a supply chain due diligence perspective, the speaker on the
> UBS-hosted call discussed an interesting red flag: given the
> gestation periods and fecundity of primates, **the rapid increase in
> supply originating in Cambodia simply was not possible without
> including (illegally-sourced) wild animals into the mix**. The
> speaker suggested industry participants should question any new
> source that provides a rapid and significant increase in supply.

**B. The U.S. Recommends the CITES Convention's Animal Committee to Investigate
the Cambodian Supply of Long-Tailed Macaques**

321.    In connection with the meeting of the CITES Convention's Animal Committee on

June 19-23, 2023, the U.S. government indicated that there was new information that indicates that

"urgent action may be needed concerning problems relating to the implementation of provisions

under the Convention for captive production of specimens" and submitted an "Exceptional Case

for Inclusion of Species-Country Combination in Review of Trade in Animal Specimens Reported

as Produced in Captivity – Macaca Fascicularis" (created in or around April 26, 2023).[21]

322.    The U.S. stated that in 2015, concerns were noted and asked to be brought to the

---

[21] https://cites.org/sites/default/files/documents/AC/32/agenda/E-AC32-15-03.pdf

attention of the Standing Committee to the Secretariat of the CITES Convention for further attention with regard to "the high levels of illegal trade in the species [long-tailed macaques], particularly between Cambodia and Viet Nam."

323.   The U.S. further observed that "primate researchers have raised concerns that the official trade numbers fail to capture laundering of wild-caught individuals as captive bred, harvesting to establish or augment captive breeding operations, capture for the pet trade, hunting for consumption, and culling due to human-macaque conflict. . . ."

324.   "In light of the 2022 reclassification by IUCN of M. fascicularis as Endangered, the sustained high levels of exports of the species reported as produced in captivity, and recent indications of large-scale laundering of wild-caught specimens through captive breeding facilities," the U.S. recommended that CITES further investigate the long-tailed macaque trade from Cambodia under procedures provided by the CITES Convention.

### C.  Charles River Abandons Commitment to Address USFWS Requirement That the Company Demonstrate Its Long-Tailed Macaques Were Captive Bred

325.   On August 9, 2023, Charles River issued a press release that disclosed its financial results for the quarter ended July 1, 2023 that was filed with the SEC on Form 8-K, and the Company filed the Q2 2023 10-Q with the SEC. The press release stated that the Company updated its guidance to reflect "implementation of mitigation efforts around NHP supply constraints."

326.   The Q2 2023 10-Q stated the following:

> The Company continues to care for the Cambodia-sourced non-human primates from certain recent shipments in the United States. The carrying value of the inventory related to these shipments is approximately $20 million. On May 16, 2023, the Company received an inquiry from the Enforcement Division of the U.S. Securities and Exchange Commission (SEC) requesting it to voluntarily provide information primarily related to the sourcing of non-human primates in Asia, and the Company is cooperating with the request.

327.    Also on August 9, 2023, the Company hosted an earnings conference call for analysts and investors in which Defendant Foster participated on behalf of the Company. During the conference call, the following statements were made:

> **Defendant Foster**: we believe that we have successfully mitigated the logistical challenges posed by the current NHP supply constraints by conducting more studies outside of the U.S. . . . we have already made significant progress with these initiatives and do not foresee any meaningful NHP supply constraints affecting the business in the fourth quarter and next year. . . .
>
> Going forward, we are operating under the assumption that we will conduct meaningfully less NHP related study work in the U.S. . . .

328.    On August 9, 2023, Jefferies published a research report concerning Charles River that stated the following:

> **Mgt and Investors Cheering up on NHPs. We Aren't**. . . . The market seems encouraged by: 1) NHP supply returning to normal in 4Q, and 2) shifting NHP studies ex-US to Canada + EU as a viable long-term solution. To us, this scenario is possible, not base case. Ex-US regulators should be aware of the DOJ/FWS investigation into Cambodian NHP exports and the [Indictment], since FWS took its concerns to CITES Animals Committee in June prompting a review (ongoing) of trade from multiple Southeast Asian countries including Cambodia. The CITES Standing Committee, which has authority to suspend trade, is meeting Nov 6-10. **With the court case, DOJ investigation, SEC inquiry, CITES review and upcoming meeting, we wouldn't call this "all clear."**

**D.  Charles River's September Investor Day Conference**

329.    On September 21, 2023, Charles River hosted its Investor Day Conference in which Defendant Foster participated, among other senior Charles River executives. A slide presentation published in connection with the Investor Day Conference revealed that NHP study revenue, which had since been interrupted by the Indictment and the ongoing criminal and civil investigation, had a material impact on revenue growth in the Company's DSA segment during the Relevant Period:



330. During the conference, Parisotto, the Company's Corporate Executive VP of Global Discovery and Safety Assessment, made the following statements:

> NHP related revenue has benefited the DSA growth rate due to 2 things: a robust increase in biologics related development work and escalating NHP prices that have risen at a rate faster than base pricing. . . .

331. On September 21, 2023, Jefferies published a research report that stated the following:

> **Open NHP Questions.** Mgt disclosed NHP pricing accounts for ~275 bps of the ~11.7% DSA revenue CAGR from 2020-23E, implying ~$185M rev contribution in '23 alone and, by our math, $550M+ over the three years. . . .

332. On September 22, 2023, Guggenheim published a research report that stated the following:

> **Key NHP takeaways from the Q&A.** 1) NHP price increases have been a tailwind for the DSA business from '20-'23 (if the company maintained NHP pricing at 2020 levels, that would have led to 275 bps of slower growth over the time period); 2) This trend of price increases appears to be moderating, so we do not expect it to provide as significant of a tailwind over the next three years; and 3) The

> company expects to have less of their NHP-related work take place
> in the U.S. going forward, further diversifying their operations.

333.    On September 25, 2023, Stephens published a research report that stated the following:

> Moving forward it is estimated they will conduct ~50% of NHP-related studies
> outside of the U.S. vs. ~30% beforehand. In response to a common investor
> question, CRL noted that NHP pricing represented a 250 - 300 bps annual
> tailwind to DSA growth from 2020 to 2023. In order to mitigate pricing
> challenges and uncertainty in supply, the Company has made efforts to partner
> with or invest in pieces of suppliers of NHP's in order to better control the pricing
> and volume. Going forward, CRL plans to own more of their suppliers or JV with
> them (including CRL employees in the facility) to ensure proper oversight.

334.    On April 18, 2024, People for the Ethical Treatment of Animals ("PETA") filed a complaint with the SEC urging the agency to investigate the Company for misleading investors about its sales and purchases of long-tailed macaques (the "PETA complaint").[22] The PETA complaint accuses Charles River of, *inter alia,* failing to disclose purchases of thousands of non-human primates that should not have been imported into the U.S. and obtaining some from the Vanny Group, as described above.

335.    In a press release issued the same day, PETA discussed its complaint as follows:

> **Boston** – PETA filed a complaint today with the U.S. Securities and Exchange
> Commission (SEC) over a series of misleading statements that Charles River
> Laboratories Inc. has made to shareholders about how it has obtained, imported,
> and sold countless endangered long-tailed macaques who may have been illegally
> abducted from their forest homes and falsely labeled as animals bred in captivity.

> Charles River, the largest primate experimenter in the U.S., is already under
> investigation by the SEC over its sourcing of primates and is also under civil and
> criminal investigation by the U.S. Department of Justice (DOJ) for possible
> violations of monkey-importation laws.

> In a letter sent today to Gurbir S. Grewal, the director of the SEC's Division of
> Enforcement, PETA provides evidence that the company has misled shareholders
> about its ties to the alleged smuggling operation—including that the company has

---

[22] A copy of the PETA complaint is attached hereto as Exhibit A.

purchased monkeys from the two unindicted coconspirators who were named in a recent trial.

- A DOJ indictment alleges that monkeys sold by Vanny Bio Research Corporation Ltd. (VBRC) in Cambodia were laundered as "captive-bred" even though they were caught in the wild. The indictment referenced two unnamed coconspirators—later revealed in court testimony as major U.S. primate importers Worldwide Primates and Orient BioResource Center (now Inotiv).

- Following the indictment, Charles River stated in an SEC filing that it "does not have any *direct* supply contracts with the indicted Cambodian supplier" [*emphasis added*]. But Charles River's laboratories in the U.S. had received at least 962 long-tailed macaques from Worldwide Primates, whose primary Cambodian supplier was VBRC, and its facility in Montréal received at least 10 shipments.

336.

- The company also received at least 2,730 long-tailed macaques—mostly of Cambodian origin—shipped to its laboratories across the country from Orient BioResource Center in Alice, Texas.

- When Charles River couldn't continue to import Cambodian-origin monkeys into the U.S, it began importing more of them into Montréal instead.

- Using public records, PETA also identified that hundreds of monkeys at Charles River's facility in LaBelle, Florida, had apparently originated from VBRC. The surge in these Cambodian-origin monkeys exiting the Charles River facility—immediately after the indictment had named VRBC as a monkey-laundering site—warrants scrutiny by the SEC.

- The company later stated that it "is steadfastly opposed to the illegal importation of non-human primates (NHPs) that are not purpose-bred in accordance with applicable laws" and that it was working to "reinforce confidence that the NHPs we import are purpose-bred." But this statement contradicts the company's subsequent actions. In November 2023, Charles River acquired a 90% controlling interest in Noveprim Ltd., a Mauritius-based supplier of nonhuman primates. Undercover investigation footage revealed that Noveprim captured long-tailed macaques in the wild before exporting them—including to Charles River.

"Charles Rivers Laboratories says one thing and does another, but the evidence is clear: It has been selling monkeys ripped from their forest homes," says PETA primate scientist Dr. Lisa Jones-Engel. "This risks the spillover of diseases to humans and compromises the results of scientific studies."

**E.  NHP Pricing Materially Impacted Charles River's Reported Revenue Growth During the Relevant Period**

337.    On November 8, 2023, Defendant Foster caused Charles River to disclose the Company's financial results for the quarter ended September 30, 2023 by issuing a press release that was filed with the SEC on Form 8-K and filing a quarterly report with the SEC on Form 10-Q ("**Q3 2023 10-Q**"). Also on November 8, 2023, Charles River hosted a conference call with analysts and investors attended by Defendant Foster. During the conference call, Defendant Foster and Pease made the following statements that show the impact of NHP pricing during the Relevant Period:

> [Defendant Foster:] I'd like to comment on our NHP-related study work. At our Investor Day in September, we provided some information around the benefit from NHP pricing on our DSA revenue growth rates. We believe that additional information would be useful for investors and analysts to gain a better understanding of the impact of NHP pricing and NHP-related safety assessment studies on our business.
>
> Over a three-year period, ending in 2023, NHP pricing is expected to benefit DSA revenue growth by a total of just $230 million or approximately 30% of our total DSA revenue growth since 2020. Without the impact of NHP pricing, DSA revenue would still have increased at a high single-digit growth CAGR since 2020.
>
> In total, NHP Safety Assessment study revenue, which includes both services and the embedded NHP revenue, is expected to represent approximately 30% of DSA segment revenue in both 2022 and 2023.
>
> NHP pricing has rapidly escalated since 2020 due to both NHP supply constraints and the continued increase of biologic drugs in development. Supply constraints began in China around the pandemic and intensified last year due to the Cambodian NHP supply situation in the U.S. This has caused NHP pricing to increase by approximately $20,000 per model in aggregate since 2020.
>
> In 2023, we expect to utilize approximately 11,400 NHPs in safety assessment studies worldwide. This represents a reduction of approximately 25% from over 15,000 in the prior year, principally

driven by the current level of biopharmaceutical demand and our clients' focus on their post-IND safety assessment work, which generates higher service revenue per model due to the longer-term nature of these studies, with fewer NHPs are used to generate that service revenue.

\*\*\*

[Pease:] we commented on this over the last several quarters. NHP work, on a relative basis, has slightly higher margins than some of the other species (inaudible) we do. They tend to be more complex, sometimes longer. And so there is a mix impact that has been favorable as biologics had grown, and that drives higher demand for NHP work within our total study species work that we do.

### The Company's Fiduciaries Sold Over $88 million of Charles River Stock at Artificially Inflated Prices While in Possession of MNPI

338.     Meanwhile, prior to the truth being revealed to the market, certain Individual Defendants dumped over $88 million worth of their personal holdings of Charles River stock at artificially inflated prices. By virtue of their high-level positions as officers and directors of the Company, defendants Foster, Smith, Kochevar, Massaro, Wallman, Chubb, and Milne (the "**Insider Selling Defendants**") possessed MNPI, which they knew was not yet disclosed to the public, namely that Charles River intentionally used non-preferred suppliers of long-tailed macaques from Cambodia. This subjected the Company to a heightened risk of regulatory and governmental scrutiny, as well as significant reputational and/or financial harm. The Insider Selling Defendants nevertheless acted to exploit their knowledge of this MNPI by selling over $88 million in Charles River stock to their benefit and to the detriment of the Company and its public stockholders before the truth emerged on March 15, 2023.

339.     Defendant Foster made the following sales of Charles River stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $191.61 per | Losses Avoided |
|------|-------------|----------------------|----------|----------------------|----------------|

| | | | | Share | |
|---|---|---|---|---|---|
| 8/7/20 | 24,000 | $217.49 | $5,219,760.00 | $4,677,600.00 | $542,160.00 |
| 11/2/20 | 22,000 | $232.38 | $5,112,360.00 | $4,287,800.00 | $824,560.00 |
| 2/11/21 | 2,128 | $281.32 | $598,652.36 | $414,747.20 | $183,905.16 |
| 2/11/21 | 3,766 | $282.39 | $1,063,484.51 | $733,993.40 | $329,491.11 |
| 2/11/21 | 727 | $282.96 | $205,714.10 | $141,692.3 | $64,021.80 |
| 2/11/21 | 4,038 | $284.21 | $1,147,633.52 | $787,006.2 | $360,627.32 |
| 2/11/21 | 9,643 | $285.15 | $2,749,722.66 | $1,879,420.7 | $870,301.96 |
| 2/11/21 | 2,490 | $286.48 | $713,343.17 | $485,301.00 | $228,042.17 |
| 2/11/21 | 4,775 | $287.18 | $1,371,289.28 | $930,647.5 | $440,641.78 |
| 2/11/21 | 2,402 | $287.99 | $691,752.94 | $468,149.8 | $223,603.14 |
| 2/11/21 | 31 | $285.15 | $8,839.72 | $6,041.9 | $2,797.82 |
| 2/22/21 | 1,425 | $280.66 | $399,944.06 | $277,732.50 | $122,211.56 |
| 2/22/21 | 2,223 | $281.69 | $626,189.53 | $433,262.70 | $192,926.83 |
| 2/22/21 | 5,476 | $282.49 | $1,546,928.93 | $1,067,272.40 | $479,656.53 |
| 2/22/21 | 4,020 | $285.56 | $1,147,950.80 | $783,498.00 | $364,452.80 |
| 2/22/21 | 4,240 | $284.50 | $1,206,283.39 | $826,376.00 | $379,907.39 |
| 2/22/21 | 52 | $285.79 | $14,861.08 | $10,134.80 | $4,726.28 |
| 2/23/21 | 454 | $274.81 | $124,762.06 | $88,484.60 | $36,277.46 |
| 2/23/21 | 1,309 | $276.03 | $361,322.62 | $255,124.10 | $106,198.52 |
| 2/23/21 | 1,809 | $277.00 | $501,094.63 | $352,574.10 | $148,520.53 |
| 2/23/21 | 1,249 | $278.07 | $347,309.80 | $243,430.10 | $103,879.70 |
| 2/23/21 | 925 | $279.31 | $258,365.73 | $180,282.50 | $78,083.23 |
| 2/23/21 | 6,474 | $279.97 | $1,812,519.31 | $1,261,782.60 | $550,736.71 |
| 2/23/21 | 4,259 | $280.91 | $1,196,379.08 | $830,079.10 | $366,299.98 |
| 2/23/21 | 2,832 | $281.91 | $798,358.08 | $551,956.80 | $246,401.28 |
| 2/23/21 | 984 | $282.78 | $278,255.22 | $191,781.60 | $86,473.62 |
| 2/24/21 | 1,053 | $279.51 | $294,319.50 | $205,229.70 | $89,089.80 |
| 2/24/21 | 1,234 | $280.41 | $346,028.16 | $240,506.60 | $105,521.56 |
| 2/24/21 | 2,191 | $281.65 | $617,095.81 | $427,025.90 | $190,069.91 |
| 2/24/21 | 2,656 | $282.49 | $750,280.16 | $517,654.40 | $232,625.76 |
| 2/24/21 | 2,278 | $283.53 | $645,889.77 | $443,982.20 | $201,907.57 |
| 2/24/21 | 2,646 | $284.63 | $753,138.12 | $515,705.40 | $237,432.72 |
| 2/24/21 | 1,993 | $285.48 | $568,955.06 | $388,435.70 | $180,519.36 |
| 2/24/21 | 4,485 | $286.45 | $1,284,743.95 | $874,126.50 | $410,617.45 |
| 2/24/21 | 2,752 | $287.58 | $791,427.04 | $536,364.80 | $255,062.24 |
| 2/24/21 | 2,466 | $288.33 | $711,029.42 | $480,623.40 | $230,406.02 |
| 2/24/21 | 255 | $289.02 | $73,699.97 | $49,699.50 | $24,000.47 |
| 5/7/21 | 7,500 | $343.17 | $2,573,775.00 | $1,461,750.00 | $1,112,025.00 |
| 6/1/21 | 9,577 | $332.23 | $3,181,766.71 | $1,866,557.30 | $1,315,209.41 |
| 8/6/21 | 10,000 | $401.79 | $4,017,900.00 | $1,949,000.00 | $2,068,900.00 |
| 2/15/22 | 325 | $308.23 | $100,173.91 | $63,342.50 | $36,831.41 |
| 2/15/22 | 1,064 | $309.36 | $329,164.25 | $207,373.60 | $121,790.65 |
| 2/15/22 | 2,456 | $310.35 | $762,226.48 | $478,674.40 | $283,552.08 |
| 2/15/22 | 1,643 | $311.30 | $511,465.74 | $320,220.70 | $191,245.04 |

| | | | | | |
|---|---|---|---|---|---|
| 2/15/22 | 1,835 | $312.39 | $572,871.77 | $357,641.50 | $215,230.27 |
| 2/15/22 | 1,514 | $313.24 | $474,244.60 | $295,078.60 | $179,166.00 |
| 2/15/22 | 2,812 | $314.43 | $884,179.41 | $548,058.80 | $336,120.61 |
| 2/15/22 | 1,816 | $315.15 | $572,314.03 | $353,938.40 | $218,375.63 |
| 2/15/22 | 2,157 | $316.34 | $682,353.36 | $420,399.30 | $261,954.06 |
| 2/15/22 | 1,243 | $317.06 | $394,102.97 | $242,260.70 | $151,842.27 |
| 2/15/22 | 325 | $317.98 | $103,344.28 | $63,342.50 | $40,001.78 |
| 2/15/22 | 420 | $320.23 | $134,495.59 | $81,858.00 | $52,637.59 |
| 2/15/22 | 100 | $321.93 | $32,193.00 | $19,490.00 | $12,703.00 |
| 2/15/22 | 174 | $323.07 | $56,213.85 | $33,912.60 | $22,301.25 |
| 2/15/22 | 179 | $326.88 | $58,511.14 | $34,887.10 | $23,624.04 |
| 2/15/22 | 98 | $328.50 | $32,193.37 | $19,100.20 | $13,093.17 |
| 2/15/22 | 158 | $329.12 | $52,001.12 | $30,794.20 | $21,206.92 |
| 2/15/22 | 465 | $330.16 | $153,525.98 | $90,628.50 | $62,897.48 |
| 2/15/22 | 914 | $331.43 | $302,930.77 | $178,138.60 | $124,792.17 |
| 2/15/22 | 51 | $332.63 | $16,964.13 | $9,939.90 | $7,024.23 |
| 2/15/22 | 236 | $333.29 | $78,656.72 | $45,996.40 | $32,660.32 |
| 2/15/22 | 15 | $334.06 | $5,010.90 | $2,923.50 | $2,087.40 |
| 2/22/22 | 796 | $285.88 | $227,560.80 | $155,140.40 | $72,420.40 |
| 2/22/22 | 2,394 | $286.93 | $686,919.28 | $466,590.60 | $220,328.68 |
| 2/22/22 | 5,243 | $288.12 | $1,510,587.99 | $1,021,860.70 | $488,727.29 |
| 2/22/22 | 4,472 | $288.86 | $1,291,763.14 | $871,592.80 | $420,170.34 |
| 2/22/22 | 2,600 | $290.03 | $754,085.28 | $506,740.00 | $247,345.28 |
| 2/22/22 | 1,481 | $290.89 | $430,801.72 | $288,646.90 | $142,154.82 |
| 2/22/22 | 100 | $291.50 | $29,150.00 | $19,490.00 | $9,660.00 |
| 2/22/22 | 350 | $292.74 | $102,460.02 | $68,215.00 | $34,245.02 |
| 2/23/22 | 1,503 | $283.89 | $426,683.06 | $292,934.70 | $133,748.36 |
| 2/23/22 | 3,415 | $284.79 | $972,542.48 | $665,583.50 | $306,958.98 |
| 2/23/22 | 2,027 | $286.06 | $579,844.63 | $395,062.30 | $184,782.33 |
| 2/23/22 | 3,171 | $287.10 | $910,388.39 | $618,027.90 | $292,360.49 |
| 2/23/22 | 4,245 | $287.84 | $1,221,888.87 | $827,350.50 | $394,538.37 |
| 2/23/22 | 805 | $288.82 | $232,500.91 | $156,894.50 | $75,606.41 |
| 2/23/22 | 1,078 | $290.01 | $312,632.94 | $210,102.20 | $102,530.74 |
| 2/23/22 | 1,259 | $291.05 | $366,436.48 | $245,379.10 | $121,057.38 |
| 2/23/22 | 981 | $291.81 | $286,262.67 | $191,196.90 | $95,065.77 |
| 2/23/22 | 746 | $292.87 | $218,478.48 | $145,395.40 | $73,083.08 |
| 2/23/22 | 325 | $293.81 | $95,488.84 | $63,342.50 | $32,146.34 |
| 2/23/22 | 389 | $294.70 | $114,636.86 | $75,816.10 | $38,820.76 |
| 2/23/22 | 352 | $295.70 | $104,084.85 | $68,604.80 | $35,480.05 |
| 2/15/23 | 20,000 | $250.00 | $5,000,000.00 | $3,898,000.00 | $1,102,000.00 |
| | | | | | |
| | | **Totals:** | **$68,297,460.31** | | **$21,024,660.21** |

340.   These sales amount to over **46 times** his $1,480,124 base salary and over **4 times**

his total compensation from the Company for the 2023 fiscal year. By selling his stock before the MNPI was disclosed to the public, Foster avoided losses of more than $21 million. He has not sold any Charles River stock since.

341.    Defendant Smith made the following sales of Charles River stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $191.61 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 8/7/20 | 3,304 | $216.54 | $715,448.16 | $643,949.60 | $71,498.56 |
| 1/4/21 | 5,000 | $248.76 | $1,243,800.00 | $974,500.00 | $269,300.00 |
| 2/19/21 | 6,107 | $290.03 | $1,771,190.61 | $1,190,254.30 | $580,936.31 |
| 2/19/21 | 1,400 | $291.83 | $408,557.94 | $272,860.00 | $135,697.94 |
| 2/19/21 | 1,149 | $292.37 | $335,937.15 | $223,940.10 | $111,997.05 |
| 2/24/21 | 289 | $282.98 | $81,781.22 | $56,326.10 | $25,455.12 |
| 3/1/21 | 4,366 | $290.12 | $1,266,646.89 | $850,933.40 | $415,713.49 |
| 4/15/21 | 2,000 | $320.00 | $640,000.00 | $389,800.00 | $250,200.00 |
| 4/22/21 | 3,845 | $330.00 | $1,268,850.00 | $749,390.50 | $519,459.50 |
| 5/4/21 | 3,305 | $340.01 | $1,123,718.18 | $644,144.50 | $479,573.68 |
| 8/9/21 | 1,750 | $407.40 | $712,950.00 | $341,075.00 | $371,875.00 |
| 3/3/22 | 8,965 | $282.53 | $2,532,881.45 | $1,747,278.50 | $785,602.95 |
| | | Totals: | $12,101,761.61 | | $4,017,309.61 |

342.    These sales amount to over **27 times** his $441,496 base salary, and over **5 times** his total compensation from the Company for the 2022 fiscal year. By selling his stock before the MNPI was disclosed to the public, Smith avoided losses of more than $4 million. He has not sold any Charles River stock since.

343.    Defendant Kochevar made the following sales of Charles River stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $191.61 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 8/7/20 | 2,319 | $216.24 | $501,460.56 | $451,973.10 | $49,487.46 |
| 8/6/21 | 987 | $406.43 | $401,146.41 | $192,366.30 | $208,780.11 |
| 8/6/21 | 2,539 | $406.43 | $1,031,925.77 | $494,851.10 | $537,074.67 |

| | | | Totals: | $1,934,532.74 | | $795,342.24 |
|---|---|---|---|---|---|---|

344.     These sales amount to approximately **23 times** her $83,750 in director fees, and over **5 times** her total compensation from the Company for the 2023 fiscal year. By selling her stock before the MNPI was disclosed to the public, Kochevar avoided losses of more than $795,000. She has not sold any Charles River stock since.

345.     Defendant Massaro made the following sales of Charles River stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $191.61 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 9/14/20 | 1,943 | $219.91 | $427,285.13 | $378,690.70 | $48,594.43 |
| 5/6/21 | 1,573 | $336.06 | $528,626.31 | $306,577.70 | $222,048.61 |
| 5/6/21 | 910 | $336.84 | $306,522.22 | $177,359.00 | $129,163.22 |
| 5/6/21 | 288 | $338.06 | $97,362.29 | $56,131.20 | $41,231.09 |
| 5/6/21 | 600 | $338.98 | $203,386.02 | $116,940.00 | $86,446.02 |
| 5/11/21 | 30 | $316.75 | $9,502.35 | $5,847.00 | $3,655.35 |
| 5/11/21 | 56 | $319.42 | $17,887.76 | $10,914.40 | $6,973.36 |
| 5/11/21 | 174 | $320.19 | $55,713.20 | $33,912.60 | $21,800.60 |
| 5/11/21 | 110 | $321.06 | $35,316.13 | $21,439.00 | $13,877.13 |
| 5/11/21 | 1 | $323.29 | $323.29 | $194.90 | $128.39 |
| 8/31/21 | 2,539 | $442.48 | $1,123,456.72 | $494,851.10 | $628,605.62 |
| 5/9/22 | 178 | $230.96 | $41,110.88 | $34,692.20 | $6,418.68 |
| | | Totals: | $2,846,492.29 | | $1,208,942.49 |

346.     These sales amount to over **24 times** his $115,000 in director fees, and over **7 times** his total compensation from the Company for the 2023 fiscal year. By selling his stock before the MNPI was disclosed to the public, Massaro avoided losses of more than $1.2 million. In the years since the truth was disclosed to the market on March 15, 2023, Massaro has sold over $133,000 worth of Charles River stock.

347.     Defendant Wallman made the following sales of Charles River stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $191.61 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 2/18/22 | 2,800 | $297.50 | $833,000.00 | $545,720.00 | $287,280.00 |
| 2/18/22 | 425 | $295.00 | $125,375.00 | $82,832.50 | $42,542.50 |
| 2/18/22 | 725 | $295.00 | $213,875.00 | $141,302.50 | $72,572.50 |
| 2/22/22 | 3,250 | $288.05 | $936,162.50 | $633,425.00 | $302,737.50 |
| | | Totals: | $2,108,412.50 | | $705,132.50 |

348.    These sales amount to over **25 times** his $83,750 in director fees, and over **6 times** his total compensation from the Company for the 2023 fiscal year. By selling his stock before the MNPI was disclosed to the public, Wallman avoided losses of more than $705,000. He has not sold any Charles River stock since.

349.    Defendant Chubb made the following sales of Charles River stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $191.61 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 8/18/20 | 1,000 | $217.65 | $217,650.00 | $194,900.00 | $22,750.00 |
| 2/23/21 | 658 | $281.66 | $185,332.28 | $128,244.2 | $57,088.08 |
| | | Totals: | $402,982.28 | | $79,838.08 |

350.    These sales amount to over **6 times** his $65,000 in director fees, and over **1.3 times** his total compensation from the Company for the 2020 fiscal year. By selling his stock before the MNPI was disclosed to the public, Chubb avoided losses of more than $79,000. He has not sold any Charles River stock since.

351.    Defendant Milne made the following sales of Charles River stock before the MNPI was disclosed to the public:

| Date | Shares Sold | Avg. Price per Share | Proceeds | Value at $191.61 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 3/1/21 | 3,530 | $290.01 | $1,023,735.30 | $687,997.00 | $335,738.30 |
| | | Totals: | $1,023,735.30 | | $335,738.30 |

124

352.     These sales amount to over **9 times** his $105,000 in director fees, and over **2 times** his total compensation from the Company for the 2021 fiscal year. By selling his stock before the MNPI was disclosed to the public, Milne avoided losses of more than $335,000. He has not sold any Charles River stock since.

353.     Following the disappointing March 15, 2023 disclosures, the price of Charles River's stock declined from a closing price on March 14, 2023 of $205.02 per share to close at $194.90 per share, a decline of $10.12 per share approximately 5% on heavier than usual trading volume. This is far below the price at which the Insider Selling Defendants had sold their own Charles River shares during the Relevant Period.

354.     As a result of the wrongful conduct alleged herein, the Company suffered significant damage.

## **FIDUCIARY DUTIES**

355.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Charles River and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Charles River in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Charles River and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

356.     Each Individual Defendant owes and continues to owe Charles River and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

357.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of Charles River, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Charles River, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

358.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements – including requirements involving the filing of the accurate financial and operational information with the SEC – and refrain from engaging in insider trading and other deceptive conduct;

(b)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States and pursuant to Charles River's own Code of Conduct;

(c)    Conduct the affairs of the company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)    Remain informed as to how Charles River conducted its operations and, upon receipt of notice of information of imprudent or unsound conditions or practices, make a

reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Charles River, as well as procedures for reporting said reports and records to the Board, and periodically investigate, or cause independent investigation to be made or, said reports and records;

(f)    Maintain and implement an adequately functioning system of internal legal, financial, and management controls such that Charles River's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

(g)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)    Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subject and duties set forth above; and

(i)    Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

359.    The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein and the content of the various public

statements issued by Charles River.

360.    At all times relevant hereto, the Individual Defendants were the agents of each other

and of Charles River and were at all times acting within the course and scope of such agency.

**Duties Pursuant to the Company's Code of Business Conduct**

361.    The Individual Defendants, as officers and/or directors of Charles River, were

bound by the Company's Code of Business Conduct and Ethics[23] ("**Code of Conduct**"), which

provides:

> The Code applies to all employees, officers and directors of Charles River. It also applies
> to our consultants and agents in the work they do for the Company. In addition, we expect
> our suppliers, vendors and other business partners to comply with the high ethical and legal
> standards described in the Code, as well as those described in our Supplier Code of
> Conduct.
>
> The Code applies everywhere we do business. It applies in our facilities, the facilities of
> our clients when we work there and during all other work-related activities wherever
> located, including offsite events and business trips. It applies in our dealings with our
> shareholders, the public, governments and even our competitors. In other words, it applies
> any time we represent Charles River.
>
> As a global company headquartered in the United States, some of our activities are
> regulated by both U.S. laws and local laws and regulations. If you are not sure which laws
> or policies apply, or if you think that there may be a conflict between applicable laws or
> between local laws and our policies, should ask you manager or the Legal Compliance
> team. Regardless of where you are located, Charles River's commitment to the highest
> ethical standards applies to all business activities.

362.    Under the "Responsibilities" section of the Code of Conduct, a subsection titled

"What Happens When Someone Violates the Code?" states the following:

> Anyone who violates the Code may be subject to disciplinary action,
> up to and including termination of employment. In some situations,
> violations may also result in civil or criminal penalties for you, your
> manager and/or the Company.

---

[23] *See* Charles River Code of Business Conduct and Ethics (Dec. 31, 2021)
https://www.criver.com/sites/default/files/noindex/legal-compliance/code-business-conduct-
ethics-en.pdf?_ga=2.206992660.60565945.1718896209-846232745.1718631345

363.    Under the "Responsibilities" section of the Code of Conduct, a subsection titled "Our Commitment to Non-Retaliation" states the following:

> We do not tolerate retaliation against anyone who raises concerns about a violation of the law, the Code or Company policy in good faith. Company resources should never by used to make a report that you know is false or misleading. Concerns about retaliation directed toward anyone who honestly reports a concern should be reported immediately to Legal Compliance or the Legal Department for appropriate action.

364.    Under the "Care" section of the Code of Conduct, a subsection titled "Promoting a Safe, Healthy and Sustainable Workplace" states the following:

> As a good corporate citizen, Charles River is committed to safeguarding the environment and the health and safety of our employees, visitors, customers, and the communities in which we operate.

365.    Under the "Care" section of the Code of Conduct, a subsection titled "Working Safely" states the following:

> Charles River strives to provide a safe and healthy workplace for all employees, visitors, customers, and the communities in which we operate. We adhere to all applicable health and safety regulations[.] Ultimately, however, maintaining safety in the workplace is a personal responsibility. Each of us is responsible for knowing the rules and complying with all health and safety procedures that apply to our jobs. We understand that safety is a critical part of maintaining a healthy workforce, and we encourage all employees to report unsafe conditions to manager immediately. You are encouraged to identify opportunities to improve the safety of our operations.

366.    Under the "Care" section of the Code of Conduct, a subsection titled "Protecting the Environment" states the following:

> Charles River is committed to protecting the environment and conducting our business in an environmentally sustainable manner. We adhere all applicable environmental regulations governing such areas as waste disposal, water discharges and air emissions. In addition, we pursue solution that help to make our business more environmentally sustainable. We can all help reduce Charles River's environmental impact by conserving natural resources whenever

129

possible and making suggestions that could reduce energy usage, water consumption and eliminate waste.

367.    Under the "Care" section of the Code of Conduct, a subsection titled "Understanding the Laws and Policies Relating to the Animals in Our Care" states the following:

> We are committed to compliance with both the letter and spirit of the laws and regulations relating to the care and use of research animals and to the other services and products we offer to support the activities of our clients. Since we operate in a highly regulated environment, we must all be vigilant in meeting and going beyond our responsibilities to comply with relevant laws and regulations and in complying with all applicable policies and operating procedures.

368.    Under the "Care" section of the Code of Conduct, a subsection titled "Humane Treatment of Animals" states the following:

> Our Company's CARE value includes our commitment to the humane care of the research animals we produce and with which we work. Non-compliance with our policies disregarding humane care and use of research animals is not tolerated and will result in disciplinary action, up to and including termination of employment.

> Any work at Charles River that involves research animals is closely connected to our Humane Care Imperative. The goal of our Humane Care Imperative is to ensure that Charles River continues to be a worldwide leader in the humane care and treatment of laboratory animals. The Humane Care Imperative accomplishes this by raising awareness and providing training to all employees on the importance of humane care, including how appropriate care can affect the success of drug development and how to report animal welfare concerns. This includes, among other things, recognizing and accepting responsibility for the well-being of our research animals and handling animals with care and compassion. We recognize that humane care is not only a scientific necessity but a moral imperative, and we embrace our responsibility to both the scientific community and the public for the health and well-being of the animals in our care.

369.    Under the "Care" section of the Code of Conduct, a subsection titled "Biosecurity" states the following:

Every employee contributes in his or her own way to biosecurity and the safety of animals. Each of us must consistently follow the procedures, processes, rules and performance expectations established by Charles River to ensure animal safety and to prevent genetic and microorganism contamination of the animals that we use and produce that would make the unsuitable to our clients and to us. These biosecurity-oriented workplace standards and practices include:

- o Appropriate techniques for entering restricted areas such as barrier rooms;
- o Use of protective clothing and equipment;
- o Rules about the movement of animals, including unauthorized removal from a site;
- o Restrictions on employee-animal contact outside of Charles River (where specified); and
- o Application of appropriate disinfection techniques for equipment and supplies.

Disregarding these, as well as established barrier room and animal handling procedures, can result in grave consequences to our facilities and can result in an employee's immediate dismissal.

370. Under the "Care" section of the Code of Conduct, a subsection titled "Ensuring Product Quality" states the following:

Scientific excellence and outstanding client service are two of the cornerstones of Charles River's corporate culture. It is essential that we strive to meet or exceed the expectations of our stakeholders (including our employees, business partners, customers, suppliers and service providers) by consistently providing high quality products and services. We maintain our high standards of quality through rigorous management of key performance indicators, effectively managing risks faced across the entire organization and acting ethically and responsibly in everything we do. However, identifying alteration in quality is not enough. Each of use must take ownership of our quality culture by:

- o Performing tasks with the highest level of integrity;
- o Maintaining communication and awareness both internally and externally;
- o Understanding and complying with all regulatory requirements, policies, and operating procedures; and
- o Maintaining a commitment to continuous improvement.

371.     Under the "Care" section of the Code of Conduct, a subsection titled "Maintaining

Data Integrity" states the following:

> As a company, we recognize the importance of generating quality and reliable data to ensure consistency in our approach to data integrity. Data integrity is defined as the degree to which data are complete, consistent, accurate, trustworthy and reliable throughout the data lifecycle. The Charles River global data integrity governance program applies to all data, especially data generated in support of regulated activities as conducted by our various business units in compliance with applicable regulations. Because we view data integrity as a key asset, data should:
>
> o   Be collect and maintained in a secure manner that is attributable, legible, contemporaneously recorded, original (or a true copy) and accurate;
> o   Have appropriate quality and risk management systems, including adherence to sound scientific principles and good documentation practices, and
> o   Comply with ALCOA+ principles (Attributable, Legible, Contemporaneous, Original and Accurate, plus complete, consistent, enduring and available).

372.     Under the "Care" section of the Code of Conduct, a subsection titled "Being Good

Corporate Citizens" states the following:

> Charles River embraces its role as a responsible corporate citizen. Every day, we have the ability to make a difference. Through our Corporate Citizenship program, we can be the difference – to the animals under our care, to the patients who rely on the treatments we are helping to develop, to our employees, and to our planet. Our commitment to improve lives is founded in operating our business responsibly and extends beyond the discovery and development of therapeutic cures to the communities where we live and work.

373.     Under the "Care" section of the Code of Conduct, a subsection titled "Protecting

Human Rights" states the following:

> Charles River is committed to operating its global business ethically, responsible and in accordance with all applicable laws, directives, regulations and codes governing human rights. This commitment to human rights not only applies to our Company but to our global supply chain and business partners as well. Charles River expects

132

all stakeholders to:

- o Comply with applicable laws and regulations relating to human rights;
- o Offer fair and equitable wages, benefits and working hours;
- o Provide clean and safe working conditions;
- o Allow for freely chosen employment and freedom of association;
- o Prohibit human trafficking and forced, bonded or illegal child labor; and
- o Ensure that metals and other materials contained in our products are sourced, produced and used in an ethical and responsible manner.

374. Under the "Lead" section of the Code of Conduct, a subsection titled "Avoiding Conflicts of Interest" states the following:

> Each of us has a responsibility to act in the best interest of Charles River to avoid conflicts of interest. Conflicts of interest can arise when our personal interests or personal relationships influence our judgment (including our scientific objectivity), interfere with our work for Charles River or make it difficult to perform our work fairly and without bias. All employees, officers and directors must avoid situations in which personal interests conflict – or even appear to conflict – with the interests of the Company or our clients.

375. Under the "Lead" section of the Code of Conduct, a subsection titled "Exchanging Appropriate Business Courtesies" states the following:

> Appropriate business courtesies (including gifts, entertainment and hospitality) are common in many cultures and can be an effective way to strengthen our business relationships. At the same time, business courtesies can create legal and ethical concerns and can hinder our ability to make fair and impartial decisions. At Charles River, there are important restrictions on giving and accepting business courtesies that apply to all directors, officers and employees. We must ensure that our actions comply with the law and Charles River policies, and that the business courtesy does not impact the recipient's objectivity.

376. Under the "Lead" section of the Code of Conduct, a subsection titled "Preventing Bribery and Corruption" states the following:

133

> At Charles River, we do not participate in any form of bribery or corrupt business practices. This policy applies to all aspects of our business and in all countries in which we operate, even where local laws or customs are less restrictive. It applies to anyone with whom we interact when conducting our business, including government officials as broadly defined.
>
> * * *
>
> Charles River will comply with all applicable anti-bribery and anti-corruption laws, including the U.S. Foreign Corrupt Practices Act (FCPA) and the Bribery Act 2010 (United Kingdom). Any payments, benefits or favors that are made must be fully and accurately reflected in our financial records.

377.  Under the "Lead" section of the Code of Conduct, a subsection titled "Working with Third Parties" states the following:

> Charles River relies on third-party partners to bring our products and services to market, including agents, consultants, contractors, brokers, and suppliers. Whenever a third-party partner represents Charles River or our commercial interests, we expect those third parties to act in accordance with the principles outlined in this Code, as well as those covered in other Charles River policies, including our global Anti-Bribery Policy.
>
> Before partnering with third parties who will be representing Charles River or acting on our behalf, we must use care and ensure that such third party is qualified to perform the tasks they will be performing on our behalf, including conducting appropriate screening and due diligence. All third-party partners must be committed to legal and ethical business conduct that at least meets Charles River standards.

378.  Under the "Lead" section of the Code of Conduct, a subsection titled "Preventing Money Laundering" states the following:

> As part of our commitment to financial integrity in all of our business dealings, Charles River strictly prohibits the use of Company resources for money laundering purposes. "Money laundering" refers to an illegal process that individuals and organizations use to make proceeds of their crimes appear legitimate. It is important that we know and comply with all laws and regulations intended to prevent money laundering. Likewise, we should only conduct business with reputable customers who are

involved in legitimate business activities and use funds derived from legitimate sources.

379.    Under the "Lead" section of the Code of Conduct, a subsection titled "Upholding Director and Officer Fiduciary Duties" states the following:

> Charles River directors and officer owe fiduciary duties to the shareholders of the Company, including the duty of care and the duty of loyalty. The duty of loyalty obligates each Charles River director and officer, in performing his or her duties, to put the interests of the Company ahead of his or her personal interests. The duty of care obligates each Charles River director and officer, in taking any corporate action, to act on an informed basis, in good faith and in a manner they reasonably believe to be in the best interests of the Company, and with such care as a reasonable person would use under similar circumstances. In exercising their fiduciary duties, Charles River directors and officer acknowledge that their responsibilities are to the shareholder base in its entirety (and not to any subset of the shareholder base or to any entity with which a director or officer may have a separate affiliation), and commit to consider shareholder interests without regard to the size of shareholdings.

380.    Under the "Own" section of the Code of Conduct, a subsection titled "Managing and Using Company Assets" states the following:

> Charles River assets include all of the property that the Company owns or uses to achieve our business objectives, ranging from the physical property we own, the finances we manage, the land on which we operate, the right we negotiate in our contracts, and even the ideas and information we create. Employees are required to work responsibly with all Charles River assets, as well as assets we manage for our partners and clients.

381.    Under the "Own" section of the Code of Conduct, a subsection titled "Protecting Proprietary and Confidential Information" states the following:

> Charles River's confidential and proprietary information has tremendous value to the Company. Protecting this information from unauthorized use of disclosure is vital to our continued growth and ability to compete. As a general rule, you should assume that any information you generate or learn on the job is confidential and should not be disclosed to others without authorization.

135

* * *

Our clients and business partners trust us with their proprietary and confidential information and we must always protect it in order to maintain their trust and confidence. We must never use client or business partner information for personal gain or disclose it to others without specific authorization.

* * *

You should not disclose confidential information to anyone outside the Company, unless you are authorized to do so by the Company or required by law and you follow all required procedures. You also avoid sharing confidential information with others inside the Company unless they have a need to know the information to do their jobs.

382.     Under the "Own" section of the Code of Conduct, a subsection titled "Ensuring Privacy and Protecting Personal Data" states the following:

Each of us, and each of our business partners, has a right to expect that Charles River will protect privacy whenever it collects, processes, uses, transfers or stores our personal data. As a Company, we adhere to all applicable laws and regulations relating to the protection of personal data. The careful handling and lawful treatment of personal data helps preserve confidence in the Company and enables successful business operations.

Protecting personal data is a critical responsibility of each of us and you help us uphold this commitment by:

o   Observing all applicable privacy laws and regulations
o   Collecting, processing and retaining only that personal data which is necessary for a specific purpose
o   Following company policies, procedures, and processes for data protection
o   Raising privacy concerns and reporting any potential breaches of personal data to the global Privacy team

383.     Under the "Own" section of the Code of Conduct, a subsection titled "Using Information and Communication Systems and Devices Appropriately" states the following:

Charles River's electronic systems, accounts and devices, as well as the information and data on them, are provided to employees to enable all of us to do our jobs effectively. Employees are responsible for using these electronic systems, accounts, and devices in a secure

136

and appropriate manner to prevent misuse, improper access, damage and theft. We must never use these systems, accounts or devices that are unlawful, unethical or contrary to the standards and expectations set forth in this Code.

* * *

Any using a Charles River-provided electronic device acknowledges that the Company may review the information contained on the device at any time, including any data stored, sent or received, unless prohibited by local laws.

384. Under the "Own" section of the Code of Conduct, a subsection titled "Preparing and Maintaining Accurate Records" states the following:

All Charles River employees are responsible for helping to ensure that our books and records are complete, accurate, and reliable and updated timely. We must never be dishonest or deceptive in creating or maintaining Company records, or attempt to mislead Company clients, management, auditors, regulators or investors. We must also use care in all of our communications, including emails, instant messages and texts.

* * *

We are responsible for helping to ensure that the information we record, process and analyze is accurate and thorough and recorded in accordance with applicable laws, accounting principles, and Company policies. This standard applies to all of the records we make in the conduct of our business and all reports on our performance. Each of us has a responsibility to ensure that the information we contribute to Charles River's business records is complete, accurate and timely.

385. Under the "Own" section of the Code of Conduct, a subsection titled "Dealing in Securities: Insider Trading" states the following:

As you do your job, you may become aware of material information about Charles River, a client or supplier or another company before it is announced to the public. You may not sell or buy a company's stock or other securities while you have material inside information about that company. It is also against the law and Company policy to share or "tip" material inside information to anyone (including a family member or friend) who uses that information not trade or to simply recommend that they buy or sell that company's securities. Material inside information should not be disclosed to anyone, except to those within Charles River who need to know it as part of

137

their jobs and to others outside the Company, to the extent that you have been specifically authorized to disclose it to them.

* * *

To avoid even the appearance of improper trading, to prevent inadvertent violations of the insider trading rules, and to make sure that the interests of directors, officers and employees who invest in Company stock are aligned with the interests of our other shareholders, you should not trade in options or enter into any hedging transactions, purchases on margin, speculative trading or pledges involving Charles River stock and securities.

Charles River policy subjects our directors, senior officers and certain other employees to additional restrictions on trading in Company securities because of their regular access to confidential information as part of their responsibilities.

386.    Under the "Collaborate" section of the Code of Conduct, a subsection titled

"Protecting Our Reputation with Accurate Communications" states the following:

Our reputation is one of our most valuable assets. Each of us must strive to protect and enhance our Company's reputation in all that we do. Our filings and disclosures that we make to the public about our business performance and financial results, including our filings with regulatory authorities (such as the U.S. Securities and Exchange Commission) must be full, fair, accurate, timely and understandable. We must not mislead the government, our clients, our investors or the public. Employees who have a role in preparing our public disclosures and our filings with regulatory authorities have a special responsibility to help us meet these standards. We have also formed a Disclosure Committee consisting of senior management to monitor our disclosures to the public.

To help protect our reputation and brand, we must ensure that communications to the public by or on behalf of the Company are (1) factually accurate, (2) timely, (3) effective, and (4) compliant with applicable laws. Accordingly, only a limited number of Charles River employees are authorized to speak publicly on behalf of the Company which enables leadership and management to ensure clarity and prevent conflicting messages. This includes communications to the media, market professionals and investors.

387.    Under the "Collaborate" section of the Code of Conduct, a subsection titled

"Dealing and Competing Fairly" states the following:

We compete in the marketplace on the basis of our therapeutic and scientific expertise, our quality, reputation, flexibility, responsiveness, pricing, innovation and global capabilities. Our goal is to be a leader in each of the markets in which we operate.

We deal fairly with our clients, suppliers and competitors. We must be professional and never take unfair advantage through manipulation, misleading statements or misinformation or any other conduct that involves improper or questionable business practices. We must always be truthful and accurate about our products and services. We must also be impartial and fair in our selection of suppliers, basing our decisions on objective factors, such as quality, price, service and reliability.

We must never make any false or misleading statements about our competitors or use improper means to get confidential or proprietary information about a competitor from a client, competitor or any other source.

* * *

We believe in fair and vigorous competition. We are committed to full compliance with all applicable competition laws, including the U.S. antitrust laws which apply to our business activities in every part of the world.

We must not engage in any activity that would be viewed as fixing prices, unfairly restraining trade or keeping competitors out of any market. As a result, we must avoid any communications with competitors that touch upon prices, costs, clients, terms or conditions of sale, allocating markets or clients, territories, market strategies, client or supplier boycotts, limits on production or services and other competitive information.

388.    Under the "Collaborate" section of the Code of Conduct, a subsection titled "Doing Business with the Government" states the following:

While we act with the highest level of integrity and honest with all clients, special rules apply when we do business with the government. Violations of government procurement laws could result in substantial penalties for our Company, and in some cases, the individual employees involved. In all of our dealings with actual or potential government clients, these basic rules should be followed:

o   Ensure that all costs are properly and accurately charged and

139

recorded, including proper time charging for hours worked.
- o Ensure that all invoices which the Company submits to the government are accurate and complete and comply with the applicable procurement regulations.
- o Be truthful and accurate in all representations and certifications make to government agencies.
- o Never ask or use another company's bid or proposal information, non-public government source selection information, or other proprietary or confidential information.

* * *

- o Never try to restrict a subcontractor from also selling their products and services directly to the government.
- o Strictly follow the specific requirements of each contract and the laws and regulations referenced in each contract.
- o Never discuss employment or consulting opportunities with any current or former government employee without first consulting with the Legal Department.
- o Immediately disclose any suspected legal or regulatory violations involving government clients to Legal Compliance or through the Charles River Helpline.

389.    Under the "Collaborate" section of the Code of Conduct, a subsection titled

"Complying with International Trade Requirements" states the following:

> The laws governing global trade practices are complex and subject to frequent change. As a global business, Charles River must comply with international agreements and conventions, as well as the national, regional and local laws and regulations that apply to our international business. Each of us must also follow all Company policies and procedures when conducting business across jurisdictions, including:
>
> - o Maintaining required certifications, standards, procedures and other documentation
> - o Properly classifying and recording all imported or exported goods, services and technology
> - o Complying with all laws and regulations governing the importing or exporting of goods, services and technology, including obtaining appropriate licenses
> - o Furnishing accurate and complete information to any customs official or anyone we engage to facilitate our imports and exports, including accurate payment of customs duties and taxes
>
> The Company is also subject to laws that prohibit transactions with certain countries, organizations or people, and laws concerning our

140

participation in international boycotts.

390.    Under the "Collaborate" section of the Code of Conduct, a subsection titled

"Engaging in Lobbying and Political Activities" states the following:

> Charles River complies with the many laws that regulate political
> contributions and activities. Even when the law allows political
> contributions to be made, because the purpose of political
> contributions and activities may be viewed with suspicion in some
> situations, Charles River will not fund or support any political party
> or official or any candidate for public office without the prior
> approval of our Chief Executive Officer, Chief Financial Officer and
> General Counsel.
>
> We also comply with the laws that regulate any contacts we may
> have with legislators or other to influence legislation or
> administrative actions.

391.    Under the "Collaborate" section of the Code of Conduct, a subsection titled

"Cooperating with Government Inquiries and Investigations" states the following:

> From time to time, the Company may receive an inquiry from a
> government agency or entity. This could include requests for
> information, notices of an investigation or service of a subpoena.
> When this happens, it is important that we cooperate fully and
> respond in an organized way.
>
> *  *  *
>
> In all situations, we must ensure that the information we provide in
> response to these inquiries is accurate and truthful.

## Duties Pursuant to the Audit Committee Charter

392.    In addition to these duties set forth in the Code of Conduct, Defendants Bertolini,

Llado, Massaro, Wilson and Chubb (the "**Audit Committee Defendants**"), who served on the

Audit Committee during the Relevant Period, owed specific duties to Charles River pursuant to

the Charles River Laboratories International, Inc. Audit Committee Charter[24] (the "**Audit**

---

[24] *See* Charles River Laboratories International, Inc. Audit Committee Charter (October 26,

Charter"), as set forth in part below.

393.   Specifically, the Audit Charter states that the Audit Committee was created to "assist the Board [of directors] in its oversight of:

- the integrity of the financial statements of the Company;
- the qualifications, independence and performance of the Company's independent auditor;
- the performance of the Company's internal audit function; and
- compliance by the Company with legal and regulatory requirements with respect to financial reporting matters; and

-   prepare the Committee report that Securities and Exchange Commission ("SEC") rules require to be included in the Company's annual proxy statement."

394.   With respect to oversight by the Board, the Audit Charter states the following:

-   The Committee will report its activities to the full Board periodically. This report will include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements with respect to financial reporting matters, the qualifications, independence and performance of the Company's independent auditor, the performance of the internal audit function, and any other matters that the Committee deems appropriate or is requested to be included by the Board. The Committee will perform all duties determined by the Board.

-   The Board will determine annually that the Committee's members are independent and that the Committee has fulfilled its duties and responsibilities.

-   At least annually, the Committee will evaluate its own performance and report to the Corporate Governance and Nominating Committee on such evaluation.

-   The Committee will periodically, but not less than every three years, review and assess the adequacy of this charter and recommend any proposed changes to the Corporate Governance and Nominating Committee.

-   The Committee will provide input to the Compensation

2021) at:
https://ir.criver.com/static-files/675840a7-dd3d-42a0-8522-fc59c8f8340d.

Committee as to the compensation of the Company's Chief Financial Officer.

395.    The "Independent Auditor" section of the Audit Charter states that:

1. The Committee, as representatives of the shareholders, has the ultimate authority to select, evaluate and, where appropriate, replace the independent auditor to be proposed for shareholder approval in the proxy statement. The Committee will consider management's recommendation of the appointment of the independent auditor. The Committee will review with management the performance, appointment and/or termination of the independent public accountants.

2. The Committee has sole authority to approve all audit engagement fees and terms and all non-audit services to be provided by the independent auditor. The Committee may consult with management in the decision-making process, but may not delegate this authority to management.

* * *

3. The Committee will evaluate the independent auditors' qualifications, performance and independence and will present its conclusions and recommendations to the full Board on at least an annual basis. As part of such annual evaluation, the Committee will:

- obtain and review a report(s) from the Company's independent auditors:

    o describing the independent auditors' internal quality-control procedures,

    o describing any material issues raised by (i) the most recent internal quality-control review or peer review of the auditing firm, or (ii) any inquiry or investigation by governmental or professional authorities within the preceding five years, regarding one or more independent audits carried out by the auditing firm; and any steps taken to deal with any such issues, and

    o describing all relationships between the independent auditor and the Company; and assuring that Section 10A of the Securities Exchange Act of 1934 has not been implicated;

143

- review and evaluate the senior members of the independent auditor team(s), particularly the lead audit and reviewing partners;

- whether the lead audit or reviewing partner should be rotated more frequently than is required by law, so as to assure continuing auditor independence;

- consider whether the independent auditors should be rotated, so as to assure continuing auditor independence; and

- obtain the opinion of management and the internal auditors of the independent auditor's performance.

4. The committee will review with management and the independent auditor the Company's compliance with laws and regulations having to do with accounting and financial matters.

5. The Committee and the Board should consider whether the independent auditor should meet with the full Board to discuss any matters relative to the financial statements and/or any potentially relevant matters, and to answer any questions that other directors may have.

6. The Committee will establish policies for the Company's hiring of current or former employees of the independent auditor.

396.    The "Financial Statements, Disclosure and Other Risk Management and Compliance Matters" section of the Audit Charter states:

1. The Committee will review with management, internal auditors and the independent auditor, as appropriate, and in separate meetings if the Committee deems it appropriate:

- the annual audited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-Ks;

- the quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Company's Form 10-Qs;

- any analyses or other written communications prepared by management, the internal auditors and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative methods consistent with generally accepted accounting principles (GAAP) on the financial statements;

- the critical accounting policies and practices of the Company;

- review, and if appropriate, approve related party transactions in accordance with the Company's Related Person Transaction Policy

- off-balance sheet transactions and structures;

- any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

- regulatory and accounting initiatives or actions applicable to the Company (including any SEC investigations or proceedings);

- in conjunction with management, the Company's policies with respect to the Company's earnings press releases and all financial information, such as earnings guidance, provided to analysts and rating agencies, including the types of information to be disclosed and the types of presentation to be made and paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information; and

- the Company's policies and practices with respect to risk assessment and risk management, including discussing with management the Company's major financial risk exposures (including risks exposures related to environmental, social and governance matters) and the steps that have been taken to monitor and control such exposures.

2. The Committee will request from financial management and the independent auditor, a briefing on any significant accounting and reporting issues, including any changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, SEC or other regulatory bodies, that have an effect on the financial statements.

3. The Committee will inquire about the existence and substance of any significant accounting accruals, reserves, or estimates made by management that had a material impact on the financial statements.

4. The Committee will, in conjunction with the Chief Executive Officer and Chief Financial Officer of the Company, review the Company's internal controls and

disclosure controls and procedures, including whether there are any significant deficiencies in the design or operation of such controls and procedures, material weaknesses in such controls and procedures, any corrective actions taken with regard to such deficiencies and weaknesses and any fraud involving management or other employees with a significant role in such controls and procedures.

5. The Committee will review and discuss with the independent auditor any audit problems or difficulties and management's response thereto, including those matters required to be discussed with the Committee by the auditor pursuant to Public Company Accounting Oversight Board Statement on Auditing Standard No. 1301 (which has superseded Statement on Auditing Standards 61):

- any restrictions on the scope of the independent auditor's activities or access to requested information;
- any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise);
- any communications between the audit team and the audit firm's national office regarding auditing or accounting issues presented by the engagement; any management or internal control letter issued, or proposed to be issued, by the auditor; and
- any significant disagreements between the Company's management and the independent auditor.

6. The Committee will establish procedures for:

- the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and
- the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

7. The Committee will review any significant complaints regarding accounting, internal accounting controls or auditing matters received pursuant to such procedures.

8. The Committee will prepare the audit committee report that the SEC rules require to be included in the Company's annual proxy statement.

9. The Committee with review on a regular basis with appropriate management personnel the Company's overall information security risk environment.

397.    While the Audit Committee Defendants had clear responsibilities with respect to

ensuring that the Company complied with laws and regulations and that there were controls

regarding the accuracy of the Company's financial disclosures and the Company's

communications with the public, they failed to fulfill these responsibilities. In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and/or omissions of material fact described herein.

**The False and Misleading Proxy Statements**

398.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements filed on March 26, 2021, (the "**2020 Proxy**"), March 30, 2022 (the "**2021 Proxy**"), March 30, 2023 (the "**2022 Proxy**"), and March 29, 2024 (the "**2023 Proxy**").[25] The 2020 Proxy, 2021 Proxy, 2022 Proxy, and 2023 Proxy are collectively referred to herein as the "**Proxies**."

399.    The 2020 Proxy recommended that shareholders vote to elect Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Milne, Reese, Wallman, and Wilson to serve on the Board until the 2022 annual meeting. It also recommended that shareholders vote to ratify PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 25, 2021.

400.    The 2021 Proxy recommended that shareholders vote to elect Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Reese, Wallman, and Wilson to serve on the Board until the 2023 annual meeting. It also recommended that shareholders vote to ratify PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.

---

[25] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

401.    The 2022 Proxy recommended that shareholders vote to elect Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Reese, Thompson, Wallman, and Wilson to serve on the Board until the 2024 annual meeting. It also recommended that shareholders vote to ratify PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 30, 2023.

402.    The 2023 Proxy recommended that shareholders vote to elect Defendants Foster, Andrews, non-party Kemps-Polanco, Bertolini, Kochevar, Llado, Mackay, Massaro, Thompson, Wallman, and Wilson to serve on the Board until the 2025 annual meeting. It also recommended that shareholders vote to ratify PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 28, 2024.

403.    The 2020 Proxy stated the following regarding the Board's role in risk oversight at the Company:

> The Board oversees our risk oversight process and performs this oversight role using several different levels of review. In connection with its reviews of the operations of our business units and corporate functions, particularly during the annual strategic planning sessions, the Board is informed of the primary risks associated with those units and functions. Principally, the Board satisfies its responsibility through receiving regular reports from each committee chair regarding such committee's consideration and actions, as well as through receiving regular reports directly from officers responsible for oversight of our particular risks, including operational, financial, legal, regulatory, strategic and reputational risks. Such reporting enables the Board to understand our risk identification, management and mitigation strategies. The Company periodically reviews and evaluates its enterprise risk management (ERM) program, subsequently taking steps to further formalize and enhance the ERM program, the effect of which is to enhance the Board's ability to oversee their risk oversight responsibilities.
>
> Areas of risk oversight that generally remain at the Board level and are not delegated to any Committee include risks related to our operational regulatory matters (such as quality control and humane care), cybersecurity, data privacy and significant business decisions.

148

The Board satisfies this oversight responsibility through regular reports from our officers responsible for each of these risk areas, reports from Board committees and related discussions, as well as through periodic progress reports from officers on our critical ongoing initiatives. The Board also consults periodically with outside financial and other advisors it determines necessary.

Each of the Board's committees oversees the management of our risks that fall within the committee's areas of responsibility. A description of each committee's risk oversight focus is below. In performing this function, each committee has full access to management, as well as the ability to engage advisors. The chair of the relevant committee reports on key risks to the full Board at the next Board meeting. This enables the Board and its committees to coordinate the risk oversight role, particularly with respect to risk interrelationships.

404.    The 2020 proxy stated the following regarding the Company's Code of Business

Conduct and Ethics:

All of our employees and officers, including our Chief Executive Officer and Chief Financial Officer, and members of our Board, are required to abide by our global Code of Business Conduct and Ethics (Code). Our Code outlines the laws and policies that apply to our business, as well as an individual's responsibilities for maintaining a positive and ethical work environment and our resources for issues involving legal compliance or ethical business conduct. The Code is the foundation of our comprehensive Legal Compliance program, a global function that helps promote compliance with all corporate policies and procedures, an open relationship among colleagues that contributes to good business conduct and an abiding belief in the importance of the integrity of our employees. Our Code, together with related policies and procedures, covers areas of legal and professional conduct, including employment policies, conflicts of interest, intellectual property, data privacy and the protection of confidential information, as well as adherence to all laws and regulations applicable to the conduct of our business.

Employees are required to report any conduct that they believe to be an actual or apparent violation of the Code. Consistent with the Sarbanes-Oxley Act of 2002, we maintain procedures to receive, retain and treat complaints regarding accounting, internal accounting controls or auditing matters and to allow for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

> The full text of our Code is available on our website at www.criver.com, under the "Investors—Corporate Governance" caption. We will disclose any future material amendments to the Code and any waivers granted to any director or officer within the period required following the date of such amendment or waiver on our website.

405.    The 2021 Proxy, 2022 Proxy, and 20203 Proxy contained similar provisions to the 2020 Proxy regarding risk oversight and the Audit Committee's role in risk assessment and risk management.

406.    Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Thompson, Wallman, Wilson, Chubb, Milne, and Reese caused the Proxies to be false and misleading by failing to disclose that: (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the Proxies claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Code of Conduct with no consequences.

407.    Specifically, Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Thompson, Wallman, Wilson, Chubb, Milne, and Reese willfully or recklessly made and/or caused Charles River to make false and misleading statements that failed to disclose to investors that: (1) Charles River had engaged in illegal activity with respect to its importation of NHPs for research; (2) as a result, Charles River was at a heightened risk of criminal and regulatory investigation by, *inter alia*, the DOJ; and (3) as a result, Charles River would be forced to suspend shipments of primates from Cambodia. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

408. As a result of the Company's false and misleading statements in the Proxies, the Company's stockholders made uninformed decisions when voting to reelect the Individual Defendants as proposed in the Proxies.

## BREACHES OF DUTIES

409. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Charles River the absence of good faith on their part, and a reckless disregard for their duties to the Company.

410. The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the purchasing of long-tailed macaques from non-preferred suppliers of animals from Cambodia as described herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Charles River substantial damage.

411. The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Charle's River's public statements and internal control function.

412. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Charles River, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to

prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, Charles River has expended, and will continue to expend, significant sums of money.

## DAMAGES TO CHARLES RIVER

413.    As a direct and proximate result of the Individual Defendants' conduct, Charles River has expended and will continue to expend significant sums of money.

414.    Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action filed against the Company for violations of the federal securities laws. Charles River will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations and the ongoing government investigations into the Company, and payments associated with the aforementioned issues.

415.    As a direct and proximate result of the Individual Defendants' conduct, Charles River, has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

416.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

417.    Plaintiff brings this action derivatively and for the benefit of Charles River to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Charles River, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

418. Charles River is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

419. Plaintiff is, and has been continuously at all relevant times, a stockholder of Charles River. Plaintiff will adequately and fairly represent the interests of Charles River in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

420. Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

421. A pre-suit demand on the Board of Charles River is futile and, therefore, excused. At the time of filing this action, the Board consists of eleven directors: Defendants (i) Foster, (ii) Andrews, (iii) Bertolini, (iv) Kochevar, (v) Llado, (vi) Mackay, (vii) Massaro, (viii) Thompson, (ix) Wallman, and (x) Wilson (collectively, the "**Current Director Defendants**"), along with non-party (xi) Kemps-Polanco. Plaintiff needs only to allege demand futility as to a majority of the Directors who are on the Board at the time this action is commenced (*i.e.* six directors).

422. Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Board faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

423. Demand is excused as to all of the Current Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions regarding the purchasing of long-tailed macaques from non-preferred suppliers of animals from Cambodia. In complete abdication of their

fiduciary duties, the Current Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. This fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. The Current Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested. Demand upon them is futile and thus excused.

424.    Moreover, Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Wallman, and Wilson signed the 2020 10-K and the 2021 10-K. Defendant Foster signed the Q1 2020 10-Q, Q2 2020 10-Q, Q3 2020 10-Q, Q1 2021 10-Q, Q2 2021 10-Q, Q3 2021 10-Q, Q1 2022 10-Q, Q2 2022 10-Q, Q3 2022 10-Q, Q1 2023 10-Q, Q2 2023 10-Q, and Q3 2023 10-Q. All of these contained false and materially misleading statements and/or omitted facts, as alleged herein. Accordingly, Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Wallman, and Wilson made the false and misleading statements contained in those financial statements, breached their fiduciary duties, and face a substantial likelihood of liability. Thus, demand upon Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Wallman, and Wilson is futile and therefore excused.

425.    Additionally, all the Current Director Defendants signed the 2022 10-K, which contained false and materially misleading statements and/or omitted facts, as alleged herein. Accordingly, all of the Current Director Defendants made the false and misleading statements contained in those financial statements, breached their fiduciary duties, and face a substantial likelihood of liability. Thus, demand upon all the Current Director Defendants is futile and therefore excused.

426.    Further, Defendant Foster and the Audit Committee Defendants solicited the

Proxies. The Proxies were false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and therefore excused.

### A.  The Board Faces a Substantial Likelihood of Liability

427.    Demand is excused as to all of the Current Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability. The Director Defendants knowingly or recklessly make material misrepresentations and/or omissions for the purpose and effect of concealing the Company's financial well-being and prospects from the investing public and supporting the artificially inflated price of Charles River's securities. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested, and demand upon them is futile, and thus excused.

428.    Specifically, the 2020 10-K and the 2021 10-K was signed by Defendants Foster, Andrews, Bertolini, Kochevar, Llado, Mackay, Massaro, Wallman, and Wilson. All the Current Director Defendants signed the 2022 10-K. The Q1 2020 10-Q, Q2 2020 10-Q, Q3 2020 10-Q, Q1 2021 10-Q, Q2 2021 10-Q, Q3 2021 10-Q, Q1 2022 10-Q, Q2 2022 10-Q, Q3 2022 10-Q, Q1 2023 10-Q, Q2 2023 10-Q, and Q3 2023 10-Q were signed by Defendant Foster. All of these financial statements contained false and misleading statements and/or omitted material facts, as alleged herein. Accordingly, all of the Director Defendants made false and misleading statements, breached their fiduciary duties and face a substantial likelihood of liability. Thus, demand upon all of the Director Defendants is futile and therefore excused.

429.    The Current Director Defendants, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and

participating in efforts to conceal those wrongs.

430.    Additionally, the Current Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent the recurrence.

431.    Each of the Current Director Defendants: (1) authorized, signed, and/or permitted the false and misleading statements described herein, including the Company's 2020 10-K, 2021 10-K, 2022 10-K, Q1 2020 10-Q, Q2 2020 10-Q, Q3 2020 10-Q, Q1 2021 10-Q, Q2 2021 10-Q, Q3 2021 10-Q, Q1 2022 10-Q, Q2 2022 10-Q, Q3 2022 10-Q, Q1 2023 10-Q, Q2 2023 10-Q, and Q3 2023 10-Q, to be disseminated directly to the public and made available and distributed to shareholders; (2) authorized and/or permitted the issuance of various false and misleading statements; and (3) are principal beneficiaries of the wrongdoing alleged herein. Thus, the Current Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

432.    The Current Director Defendants, as members of the Board, were and are subject to Charles River's Code of Conduct. The Current Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Current Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

433.    The four current directors who engaged in insider trading (Defendants Foster, Kochevar, Massaro, and Wallman) also face a substantial likelihood of liability because they did so with scienter.

**B.      Four of the Eleven Directors Materially Benefitted from Insider Trading**

434.     Demand is excused as to the Fourth Claim (breach of fiduciary duty under insider trading) and the Fifth Claim (unjust enrichment) because four out of eleven members received a material personal benefit from this alleged misconduct. Specifically:

435.     Defendant Foster reaped over $68 million from insider sales. This is material to him because it amounts to nearly 46 times his $1,480,124 base salary and over 4 times his total compensation from the Company for the 2023 fiscal year.

436.     Defendant Kochevar reaped over $1.9 million from insider sales. This is material to her because it amounts to approximately 23 times her $83,750 in director fees, and over 5 times her total compensation from the Company for the 2023 fiscal year.

437.     Defendant Massaro reaped over $2.8 million from insider sales. This is material to him because it amounts to over 24 times his $115,000 in director fees, and over 7 times his total compensation from the Company for the 2023 fiscal year.

438.     Defendant Wallman reaped over $2.1 million from insider sales. This is material to him because it amounts to over 25 times his $83,750 in director fees, and over 6 times his total compensation from the Company for the 2023 fiscal year.

439.     The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

**C.  Additional Demand Futility Allegations**

440.     Defendant Foster has served as a Company director since 1989. He is presently the Company's President, CEO and Chair of the Board of Directors. He has been a director at all relevant times. The Company provides Foster with significant compensation for his position(s) at the Company, as detailed above. As the CEO during the Relevant Period, Foster was ultimately responsible for all of the false and misleading statements and omissions that were made during the

Relevant Period, including the 2020 10-K, 2021 10-K, and 2022 10-K, which he signed. Moreover, Foster solicited the Proxies, which contained material misrepresentations and omissions and contributed to the reelection of himself and Defendants Foster, Andrews, non-party Kemps-Polanco, Bertolini, Kochevar, Llado, Mackay, Massaro, Thompson, Wallman, and Wilson, allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Foster also engaged in insider trading, selling over 242,000 shares of artificially inflated Company common stock for personal profits in excess of $68 million. Furthermore, Foster is a defendant in the Securities Class Action. As a result, Foster received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Foster is futile and excused.

441.    Demand is further excused as to Defendant Andrews. Defendant Andrews has served as a Company director since 2020. The Company provides Defendant Andrews with significant compensation for her role as stated above. As such, Defendant Andrews cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Andrews render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Andrews received a material personal benefit, breached her fiduciary duties,

faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Andrews is excused.

442.     Demand is further excused as to Defendant Bertolini. Defendant Bertolini has served as a Company director since 2011. The Company provides Defendant Bertolini with significant compensation for his role as stated above. As such, Defendant Bertolini cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Bertolini render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Bertolini received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Bertolini is excused.

443.     Demand is further excused as to Defendant Kochevar. Defendant Kochevar has served as a Company director since 2008. The Company provides Defendant Kochevar with significant compensation for her role as stated above. As such, Defendant Kochevar cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Kochevar render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trust Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements.

Defendant Kochevar also engaged in insider trading, selling over 5,800 shares of artificially inflated Company common stock for proceeds of over $1.9 million. As a result, Defendant Kochevar received a material personal benefit, breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Kochevar is excused.

444.    Demand is further excused as to Defendant Llado. Defendant Llado has served as a Company director since 2020. The Company provides Defendant Llado with significant compensation for his role as stated above. As such, Defendant Llado cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Llado render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Llado received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Llado is excused.

445.    Demand is further excused as to Defendant Mackay. Defendant Mackay has served as a Company director since 2017. The Company provides Defendant Mackay with significant compensation for his role as stated above. As such, Defendant Mackay cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Mackay render him incapable of impartially considering a demand to commence

and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Mackay received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Mackay is excused.

446.    Demand is further excused as to Defendant Massaro. Defendant Massaro has served as a Company director since 2003. The Company provides Defendant Massaro with significant compensation for his role as stated above. As such, Defendant Massaro cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Massaro render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. Defendant Massaro also engaged in insider trading, selling approximately 8,400 shares of artificially inflated Company common stock for proceeds of over $2.8 million. As a result, Defendant Massaro received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Massaro is excused.

447.    Demand is further excused as to Defendant Thompson. Defendant Thompson has served as a Company director since 2022. The Company provides Defendant Thompson with significant compensation for his role as stated above. As such, Defendant Thompson cannot independently consider any demand to sue himself for breaching his fiduciary duties to the

Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Thompson render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Thompson received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Thompson is excused.

448. Demand is further excused as to Defendant Wallman. Defendant Wallman has served as a Company director since 2011. The Company provides Defendant Wallman with significant compensation for his role as stated above. As such, Defendant Wallman cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Wallman render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. Defendant Wallman also engaged in insider trading, selling approximately 7,200 shares of artificially inflated Company common stock for proceeds of over $2.1 million. As a result, Defendant Wallman received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Wallman is excused.

449. Demand is further excused as to Defendant Wilson. Defendant Wilson has served

as a Company director since 2019. The Company provides Defendant Wilson with significant compensation for her role as stated above. As such, Defendant Wilson cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Wilson render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Wilson received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Wilson is excused.

450.    Furthermore, Defendants Bertolini, Llado, Massaro, and Wilson have served as members of the Audit Committee during the Relevant Period. As such, they are responsible for the integrity of Charles River's financial statements. Specifically, the Audit Charter provides that the Audit Committee is responsible for "assist[ing] the Board [of directors] in its oversight of:

- the integrity of the financial statements of the Company;
- the qualifications, independence and performance of the Company's independent auditor;
- the performance of the Company's internal audit function; and
- compliance by the Company with legal and regulatory requirements with respect to financial reporting matters; and

- prepare the Committee report that Securities and Exchange Commission ("SEC") rules require to be included in the Company's annual proxy statement."

451.    In their capacities as Audit Committee members, Defendants Bertolini, Llado, Massaro, and Wilson reviewed and approved the materially misleading statements and allowed them to be disseminated in Charles River's SEC filings and other disclosures. Thus, Defendants Bertolini, Llado, Massaro, and Wilson breached their fiduciary duties, are not disinterested, and

demand is excused as to them for this additional reason.

452.    In violation of the Code of Conduct, the Current Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflict of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Current Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

453.    Charles River has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Director Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Charles River any part of the damages Charles River suffered and will continue to suffer thereby. Thus, any demand upon the Current Director Defendants is futile.

454.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Current Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Current Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to

pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

## **FIRST CLAIM**

### **Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

455.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

456.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

457.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

458.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. § 240.14a-9.

459.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and these approval (on an advisory basis) of executing compensation.

460.    The false and misleading elements of the annual Proxies led to the re-election of several of the Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to Charles River.

461.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

462.    Plaintiff, on behalf of Charles River, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

463.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

464.    The Individual Defendants, by virtue of their positions with Charles River and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Charles River and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Charles River to engage in the illegal conduct and practices complained of herein.

465.     Plaintiff, on behalf of Charles River, has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

466.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

467.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Charles River's business and affairs as directors and/or officers of the Company.

468.     Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision, causing the Company to engage in the misconduct described herein.

469.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly and recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

470.     The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material facts referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

471.     The Individual Defendants engaged in a sustained, systemic failure to properly

167

exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

472.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Charles River has sustained and continues to sustain significant damages. The Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities litigation, sever damages to the share price of the Company's stock, and an increased cost of capital. As result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

473.     Plaintiff, on behalf of Charles River, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Insider Selling Defendants
### *for Breach of Fiduciary Duty by Insider Trading*

474.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

475.     The Insider Selling Defendants owed the Company duties of loyalty, good faith, and care as officers and directors of the Company. This includes the duty not to trade in the Company's stock on the basis of MNPI. Nevertheless, the Insider Selling Defendants traded in the Company's stock while in possession of the MNPI described herein, reaping proceeds of over $88 million.

476.     As alleged above, the Insider Selling Defendants are Charles River's fiduciaries, possessed MNPI from Charles River, and used that information to improperly profit from sales of

Charles River stock. These defendants directed their stock sales set forth above due in whole or in part to their knowledge of the substance of the MNPI that they possessed.

477.    The Insider Selling Defendants knew that the investing public was unaware of the negative material information that they possessed when they sold their Charles River stock. They also knew that, if the information were disclosed, the market price of Charles River stock would be significantly lower. These defendants timed their stock sales to take advantage of the public's ignorance of the concealed facts described herein and obtain a higher price for the stock they sold, thus benefiting by misappropriating the Company's confidential information.

478.    As a direct and proximate result of the misconduct of the Insider Selling Defendants, Charles River has sustained significant damages, as alleged herein.

479.    Plaintiff, on behalf of Charles River, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

480.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

481.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Charles River.

482.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Charles River tied to the performance or artificially inflated valuation of Charles River, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant

Period.

483.     Moreover, the Insider Selling Defendants unjustly enriched themselves by selling over $88 million of Charles River common stock, inflated as a result of the Company's issuance of the false and misleading statements described herein

484.     Plaintiff, as a stockholder and a representative of Charles River, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

485.     Plaintiff, on behalf of Charles River, has no adequate remedy at law.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues so triable.

**<u>PRAYER FOR RELIEF</u>**

486.     **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Charles River, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached their fiduciary duties to Charles River;

C.     Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

D.     Finding that the Individual Defendants have been unjustly enriched;

E.     Determining and awarding to Charles River the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

F.      Directing Charles River and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Charles River and its stockholders from a repeat of the damaging events described herein;

G.      Awarding Charles River restitution from Individual Defendants;

H.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I.      Granting such other and further relief as the Court may deem just and proper.

Dated: August 2, 2024                          Respectfully submitted,

Of Counsel:                                    **FARNAN LLP**

Gregory M. Nespole                             /s/ Michael J. Farnan
Daniel Tepper                                  Brian E. Farnan (#4089)
Correy A. Suk                                  Michael J. Farnan (#5165)
Sidharth Kakkar                                919 N. Market St., 12th Floor
**LEVI & KORSINSKY, LLP**                      Wilmington, DE 19801
33 Whitehall Street, 17th Floor                (302) 777-0300
New York, NY 10004                             bfarnan@farnanlaw.com
T. 212.363.7500                                mfarnan@farnanlaw.com
F. 212.363.7171
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com
skakkar@zlk.com

Michael J. Hynes
Ligaya T. Hernandez
**HYNES & HERNANDEZ, LLC**
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
T. 484.875.3116
F. 484.875.9273
mhynes@hh-lawfirm.com
lhernandez@hh-lawfirm.com                      *Attorneys for Plaintiff*

171

**VERIFICATION**

I, Ross Weintraub, have authorized the filing of the attached Verified Stockholder Derivative Complaint.  I have read the Complaint, and the allegations therein are true to the best of my knowledge, information, and belief based upon information provided by counsel. I declare under penalty of perjury that the foregoing is true and correct.

2024-07-24
_____
Date

_____
Ross Weintraub